ACCEPTED
15-25-00055-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
10/7/2025 7:37 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00055-CV

# In the Court of Appeals for the Fifteenth District at Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
10/7/2025 7:37:59 PM
CHRISTOPHER A. PRINE
Clerk

**Frisco Summit, LP et al.,**
*Appellants,*

v.

**Frisco Multifamily GP, LLC et al.,**
*Appellees.*

On Appeal from the 493d District Court of Collin County, Texas,
Cause No. 493-01132-2023, the Honorable Christine Nowak, Presiding

## FRISCO SUMMIT'S BRIEF

Jim Moseley
William N. Drabble
**Gray Reed & McGraw LLP**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Email: jmoseley@grayreed.com
Email: wdrabble@grayreed.com

Mitchell Madden
Melissa Johnson
**Holmgren Johnson: Mitchell Madden, LLP**
12801 N. Cent. Expy., Suite 140
Dallas, Texas 75243
Telephone: (972) 484-7780
mmadden@hjmmlegal.com
melissa@hjmmlegal.com

*Counsel for Appellants*

**--- ORAL ARGUMENT REQUESTED ---**

## STATEMENT OF THE CASE

**Appellants**:     Frisco Summit, LP and Frisco Summit, LP derivatively on behalf of Frisco Multifamily Land Partners, LP

Trial and appellate counsel:

Mitchell Madden
State Bar No. 12789350
mmadden@hjmmlegal.com
Melissa Johnson
State Bar No. 19142900
melissa@hjmmlegal.com
HOLMGREN JOHNSON: MITCHELL MADDEN LLP.
12801 North Central Expressway, Suite 140
Dallas, Texas 75243
(972) 484-7780

Appellate counsel:

Jim Moseley
William N. Drabble
Gray Reed & McGraw LLP
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Email: jmoseley@grayreed.com
Email: wdrabble@grayreed.com

**Appellees**:     Frisco Multifamily Land GP, LLC; Carleton Development, Ltd.; GH Southwest II, Inc.; Frisco Summit I, LP; Frisco Summit I GP, LLC; Printice L. Gary; Jeffrey D. Fulenchek; and Neal R. Hildebrandt

Trial and appellate counsel:

Ryan D. Marrone
State Bar No. 24094567
FERGUSON BRASWELL FRASER KUBASTA PC
2500 Dallas Parkway, Suite 600
Plano, Texas 75093
Phone: 972-378-9111
Facsimile: 972-378-9115
E-Mail: rmarrone@fbfk.law

# TABLE OF CONTENTS

STATEMENT OF THE CASE ................................................................ii

TABLE OF CONTENTS ....................................................................iv

INDEX OF AUTHORITIES ...............................................................vii

STATEMENT OF THE CASE ...........................................................xiii

STATEMENT REGARDING ORAL ARGUMENT ............................xv

ISSUES PRESENTED ......................................................................xvi

STATEMENT OF FACTS ...................................................................1

    I.   The Joint Venture to Develop and Sell the Property .....................1

    II.   The LPA ................................................................................6

    III.  Development of Phase I ......................................................10

    IV.  The "Flip" Profit on the Phase I Property ...............................11

    V.   Completion of Phase I .........................................................13

    VI.  Development of Phase II ......................................................15

    VII.  The Appellees' Failure to Timely Develop Phases II and III..16

    VIII.  The Lawsuit ......................................................................18

        A.   Original filing and scheduling order ..................................18

        B.   Refusal to Grant Leave to Amend .....................................19

        C.   The court's summary judgment order .................................21

        D.   Bench trial .......................................................................21

        E.   Final Judgment, Findings of Fact and Conclusions of Law....22

SUMMARY OF THE ARGUMENT ....................................................22

STANDARDS OF REVIEW ...............................................................27

    I.   Summary Judgment..............................................................27

    II.   Findings of Fact and Conclusions of Law..............................29

    III.  Pleading Amendment..........................................................31

ARGUMENT ...................................................................................32

I. Appellees were not entitled to summary judgment on Frisco Summits' breach-of-fiduciary-duty, aiding-and-abetting, and conspiracy claims. ...................................................................... 32

   A.   No-evidence grounds ............................................................. 32

   B.   Traditional grounds ............................................................. 43

   C.   Because Frisco Summit's breach-of-fiduciary-duty claims survive summary judgment, so do its conspiracy and aiding-and-abetting claims. ........................................................................ 52

II.   The trial court's rulings on the time for performance under the JVA and LPA are legally and factually erroneous ............................. 53

   A.   The record evidence and the trial court's findings of fact and conclusions of law regarding the Appellees' obligations to develop the Property ..................................................................................... 53

   B.   The Trial Court erred in failing to imply a reasonable time for performance of the LPA. .............................................................. 56

III.   The trial court erred by failing to make the findings of fact and conclusions of law necessary to support its take-nothing judgment on Frisco Summit's claim for breach of the JVA ...................................... 59

IV.   Because the LPA is a partially integrated contract between different parties, it did not extinguish the JVA ................................. 64

   A.   The LPA is not "fully" integrated. .......................................... 66

   B.   The merger doctrine does not foreclose Frisco Summit's claims regarding timely development of the Property under the JVA ....... 69

   C.   The JVA is both collateral to and consistent with the LPA .... 71

V.   The trial court's finding that Frisco Multifamily GP did not breach §7.01(d)(ii) of the LPA is clearly erroneous. ............................ 74

VI.   Newly discovered evidence provided good cause for leave to amend and the trial court abused its discretion in denying it. .......... 75

VII.   This Court should reverse and remand Appellees' Attorney's Fees Award. ..................................................................................... 78

PRAYER ..................................................................................... 79

CERTIFICATE OF COMPLIANCE ............................................... 81

CERTIFICATE SERVICE .............................................................. 81

APPENDIX ...................................................................................................... 82

# INDEX OF AUTHORITIES

**Cases**

*AD Villarai, LLC v. Chan II Pak*,
519 S.W.3d 132 (Tex. 2017) (per curiam)..........................25, 59, 63, 64

*Agar Corp. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136 (Tex. 2019).......52

*Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420 (Tex. 1997) .....................29

*Asai v. Vanco Insulation Abatement, Inc.*,
932 S.W.2d 118 (Tex. App.—El Paso 1996, no writ).........................63

*Belanger v. BAC Home Loans Servicing, L.P.*,
839 F. Supp. 2d 873 (W.D. Tex. 2011)................................................44

*Boy Scouts of America v. Responsive Terminal Sys., Inc.*,
790 S.W.2d 738 (Tex. App.—Dallas 1990) .........................................27

*Brumley v. McDuff*, 616 S.W.3d 826 (Tex. 2021) ...................................50

*Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*,
445 S.W.3d 716 (Tex. 2014) (per curiam)....................................43, 49

*Cheek v. Metzer*, 291 S.W. 860 (Tex. 1927) ...........................................57

*Chen v. Parkwood Creek Owner's Ass'n, Inc.*,
No. 05-10-01511-CV, 2012 WL 3759032
(Tex. App.—Dallas Aug. 30, 2012, no pet.) .................................25, 57

*Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768 (Tex. 1999)............59

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005)............................30

*Clinton v. Gallup*, 621 S.W.3d 848
(Tex. App.—Houston [14th Dist.] 2021, no pet.)..............................63

*Cmty. Health Sys. Prof'l Serv. Corp. v. Hansen,*
525 S.W.3d 671 (Tex. 2017) .......................................................27, 28

*Comm'y Health Sys. V. Hansen,* 525 S.W.3d 671 (Tex. 2017) ...............33

*Dallas Morning News v. Tatum,* 554 S.W.3d 614 (Tex. 2018) ..............29

*Darocy v. Albidtrup,*
345 S.W.3d 129 (Tex. App.—Dallas 2011, no pet.) ...........................52

*Dow Chem. Co. v. Francis,* 46 S.W.3d 237 (Tex. 2001).....................30, 31

*Drew v. Belver,* No. 13-23-00341-CV,
2025 WL 2076881, at *8 (Tex. App.—Corpus Christi
July 24, 2025, no pet. h.) ...................................................................63

*Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867 (Tex. 2010) .......................45, 71

*ERI Consulting Eng'rs, Inc. v. Swinnea,*
318 S.W.3d 867 (Tex. 2010) ...........................................27, 45, 71, 73

*Exxon Mobil Corp. v. Rincones,* 520 S.W.3d 572 (Tex. 2017) .................29

*First United Pentecostal Church of Beaumont v. Parker,*
514 S.W.3d 214 (Tex. 2017) .......................................................28, 33

*Fish v. Texas Legislative Service,* No. 03-10-00358-CV, 2012 WL 254613
(Tex. App.—Austin Jan. 27, 2012, no pet.) .........................................48

*Fitz-Gerald v. Hull,* 237 S.W.2d 256 (1951)...........................................36

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,*
960 S.W.2d 41, 46 (Tex. 1998)..........................................................45

*Ganguly Holdings, LLC v. Ker-Seva Ltd.,*
2022 Tex. App. LEXIS 5342 (Tex. App.—Dallas 2022) .....................25

*Gaynier v. Ginsberg,* 715 S.W.2d 749
(Tex. App.—Dallas 1986, writ ref'd n.r.e.) .......................................... 41

*Graham Cent. Station, Inc. v. Pena,* 442 S.W.3d 261 (Tex. 2014).......... 59

*Graham Mortg. Corp. v. Hall,*
307 S.W.3d 472 (Tex. App.—Dallas 2010, no pet.) ........................... 33

*Great Am. Rsrv. Ins. Co. v. San Antonio Plumbing Supply Co.,*
391 S.W.2d 41 (Tex. 1965).................................................................. 29

*Gulbenkian v. Penn,* 252 S.W.2d 929 (Tex. 1952)................................. 29

*Hall v. Hall,* 308 S.W.2d 12 (Tex. 1957) ................................................ 57

*Hardy v. Commc'n Workers of Am. Local 6215,*
536 S.W.3d 38 (Tex. App.—Dallas 2017, pet. denied) ................. 23, 34

*Hart v. Bullion,* 48 Tex. 278 (1877)........................................................ 57

*Haynes v. Hawkes,* No. 05-17-00304-CV,
2018 WL 3134884 (Tex. App.—Dallas June 27, 2018, no pet.) ........ 47

*Heritage Res., Inc. v. Anschutz Corp.,*
689 S.W.2d 952 (Tex. App.—El Paso 1985, writ ref'd n.r.e) .............. 57

*In re Est. of Coleman,*
360 S.W.3d 606 (Tex. App.—El Paso 2011, no pet.) .......................... 34

*In re Marriage of CAS,*
405 S.W.3d 337 (Tex. App.—Dallas 2013, no pet.) ........................... 61

*ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.,*
234 S.W.3d 719 (Tex. App.—Eastland 2007, pet. denied)................. 67

*James L. Flanagan Shipping Corp. v. Del Monte Fresh Produce, Inc.,*
403 S.W.3d 360 (Tex. App.—Houston [1st Dist.] 2013, no pet.)........ 47

*James v. Witherite,* No. 05-17-00799-CV, 2018 Tex. App.
LEXIS 9214 (Tex. App.—Dallas Nov. 9, 2018, no pet.) ..................... 31

*Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex. 1986)................ 44

*Jones v. Martin K. Eby Const. Co., Inc.,*
841 S.W.2d 426 (Tex. App.—Dallas 1992, writ denied)............... 33, 63

*KIB Constr. Inc. v. Shipwash,*
582 S.W.3d 791 (Tex. App.—Houston [1st Dist.] 2019, no pet.)........ 50

*Kirby v. Cruce,* 688 S.W.2d 161
(Tex. App.—Dallas 1985, writ ref'd n.r.e.) ........................................ 36

*Latch v. Gratty, Inc.*, 107 S.W.3d 543 (Tex. 2003) ................................ 41

*Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572 (Tex. 2006) ...................... 28

*Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997) ........ 28

*Meza v. Honorcare Home Health, Inc.*, No. 04-17-00741-CV,
2018 WL 6793839 (Tex. App.—San Antonio
Dec. 27, 2018, no pet.) ................................................................... 47

*Moore v. Dillworth,* 179 S.W.2d 940 (Tex. 1944) ............................. 25, 57

*O'Donnell v. Roo Investment Fund II, LLC,* No. 05-23-00238-CV,
2024 WL 469558 (Tex. App.—Dallas Feb. 7, 2024, no pet.) ........ 24, 40

*Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.,*
2025 Tex. Bus. 9, ¶ 128, 709 S.W.3d 619, 646–47 (1st Div. 2025) ....38

*Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.,*
227 S.W.3d 46 (Tex. 2007)............................................................... 30

*Roark v. Allen*, 633 S.W.2d 804 (Tex. 1982) ........................................ 50

*Scott Equip., LLC v. Raza,* No. 01-23-00862-CV, 2025 WL 2413074 (Tex. App.—Houston [1st Dist.] Aug. 21, 2025, no pet. h.)...............74

*Sharyland Water Supply Corp v. City of Alton*, 3 54 S.W.3d 407 (Tex. 2011).........................................................45, 46

*Smith v. Smith*, 794 S.W.2d 823 (Tex. App.—Dallas 1990, no writ)...................................26, 66, 69, 79

*Sw. Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991) ... 44, 46

*Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678 (Tex. 2020)....................30

*Tex. Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647 (Tex. 2019)...............30

*Truly v. Austin*, 744 S.W.2d 934 (Tex. 1988) .........................................32

*USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479 (Tex. 2018)..........62

*Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).........................63

*Victory Park Mobile Home Park v. Booher*, No. 05-12-01507-CV, 2014 WL 1017512 (Tex. App.—Dallas Feb. 26, 2014, no pet.), ......................................................... 47, 48, 49

*Wagner v. Riske*, 178 S.W.2d 117 (Tex. 1944)........................................59

*Walker v. Anderson*, 232 S.W.3d 899 (Tex. App.—Dallas 2007, no pet.)30

*Walz v. Hayes*, No. 01-16-00277-CV, 2017 Tex. App. LEXIS 1557 (Tex. App.—Houston [1st Dist.] Feb. 23, 2017, pet. denied) ....73

*Warner v. Winn*, 197 S.W.2d 338 (Tex. 1946) ............................. 32, 36, 37

*West v. Quintanilla*, 573 S.W.3d 237 (Tex. 2019) .......................... passim

*Williams ex rel. Blackland Constr., Inc. v. Gottfried,*
   No. 03-22-00234-CV, 2024 WL 1745657, at *3
   (Tex. App.—Austin Apr. 24, 2024, no pet.) .................................. 10, 35

*Wood v. Wiggins*, 650 S.W.3d 533 (Tex. App.—Houston [1st Dist.] 2021,
   pet. denied) ........................................................................................ 75

**Statutes**

Tex. Bus. Orgs. Code Ann. §152.204 ..................................................... 37
Tex. Bus. Orgs. Code Ann. §206 ..................................................... 28, 37
Tex. Bus. Orgs. Code Ann. 152.213 ..................................................... 37

**Other Authorities**

Jim Wren, *Applying the Economic Loss Rule in Texas*, 64 Baylor L. Rev.
   204, (2012) .......................................................................................... 46
William J. Powers, Jr. & Margaret Nivers, *Negligence, Breach of
   Contract, and the "Economic Loss" Rule*, 23 Tex. Tech L. Rev. 477, 492
   (1992) .................................................................................................. 45

**Rules**

Tex. R. App. P. 39.1(c) ........................................................................ xiii
Tex. R. App. P. 44.4 ............................................................................. 64
Tex. R. Civ. P. 166a(i) .................................................................... 33, 34
Tex. R. Civ. P. 299 ............................................................................... 62

**Treatises**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of
   Legal Texts* 132 (2012) ....................................................................... 50
Restatement (Second) of Contracts § 210(1) (1981) ......................... 66, 67
W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 92 (5th
   ed. 1984) .............................................................................................. 46

**STATEMENT OF THE CASE**

Nature of the Case: This suit arises out of an agreement to develop multi-family housing. Frisco Summit filed this suit asserting claims for breaches of fiduciary duty arising out of both the joint venture agreement between the Appellees and the limited partnership that was formed in furtherance of the joint venture. Frisco Summit also brought claims for breach of contract with respect to both the joint venture agreement and the limited partnership agreement and related claims for declaratory relief.

Trial Court: The Honorable Christine Nowak, 493rd Judicial District Court of Collin County, Texas

Trial Court Disposition: After appointment to the newly-created 493rd District Court, on January 26, 2024, the trial court held a status conference requiring the entry of a docket control order with an initial trial setting of no later than June of 2024. (CR.81)

After initial discovery responses and an Order compelling discovery (CR.916), on May 20, 2024 Frisco Summit sought leave to amend. (CR.1500). The trial court denied leave by order dated July 3, 2024. (CR.3869).

On August 2, 2024, the trial court rendered summary judgment on Frisco Summit's breach-of-fiduciary, duty, aiding-and-abetting, and conspiracy claims, in their entirety. (5198-5200). It also rendered partial summary judgment on Frisco Summit's breach-of-contract and declaratory

judgment claims. (5198-5200). [See Appendix 1].

After a three-day bench trial, the trial court found for Appellees on Frisco Summit's remaining breach-of-contract claims.

On January 24, 2025, the trial court rendered its final judgment (App. 1), ordering Frisco Summit take nothing by their claims and awarding Appellees their attorney's fees. (CR.5946).

Frisco Summit timely requested that the court enter findings of fact and conclusions of law (CR.5951). On or about March 20, 2025, the court entered its findings of fact and conclusions of law (CR.5964) (See Appendix 3). On March 28, 2025, Apellants filed their request for additional and amended findings of fact and conclusions of law, which the trial court refused to make. (SuppCR.23-34) (See Appendix 4).

## STATEMENT REGARDING ORAL ARGUMENT

This case presents complex issues of both law and fact that were disposed of by the trial court in part on summary judgment. Oral argument would ensure that the Court has a complete understanding of the record and aid the Court's decisional process, Frisco Summit request that it be granted. *See* Tex. R. App. P. 39.1(c)–(d).

# ISSUES PRESENTED

<u>Issue I:</u>  The trial court erred in granting Appellees summary judgment on Frisco Summit's breach of fiduciary duty, aiding and abetting, and conspiracy claims

<u>Issue II:</u>  The trial court's rulings on the time for performance under the JVA and LPA (*See* Appendix 5) are legally and factually erroneous

<u>Issue III:</u>  The trial court erred by failing to make the findings of fact and conclusions of law necessary to support its take-nothing judgment on Frisco Summit's claim for breach of the JVA

<u>Issue IV:</u>  Because the LPA is a partially integrated contract between different parties, it did not extinguish the JVA

<u>Issue V:</u>  The trial court's finding that Frisco Multifamily GP did not breach 7.01(d)(ii) of the LPA is clearly erroneous

<u>Issue VI:</u>  Newly discovered evidence provided good cause for leave to amend and the trial court abused its discretion in denying it

<u>Issue VII:</u>  This Court should reverse and remand Appellees' attorney's fees award

# STATEMENT OF FACTS

## I. The Joint Venture to Develop and Sell the Property

Stanley V. Graff (Graff) formed Appellant Frisco Summit, LP (Frisco Summit) in 2001[1] to acquire, own, and develop real property (Property)[2] in the City of Frisco.[3] As its name suggests, Frisco Summit GP, LLC (Frisco Summit GP) is and always has been Frisco Summit's general partner. Graff is the manager of Frisco Summit GP.[4]

During the 2000's, Frisco Summit retained Roger Gault (Gault) as a project manager to assist with the Property's development.[5] After considering several development scenarios, ultimately Gault proposed developing the Property as multi-family housing if the City of Frisco (City) would agree to rezone.[6]

To that end, Gault introduced Graff to his contacts at Appellee Carleton Development, Ltd. (Carleton), who had been Gault's close

---

[1] CR.1706-1707.
[2] The Property is more particularly described as Lot 15, Block A, George Mixon Addition, as recorded in Vol. M, page 100 of the Plat Records of Collin County.
[3] CR.1708-1719.
[4] CR.1706-1707
[5] CR.2083-2084(13:14-17;15:2-19)
[6] CR.2085(18:1-19:21;20:12-24); CR.3147; CR.2101(82:16-23); CR.2104(97:20-98:3)

1

friends since 1993.[7] Carleton was formed in 1996 by Appellees Printice L. Gary (Gary), acting as the president of CCB Southwest, Inc., its then-general partner,[8] which was replaced as Carleton's general partner by GH Southwest II, Inc. (GH Southwest) in September 2011.[9] At all relevant times, Appellees Gary, Neal R. Hildebrandt (Hildebrandt), and Jeffrey D. Fulenchek (Fulenchek) have been GH Southwest's officers, directors, or both.[10]

Through the introductions and negotiations that followed, Frisco Summit learned Carleton was involved and had many years of experience in multi-family housing development. [11] Carleton represented it had an affiliated general contracting and construction entity,[12] a capital markets/ financing affiliate, and experience and expertise in the developing raw land, like the Property, into upscale multi-family housing.[13] Ultimately, these discussions led to the generation of a Purchase and Sale Agreement (PSA), whereby Frisco Summit would

---

[7] Gault testified that he was working with them in the early stages of a ground-up multifamily project in Celina, Texas. (3RR33:18-34:8).
[8] CR.2843
[9] CR.2844-2846.
[10] CR.1975-1976; DX1; 16:24-17:21
[11] CR.2106; 105:14-22
[12] CR.2106;105:23-25; 3RR62:2-4
[13] CR.2107 (106:1-23)

have conveyed the Property outright to Carleton or its affiliate for subsequent development. But due in large part to concerns regarding the ability and timing to obtain satisfactory zoning, the PSA never came to fruition.[14]

Based upon ongoing negotiations with its mortgage lender in 2013, Frisco Summit had a need to sell the Property or obtain refinancing by the end of 2013.

As a result, sometime in mid-2013, Frisco Summit, through Gault, reengaged with Carleton and suggested a joint venture development structure that facilitated the refinancing of the existing debt while the zoning process was being completed.[15] During the ensuing negotiations, Carleton made several proposals[16] and provided financial projections with respect to those proposals.[17] The common premise of all proposals and projections was the Property's development in three separate phases, with development of Phase I to commence immediately upon obtaining satisfactory zoning from the City.[18] These culminated in Carleton's

---

[14] CR.2091 (45:13-46:18); CR.1992 (84:22-85:24)
[15] CR.1984-1985 (51:11-16; 52:15-53:11)
[16] CR.2768-2786
[17] CR.2774-2790; PX32, PX37, PX40, PX42 and PX43
[18] CR.2774; 2RR43:1-4; 2RR53:8-20.

3

delivery of a proposed "critical path" development plan for Phase I and a listing of the key material components of a joint venture agreement.[19] Carleton based its proposal and the timing of the planned development on its experience and the knowledge it had gained regarding the project in the two years it had been evaluating the project. Indeed, Carleton represented that, upon obtaining zoning from the City, it "was off to the races."[20] Fulenchek thought in October 2013 Carleton might have been able to perform "even quicker" than the timeframes set forth in the proposed timelines.[21] Thereafter, Carleton prepared a projection timeline.

These proposals and financial projections were based on total development and construction costs that Carleton provided to Frisco Summit as part of the development scenario for Phase I (the Initial Phase I Projections). [22]

During negotiations of the joint venture, Gary, Hildebrandt, and Fulenchek also made representations regarding the Property's proposed

---

[19] PX40
[20] CR.2107 (106:25-107:12).
[21] CR.2048(66:1-67:23).
[22] CR.2791-2793; PX43.

4

development and their expertise and ability to carry out their development obligations for the joint venture.[23]

Based on those representations, Frisco Summit agreed to enter an oral joint-venture agreement (JVA) with Carleton, Gary, Hildebrandt, and Fulenchek (collectively the Carleton Group) to develop and ultimately sell the Property (the JVA). The JVA's material terms were:[24]

> (a) Frisco Summit would convey the Property to a newly created limited partnership in exchange for a 99% limited partnership interest;[25]
>
> (b) Gary, Hildebrandt, and Fulenchek would form an entity to act as general partner of the newly formed limited partnership;[26]
>
> (c) Because Frisco Summit could not obtain financing on the Property, and in order to prevent foreclosure, Gary, Hildebrandt, and Fulenchek would obtain new acquisition financing for the Property to be acquired by the newly created limited partnership;[27]
>
> (d) Frisco Summit would service the mortgage indebtedness through additional contributions to the newly created limited partnership;[28]

---

[23] CR.2106(105:14-106:19)
[24] CR.2787-2790
[25] CR.1690
[26] CR.1690
[27] CR.1692
[28] CR.1692

5

(e) Carleton and its affiliates would develop the Property in three phases, with the first two phases comprising approximately seven (7) acres each.[29] Gary, Hildebrandt, and Fulenchek committed to begin immediately to obtain accepted zoning from the City for Phase I; with the following phases commencing in two to four years, a reasonable time "as the market allows."[30]

(f) In addition to the 99% limited partnership interest in the sale proceeds of the Property for each phase of the development, Frisco Summit would receive half of Carleton's Promote Fee for each phase of the development;[31] and

(g) Frisco Summit would also receive a special limited-partnership interest in each of the project partnerships that Carleton to complete each of the phases of the development without "any obligations or liabilities of any kind."[32]

## II.    The LPA

In accordance with the JVA, Gary, Hildebrandt, Fulenchek, and Graff formed Frisco Multifamily Land Partners, LP (Frisco Multifamily)[33] and its general partner, Appellee Frisco Multifamily Land GP, LLC (Frisco Multifamilty GP). Frisco Summit and Frisco

---

[29] CR.1936 (37:13-20)
[30] CR.1692. As referenced above, the Letter of Intent (CR.2787-2790) set forth a structure of commencement of the Phases: Phase I-- obtaining zoning; Phase II-- 24 months after Phase I; Phase III--42 months after Phase I. Gault testified he and Graff understood two-year intervals for Phases II and III. (CR2108:111:19-113:19)
[31] CR.1692; CR.1938 (39:10-13); CR.1940-1942 (40:13-41:22)
[32] CR.1692; CR.2006-2008 (137:18-146:25); CR.2008-2009 (147:20-152:16)
[33] CR.2835-2838; C.R.2839-2842.

6

Multifamily GP, the only partners of Frisco Multifamily, signed the Limited Partnership Agreement (LPA) on or about December 27, 2013.[34] Three days later, Frisco Summit conveyed the Property to Frisco Multifamily.[35]

The LPA prohibited Frisco Multifamily GP from selling, exchanging, or otherwise disposing of any portion of the Property except as permitted by section 7.1(d):

---

[34] CR.2794-2834; PX-54
[35] CR.2847-2851

7

(d) Specific Authority. Without limiting the generality of subsections (a) and (b) above, the General Partner shall full power without requiring the consent of the Limited Partner to perform the following:

(i) The General Partner shall have full power to enter into Purchase Contracts with Carleton Development provided the Purchase Contracts reflect the terms and conditions set forth below.

(A) Purchase Contract Phase 1 (herein so called) shall (1) provide for the sale of approximately 7 acres of the Property; (2) reflect a purchase price equal to or greater than $7.00 per square foot; and (3) provide for the buyer under the Purchase Contract (i.e., the purchasing Project Partnership) to pay the rollback taxes applicable to such portion of the Property.

(B) Purchase Contract Phase 2 (herein so called) shall (1) provide for the sale of approximately 7 acres of the Property; (2) reflect a purchase price equal to or greater than $8.00 per square foot, plus the accrued interest under the Acquisition Loan; and (3) provide for the buyer under the Purchase Contract (i.e., the purchasing Project Partnership) to pay the rollback taxes applicable to such portion of the Property.

(C) Purchase Contract Phase 3 (herein so called) shall (1) provide for the sale of the remaining Property; (2) reflect a purchase price equal to or greater than $9.00 per square foot, plus the accrued interest under the Acquisition Loan; and (3) provide for the buyer under the Purchase Contract (i.e., the purchasing Project Partnership) to pay the rollback taxes applicable to such portion of the Property.

The Purchase Contracts shall reflect such other terms and conditions as the General Partner shall deem necessary so long as such other terms and conditions do not conflict with the above.

(ii) Notwithstanding the authority given to the General Partner to enter into the Purchase Contracts with Carleton Development, the General Partner shall not have the power or authority to consummate the sales contemplated by the Purchase Contracts (i.e., the General Partner may not execute any warranty deed conveying any portion of the Property to a Project Partnership) unless the Project Partnership Agreement for the Project Partnership then acquiring a portion of the Property (i) provides for the Limited Partner to be admitted as a special limited partner in such Project Partnership without any obligations or liabilities of any kind, and (ii) provides for the Limited Partner to receive 50% of any Promote Fee. The General Partner and Carleton Development acknowledge and agree that the Limited Partner's receipt of 50% of the Promote Fee is a material inducement to the Limited Partner entering into this Agreement.

(iii) The Partners acknowledge and agree that the rezoning of the Property in a manner that facilitates the development of the Property into residential apartment communities is a critical component of the General Partner's involvement in the Partnership, as well as the involvement of Carleton Development, and that the rezoning must occur prior to the contemplated sales to the Project Partnerships. Accordingly, in the event the Property cannot be rezoned in a manner acceptable to the General Partner in its sole discretion, the General Partner shall full power without requiring the consent of the Limited Partner to list the Property for sale for a price sufficient to pay off the Acquisition Loan and all other liabilities of the Partnership.

Section 7.1(d) refers to "Purchase Contracts" and "Project Partnerships," which are defined terms in the LPA. "Purchase Contracts" are "collectively, the Purchase Contract Phase 1, Purchase Contract Phase 2, and Purchase Contract Phase 3, as such terms are defined in Section 7.1(d). 'Purchase Contract' means any one of the Purchase Contracts."[36] "Project Partnerships" are "collectively, the entities that will ultimately acquire portions of the Property pursuant to the Purchase Contracts, that is the entities to whom [Carleton] will assign the Purchase Contracts.

---

[36] CR.2799

9

Any Partner, and any Affiliate of any Partner, may be a partner in the Project Partnership."[37]

Gary testified that he did not know which attorney proposed the language in section 7.1(d)(ii),[38] but agreed section 7.1(d)(ii) provided that Frisco Summit receive *both* a promote fee and a special limited-partner interest in the Project Partnerships without assuming any obligations.[39]

The LPA also prohibited Frisco Multifamily GP from entering any contracts, agreements, leases, or other arrangements with any party or entity "related to" or "affiliated" with it, Gary, Hildebrandt, or Fulenchek without Frisco Summit's consent.[40]

## III.     Development of Phase I

Acceptable zoning was obtained from the City in August 2014.[41] But the Carleton Group were neither ready nor able to "hit the ground running."   Indeed, as reflected in a November 6, 2015 email sent by Fulenchek to Brian Jarvis and Valerie Williams, the Carleton Group was

---

[37] CR.2799
[38] CR.2008 (145:23-148:1).
[39] CR.2008-2009 (148:2-151:11)
[40] *See* §8.2 of the FMLP LPA (hereafter the "Conflicts of Interest Provision") (CR.2812)
[41] CR.2852-2867; PX-70

10

unable to secure the main equity source for development of Phase I until the fall of 2015.[42] That, in turn, delayed bank financing. So, the development of Phase I did not even begin until late 2015, a year and a half after zoning was obtained.

## IV. The "Flip" Profit on the Phase I Property

In the Fall of 2015, the Appellees sought Frisco Summit's consent to the sale of the first phase property to Carleton as contemplated by §7.01(d)(i) of the Partnership Agreement.[43] In response, and due in part to the delay in the commencement of Phase I, in a teleconference with Appellee Fulenchek, Frisco Summit requested an updated financial projection timeline. This was provided pursuant to email on November 24, 2015.[44] Based upon the representations as contained in that updated financial projection timeline, Frisco Summitt executed and delivered the consent.[45]

The Phase I Development ultimately included 8.746 acres of the Property (Phase I Property).[46] As contemplated by the LPA, the Carleton

---

[42] PX 68
[43] DX-13
[44] PX-86 2RR 91:1-21
[45] DX-13
[46] CR.3058-3081; CR.2021 (200:10-19).

and the Individual Appellees created a new limited partnership, Frisco Summit I, LP (Phase I Partnership) to acquire the Phase I Property for development.[47] Carleton and the Individual Appellees also formed Frisco Summit I GP, LLC, as the Phase I Partnership's general partner.[48] Although Frisco Summit owned half of the membership interest in that general partner, Gary, Hildebrandt, and Fulenchek maintained the same duties, functions, and control in the Phase I Partnership's general partner as they held in Carleton and its general partner.[49]

Unbeknownst to Frisco Summit, Carleton acquired the Phase I Property from Frisco Multifamily for approximately $2.77 million, and then it "sold" that property to the Phase I Partnership in a "flip" (in other words, a transaction that closed on the same day with the same title company) for approximately $3.7 million.[50] The Carleton Group utilized that profit to acquire (at least in part) a limited-partnership interest in the Phase I Partnership for Carleton, [51] allowing it to enjoy that interest

---

[47] PX-96, 102; CR.2983-3053.
[48] PX-95
[49] 2RR.20:10-16; 2RR230:15-231:11; PX77.
[50] PX80 and PX81; CR. 2021-2023 (200:10-206:4)
[51] CR.1989; CR.2019; CR.2983-3053

12

and the rights and benefits that flowed from it,[52] in breach of their obligations to Frisco Summit under the JVA and LPA.[53]

Indeed, as was reflected in promotional materials prepared to solicit investors in the Phase I Partnership[54] (materials not provided to Frisco Summit prior to receiving discovery in litigation), the Appellees had represented the cost of the Property to the Phase I Partnership would be approximately $3.7 million. Notwithstanding, as set forth above, in order to obtain Frisco Summit's consent, the financial projection timeline prepared and transmitted to Frisco Summit in November of 2015 continued to represent a purchase price of $2.7 million for the first Phase of the Property and erroneously calculated the promote fee waterfall based upon the lower number, knowing that to do so was incorrect.[55]

## V. Completion of Phase I

Construction of the apartment complex on Phase I began in early 2016[56] and was completed by August 2017. Lincoln Properties was hired as the complex's manager in early 2017 and was terminated

---

[52] CR.2983-3053. CR.2249-2280; CR.1700.
[53] CR.2983-3053; CR.2249-2280; CR.1700
[54] PX-77
[55] P-86 2RR 90:22-99:23
[56] CR.3058-3081; CR2021 (200:10-19)

approximately one year later. A Carleton affiliate managed the complex until December 2021, when the Phase I Partnership was sold to, MA Echelon At Summit At Frisco, LLC.[57]

During operation of the Phase I Property, and despite Frisco Summit owning half the general partner of the Phase I Partnership, Frisco Summit was never provided with underlying information regarding the Phase I Partnership's financial operations nor did it receive detailed financial information of any kind until 2022, after the Phase I Property had been sold.[58]

At no time between the Phase I Partnership's formation and the above-referenced sale were Graff or Frisco Summit provided any interest in the Phase I Partnership or information regarding that partnership or its operations.[59] Indeed, Frisco Summit did not receive a tax return or final Form K-1 for either the Phase I Partnership or its general partner until April 26, 2024, in response to discovery and an order to compel.[60]

---

[57] 2RR175:10-19
[58] CR 3180; CR.1999 (110:13-111:21)
[59] CR.1988 (65:7-70:8); CR.2019 (192:4-15)
[60] CR.1696

## VI.        Development of Phase II

The financial projection timeline provided by Fulenchek in November of 2015 provided a then-timeline to develop for Phase starting in 2017. Fulenchek admitted that in providing the timeline, it "was probably [the Carleton Group's] intention at the time to do it this way. It likely was. Fulenchek wouldn't have done it otherwise."[61]

Thereafter, the Carleton Group provided periodic updates to Graff and Frisco Summit that the development of Phase I was proceeding according to the plan and that they were diligently working on the development of Phase II.[62] The Carleton Group and Graff also had face-to-face meetings, including in November 2018.[63]

However, before the filing of this lawsuit and discovery in the case, the Carleton Group provided no detailed underlying information regarding their development efforts with respect to Phase II of the property.[64] Indeed, the only information of which Frisco Summit was aware regarding the actual Phase II development was certain publicly

---

[61] CR.2055 (93:19-21)
[62] CR.1960 (104:4-14)
[63] CR.2524
[64] CR.1694

15

available filings in the deed records that were the result of pre-suit investigation.[65]

## VII.    The Appellees' Failure to Timely Develop Phases II and III.

The Appellees retained numerous experts and professionals to conduct market studies and provide opinions of the Property's value, both "as is" and "as developed," all which set forth undisputed information regarding the strength of the multi-family housing market in the area surrounding the Property and the development viability on the timeline represented by the Appellees, both at the joint venture's inception, and in connection with Frisco Summit's Phase I development in late 2015.[66]

In particular, Meyers Research performed a market study in July 2015.[67] That market study noted comparable properties,[68] and reached recommendations and conclusions regarding rent positioning, targeted revenues, and absorption forecast.[69] It estimated that absorption of the

---

[65] *See* paragraph 31 of Plaintiff's Original Petition; CR.40.
[66] CR.2870-2939; CR.3112-3144
[67] CR.1962-1964 (173:13-174:8)
[68] CR.2870-2939; CR.8292; CR.2881
[69] CR.2870-2939; CR.8292; CR.2878-2880.

contemplated 372 units for the apartment complex on the Phase I Property would be obtained in a fourteen-month lease-up period.[70]

Thereafter, in 2021, in connection with the Phase I Property's sale, the Carleton Group's broker, International Property Advisors, prepared a detailed broker opinion of value or "BOV." According to that BOV,[71] all the available land zoned for multi-family development within the sub-market of the development had either been developed or was under construction by the summer of 2021.[72] This demonstrates that prior to the COVID-19 pandemic, all other available multifamily-zoned land had been developed or was under construction, except Phases II and III.[73]

Finally, based upon Gault's history, expertise,[74] and his familiarity with the market and Property as a result of his work with Frisco Summit as a project manager, Gault testified that, to his knowledge, all of the available property in the Frisco-Prosper submarket that could have been developed as multifamily residential had been timely developed by the

---

[70] CR.2923
[71] PX153; CR.3126; at Defendant 472
[72] See also CR.3126 as to the status of all construction within the sub-market.
[73] *See also* CR.3136-3143.
[74] CR.2014 (9:7-13:5)

outbreak of COVID-19.[75] At no time prior to 2013 or 2015 would it have been contemplated by Frisco Summit that Phase II would remain undeveloped a decade later.[76] Finally, Gault testified that had that been the "deal," Frisco Summit would never have entered into the joint venture.[77]

## VIII.    The Lawsuit

### A.    Original filing and scheduling order

When Frisco Summit could not obtain disclosure of underlying information regarding its interest in the initial Project Partnership, the waterfall calculations showing amounts due Frisco Summit for the sale of the Phase I apartment complexes, and the status of the development of Phase II, this suit ensued.[78]  In its Original Petition, Frisco Summit individually and on behalf of the Multifamily Limited Partnership, brought tort claims for breach of fiduciary duty, conspiracy, aiding and abetting, sought declaratory relief, and brought claims for breach of

---

[75] CR.2015-2016 (101:19-102:4)
[76] CR.2108-2109 (113:21-114:1).
[77] CR2019 (114:3-8)
[78] CR.33-52

18

contract under both the Joint Venture Agreement and the Limited Partnership Agreement.[79]

Because the court was newly created and the judge had yet to be appointed, after the trial judge's appointment in January of 2024 there was a court-ordered status conference. At that status conference, the trial court required the entry of a docket control order with an initial trial setting no later than June of 2024.[80] In other words, approximately 4-5 months after the initial status conference and the entry of the Scheduling Order.

## B.    Refusal to Grant Leave to Amend

In keeping with their *modus operandi*, despite requests that were served even before the Court's docket control order (DCO) and their discovery obligations to do so, the Carleton Group failed to produce almost all the important underlying documents in their possession, custody, and control which informed Frisco Summit's claims.[81] After deposition testimony clearly established the existence of those responsive documents and after six letters requesting voluntary compliance, Frisco

---

[79] CR.33-52
[80] CR.81-83
[81] CR.345

19

Summit was forced to file, set, and appear in Court to argue a Motion to Compel.[82] However, Appellees agreed, without the Court having to hear the Motion, to produce a broad category of underlying documents and the trial court entered an Order to compel Appellees to produce those documents on April 24, 2024.[83] But production responsive to that Order ***was only made shortly before midnight on the last day of discovery period under the existing DCO***.[84] The production and depositions and, in particular, the documents finally produced on the last day of the discovery period, revealed information that warranted amendment to existing claims and the assertion of new claims.[85]

The trial court modified the discovery schedule on May 17, 2024, and authorized depositions of the Individual Defendants on the newly discovered information.[86] These depositions were taken, yet on July 3, 2024, the court denied the Motion for Leave to Amend.[87]

---

[82] CR.345.
[83] CR.916.
[84] CR.1203.
[85] CR.1500; See Madden Declaration filed in support of Motion to Modify Scheduling Order CR.1039-1949.
[86] CR.1482
[87] CR.3869

### C.    The court's summary judgment order

After the Motion for Leave was denied and after an interim Motion for Continuance, the trial court heard and granted in part and denied in part the Appellees' No-Evidence and Traditional Motion for Summary Judgment. (Appendix 2).

### D.    Bench trial

On August 27, 2024, the court commenced what ultimately was a 3-day bench trial. At the conclusion of the bench trial, the trial court reiterated the issues to be tried based upon the previous Order on summary judgment and entered an oral ruling that: "There is no development timeline provided in the LPA. There are no specific time limits on development in the LPA. Frisco Summit is a sophisticated party and was represented by counsel during the negotiations of the LPA. If there was a development timeline intended by or agreed to by the parties, it would have been included in the LPA. There was no development timeline agreed to by the parties."[88]

---

[88] Findings of Fact and Conclusions of Law (CR.5964 at 5965).

### E. Final Judgment, Findings of Fact and Conclusions of Law

After the bench trial, the trial court entered a Final Judgment on January 24, 2025.[89] Thereafter Frisco Summit timely requested Findings of Fact and Conclusions of Law and on March 12, 2024, the court entered the Findings of Fact and Conclusions of Law[90] as proposed by the Appellees without revision. Thereafter, Frisco Summit timely requested Additional Findings of Fact and Conclusions of Law that were, in part, consistent with the Final Judgment entered by the trial court.[91] However, despite this request, the trial court did not enter any further findings of fact or conclusions of law and this appeal ensued.

## SUMMARY OF THE ARGUMENT

The trial court's take-nothing judgment in favor of Appellees was based on improper procedure, clearly erroneous factual determinations, and errors of law regarding well settled threshold legal issues and therefore should be reversed and remanded.

---

[89] CR.5946; Appendix 1
[90] CR.5964; Appendix 3
[91] SuppCR.23-34; Appendix 4

First, the trial court erred in disposing of all of Frisco Summit's tort claims—breach of fiduciary duty claims and the derivative claims of conspiracy and aiding and abetting—pursuant to Appellees' No-Evidence and Traditional Motion for Summary Judgment. The No-Evidence Motion for Summary Judgment challenged only two of the elements of Frisco Summit's breach of fiduciary duty claim, breach and damages. As a result, Appellees conceded Frisco Summit's assertions of the existence of a formal fiduciary relationship between the Appellees and Frisco Summit and the recognized fiduciary duties that flow therefrom. Thus, the Appellees improperly sought and the trial court improperly granted, the No-Evidence Motion for Summary Judgment on the of breach because the Appellees bore the burden of proof. *Hardy v. Commc'n Workers of Am. Local 6215*, 536 S.W.3d 38, 41 (Tex. App.—Dallas 2017, pet. denied). Moreover, Frisco Summit offered abundant summary judgment evidence of Appellees' breach of the duties of loyalty, disclosure, and care. In particular, Frisco Summit offered evidence in the summary judgment record and during the trial that, Appellees engaged in self-dealing and made in an excess of $1 million profit in a concealed "flip" transaction. The summary judgment evidence also established that they did so, not

23

only through fraudulent concealment and non-disclosure, but by obtaining Frisco Summit's consent to a transaction by misrepresenting the true purchase price that resulted in the improper profit. Thus, Frisco Summit offered competent summary judgment evidence of both breach and damages.

The trial court likewise erred when it granted summary judgment on the Appellees' sole traditional ground based upon the economic loss rule. The trial court ignored recent binding precedent from the Dallas Court of Appeals regarding the application and reach of the economic loss rule, particularly when it involves, as here, claims of breach of fiduciary duty, *see O'Donnell v. Roo Investment Fund II, LLC,* No. 05-23-00238-CV, 2024 WL 469558, at *8–9 (Tex. App.—Dallas Feb. 7, 2024, no pet.). For this reason, the trial court's take-nothing Final Judgment based upon its summary judgment rulings should be reversed and remanded.

Secondly, the trial court erred in failing to make findings of fact and conclusions of law to support its take-nothing judgment on Frisco Summit's claim for breach of the JVA. The trial court, despite requests for additional findings and conclusions by Frisco Summit in support of its take-nothing judgment, failed altogether to make any finding of fact

or conclusion of law with respect to this claim. *See AD Villarai, LLC v. Chan II Pak*, 519 S.W.3d 132, 135 (Tex. 2017) (per curiam).

Third, the trial court erred by rendering a take-nothing judgment on Frisco Summit's claims that the Appellees breached the JVA and the LPA by failing to timely develop the Property. As referenced above, the trial court made no findings or conclusions regarding Frisco Summit's claims for breach of the JVA; however, with respect to the claims under the LPA, the trial court made specific findings and conclusions that the parties to the LPA were sophisticated and intentionally provided no time for performance in the LPA. Indeed, the LPA does not specifically provide for a time of performance; however, in reaching its conclusion of law regarding the interpretation of the LPA in this regard, the trial court failed to acknowledge or apply the well settled "reasonable time" doctrine. *See Moore v. Dilworth,* 179 S.W.2d 940 (Tex. 1944) and more recently *Chen v. Parkwood Creek Owner's Ass'n, Inc.*, No. 05-10-01511-CV, 2012 WL 3759032 (Tex. App.—Dallas Aug. 30, 2012, no pet.) and *Ganguly Holdings, LLC v. Ker-Seva Ltd.*, 2022 Tex. App. LEXIS 5342 (Tex. App.—Dallas 2022). Thus, the trial court ignored the conclusive

evidence that Frisco Summit adduced regarding the Appellees' failure to perform.

Fourth, the trial court erred in determining that the LPA was a "fully integrated" agreement and as a result did not and could not extinguish Appellant's claims under the JVA.

Despite the fact that §16.3 of the LPA specifically limited the scope of the agreement to the "ownership and operation of the partnership" and contained a specific acknowledgement that the parties to the agreement had other contemporaneous agreements not addressed by the LPA, the trial court entered findings and conclusions that the LPA was "fully integrated." However, under controlling authority from the Dallas Court in *Smith v. Smith,* 794 S.W.2d 823 (Tex. App.—Dallas 1990, no writ) and the more recent teachings of the Supreme Court in *West v. Quintanilla,* 573 S.W.3d 237 (Tex. 2019), the provisions of section 16.3 of the LPA render it, at best, partially integrated. Moreover, because neither Carleton nor the Individual Appellees are parties to the LPA, and because the provisions of 16.3 contain an explicit provision that the LPA does not benefit any third parties, the merger doctrine is inapplicable. *See Smith v. Smith.* Finally, the JVA is both collateral to and consistent

26

with the LPA. *See West* at 245, *ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867 (Tex. 2010), and *Boy Scouts of America v. Responsive Terminal Sys., Inc.,* 790 S.W.2d 738 (Tex. App.—Dallas 1990, writ denied).

Sixth, the trial court abused its discretion in denying Frisco Summit leave to amend.

Finally, the trial court's award of attorney's fees which were premised on the determinations challenged above, should be reversed in whole or in part.

## STANDARDS OF REVIEW

### I. Summary Judgment

This Court reviews the rendition of summary judgment de novo, applying the same standards as the trial court. *Cmty. Health Sys. Prof'l Serv. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017) . When, as here, the parties moved for summary judgment on both no-evidence and traditional grounds and the trial court did not identify the grounds on which it granted the motion, this Court considers the no-evidence grounds first. *Id.*

A no-evidence motion "is essentially a motion for a pretrial directed verdict." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581 (Tex. 2006). The motion must "specifically state the element or elements" of the non-movant's claim "for which there is no evidence." *Cmty. Health Sys. Prof'l Serv. Corp.*, 525 S.W.3d at 695. "Once such a motion is filed, the burden then shifts to the [nonmovant] to present evidence raising an issue of material fact as to each element specified in the motion." *Mack Trucks*, 206 S.W.3d at 582. "A genuine issue of material fact exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

"Any claims that survive the no-evidence review will then be reviewed under the traditional standard." *Id.* at 219–20. That standard places the burden on the movants to prove "that there is no genuine issue of material fact and [they] are entitled to judgment as a matter of law." *Id.* at 220. To obtain a traditional summary judgment, the defendants must conclusively disprove at least one essential element of the plaintiff's claims or conclusively establish every element of an affirmative defense."

*Dallas Morning News v. Tatum*, 554 S.W.3d 614, 625 (Tex. 2018) (quoting *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997)).

Regardless of whether it is considering the no-evidence or traditional grounds, the court cannot weigh the testimony or evaluate the credibility of the witnesses. *Great Am. Rsrv. Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965); *Gulbenkian v. Penn*, 252 S.W.2d 929, 931 (Tex. 1952). Rather, it must "take as true all evidence favorable to the nonmovant and . . . indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Dallas Morning News*, 554 S.W.3d at 624 (quoting *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017)); *see also Great Am. Rsrv. Ins.*, 391 S.W.2d at 47 ("Evidence which favors the movant's position is not considered unless it is uncontradicted.").

## II.    Findings of Fact and Conclusions of Law

The applicable standard of review for the trial court's rulings following a bench trial turns on whether the challenged ruling is a legal conclusion or a factual finding. This Court reviews the trial court's conclusions of law de novo; it independently evaluates them "to determine whether the trial court correctly drew the legal conclusions

29

from the facts." *Walker v. Anderson*, 232 S.W.3d 899, 908 (Tex. App.—Dallas 2007, no pet.); *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020).

The trial court's findings of fact, on the other hand, receive more deference and are reviewed for sufficiency of the evidence. *Sw. Elec. Power*, 595 S.W.3d at 683 (quoting *Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46, 50 (Tex. 2007)); *see also Tex. Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019) ("A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict."). A party who attacks the legal sufficiency of an adverse finding on an issue on which it bore the burden of proof must "demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). When conducting its legal-sufficiency review, this Court must view the evidence in the light most favorable to the trial court's findings. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). It must credit evidence that supports the findings if the factfinder could have reasonably done so and disregard contrary evidence unless a reasonable factfinder could. *Id.* at 827.

A party who attacks the factual sufficiency of an adverse finding on which it bore the burden of proof "must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem.*, 46 S.W.3d at 242. This Court's review is not limited to the evidence that supports the trial court's findings. *See id.* Rather, it "must consider and weigh all the evidence" and set aside the finding "if the evidence is so weak or if the finding is against the weight and preponderance of the evidence that it is clearly wrong or unjust." *Id.*

## III. Pleading Amendment

When, as here, the DCO signed by the parties (and entered by the Court) requires a motion for leave to amend pleadings after a date certain upon a showing of good cause, that order controls the subsequent course of action. *See James v. Witherite,* No. 05-17-00799-CV, 2018 Tex. App. LEXIS 9214, at *18 (Tex. App.—Dallas Nov. 9, 2018, no pet.). This Court must determine whether the trial court abused its discretion in denying Frisco Summit leave to amend in concluding (expressly or impliedly) Frisco Summit did not establish good cause. *See id.*

## ARGUMENT

**I.**   **Appellees were not entitled to summary judgment on Frisco Summits' breach-of-fiduciary-duty, aiding-and-abetting, and conspiracy claims.**

The rendition of summary judgment on Frisco Sumitt's breach-of-fiduciary-duty, aiding-and-abetting, and conspiracy claims was improper. Frisco Summit did not have burden to prove that the Appellees breached their duties, and, even if Frisco Summit did, it produced sufficient evidence to show breaches and the resulting damages. In addition, the economic-loss rule does not apply to Frisco Summit's breach-of-fiduciary duty claims.

### A.   No-evidence grounds

The fiduciary duties spring from two sources. First, Carleton, Gray, Hildebrandt, and Fulenchek owed those duties because they entered the JV with Frisco Summit to develop the Property. "A joint venture is in the nature of a partnership." *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988). Joint venturers "stand, within the scope of the enterprise, in a fiduciary relationship each to the other and are bound by strict standards of good conduct and fair dealing . . . ." *Warner v. Winn*, 197 S.W.2d 338, 342 (Tex. 1946). Second, Frisco Multifamily GP owed fiduciary duties

because it was Frisco Multifamily's general partner. Because of its control over the limited partnership, a general partner owes fiduciary duties to the limited partners. *See Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.).

"The elements of a breach of fiduciary duty claim are: (1) the existence of a fiduciary duty; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in an injury to the plaintiff or a benefit to the defendant." *First United Pentecostal Church of Beaumont v. Parker,* 514 S.W.3d 214, 220 (Tex. 2017) (*citing Jones v. Blume,* 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). Here, the Appellees only challenged the second and third elements. *Comm'y Health Sys. V. Hansen,* 525 S.W.3d 671, 695 (Tex. 2017). Their summary-judgment motion claimed that Frisco Summit's claim "fail[ed] on no-evidence grounds" because it had "no evidence of any breaches of fiduciary duties" and "no evidence of damages." (CR.1275).

### 1. The Carleton Group improperly shifted the burden of proving breach of fiduciary duty.

The Appellees' motion, however, misplaced the burden of proof. Texas Rule of Civil Procedure 166a(i) allows a party to utilize a no-

evidence motion for summary judgment "on the ground that there is no evidence of one or more essential elements of a claim or defense *on which an adverse party would have the burden of proof at trial.*" Tex. R. Civ. P. 166a(i) (emphasis added). It should go without staying that "[a] movant . . . is not entitled to prevail on a no-evidence motion for summary judgment on a ground that is not an essential element of the non-movant's claim or on which the non-movant does not bear the burden of proof." *Hardy v. Commc'n Workers of Am. Local 6215*, 536 S.W.3d 38, 41 (Tex. App.—Dallas 2017, pet. denied); *see also In re Est. of Coleman*, 360 S.W.3d 606, 610 (Tex. App.—El Paso 2011, no pet.) ("It is error for a trial court to grant a no-evidence summary judgment on a claim for which the moving party bears the burden of proof.").

Here, the Appellees did not challenge Frisco Summit's allegations that they owed fiduciary duties to Frisco Summit—as to Carleton, Gray, Hildebrandt, and Fulenchek under the JVA and as to Frisco Multifamily GP as the general partner of Frisco Multifamily. These, of course, are formal fiduciary relationships, the existence of which creates a presumption in favor of the beneficiary and shifts the burden of proof to the fiduciaries to prove that they complied with their fiduciary

34

obligations. *See Williams ex rel. Blackland Constr., Inc. v. Gottfried,* No. 03-22-00234-CV, 2024 WL 1745657, at *3 (Tex. App.—Austin Apr. 24, 2024, no pet.); *Anderton v. Cawley,* 378 S.W.3d 38, 52 (Tex. App.—Dallas 2012); *Miller v. Miller,* 700 S.W.2d 941, 946–47 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). When, as here, a party establishes that a formal fiduciary relationship exists, the burden with respect to breach shifts to the fiduciaries. *Miller v. Miller,* 700 S.W.2d at 946–47.

The Fifth Court of Appeals' decision in *Miller v. Miller* is instructive. After observing that fiduciary duties were based not only on relationship of trust and confidence but also on a formal fiduciary relationship (corporate officer and director), the Fifth Court of Appeals held, because of the latter, the fiduciary bore the burden of proving he had not breached his duties. *See id.* Accordingly, the Carleton Group could not obtain summary judgment by simply asserting Frisco Summit had no evidence of breach.

### 2. Alternatively, Frisco Summit produced sufficient evidence that the Appellees breached their fiduciary duties.

Assuming, *arguendo*, that Frisco Summit bore the burden of proving that the Appellees breached their fiduciary duties, it satisfied that burden.

### i. Carleton, Gary, Hildebrandt, and Fulenchek

The summary-judgment evidence establishes that Carleton, Gary, Hildebrandt, and Fulenchek breached the duties they owed as joint venturers. Under common law, joint venturers owe each other "a fiduciary duty of 'utmost good faith and scrupulous honesty' and [have] a corresponding obligation to 'make good faith disclosure of all facts relevant to the transaction.'" *Kirby v. Cruce*, 688 S.W.2d 161, 165 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (quoting *Warner v. Winn*, 197 S.W.2d 338, 341 (Tex. 1946)); *see also Fitz-Gerald v. Hull*, 237 S.W.2d 256, 264 (1951) (holding that partners owe a duty of "the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise"). A joint venturer cannot "obtain any secret profit or advantage for himself" or, "without the consent of the other[s], engage in any individual operations harmful to the business, or

36

acquire any interest in the property employed in the venture antagonistic to the interest which they have in it." *Warner*, 197 S.W.3d at 341.

In addition to those common-law duties, the Legislature imposed duties of loyalty, care, and disclosure on general partners in the Business Organizations Code. *See* Tex. Bus. Orgs. Code Ann. §§ 152.204–.206, 152.213; *see also id.* at § 152.003 ( "principles of law and equity" supplement the statute unless otherwise provided). Section 152.213 requires each partner to "furnish complete and accurate information concerning the partnership" to a partner upon "request and to the extent just and reasonable." *Id.* § 152.213(a)(1).

But a request is not always required to trigger the duty of disclosure. As the Business Court recently explained, a partner must volunteer information under the following circumstances:

- A partnership agreement may address the issue either directly or indirectly by omission.

- Absent a partnership agreement standard, partners must disclose material information affecting the partnership or other partners that ordinarily would not be expected to be covered by a partnership agreement. For example, a partner must tell at least partnership management when the partner is served with a suit against the partnership.

•    A partner may not mislead the partnership or other partners where fraud by omission principles would apply absent the partnership relationship.

•    That a partner is acting in its self-interest does not by itself create a duty to voluntarily disclose information regarding its conduct if the partnership agreement lawfully permits that conduct.

*Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.*, 2025 Tex. Bus. 9, ¶ 128, 709 S.W.3d 619, 646–47 (1st Div. 2025) (citations omitted). A partner, however, "need not disclose facts that would be immaterial under the circumstances, including circumstances contemplated by the partnership agreement." *Id.*

The summary-judgment evidence in this case showed a fact issue on whether Carleton, Gary, Hildebrandt, and Fulenchek breached those duties. They implemented a plan or scheme to: (1) obtain undisclosed profits through self-dealings with respect to the sale of Phase I Property to the Phase I Partnership; (2) obtain an undisclosed limited-partnership interest in the Phase I Partnership; and (3) deprive Frisco Summit of any interest in the Phase I Partnership.[92] Moreover, Carleton, Gary, Hildebrandt, and Fulenchek concealed information regarding this plan

---

[92] In particular, the carried limited partnership interest referred to in §7.01(d)(ii) of the LPA (CR.2809).

38

or scheme. And more importantly, they failed to disclose the Phase I Partnership's ownership, agreements with the investors in the Phase I Partnership, or the underlying transaction documents by which the Phase I Property was transferred to the Phase I Partnership.[93] They did so because such disclosures would have informed Frisco Summit of their plan or scheme. Indeed, Carleton, Gary, Hildebrandt, and Fulenchek solicited Frisco Summit's consent to the sale of the Phase I Property while intentionally concealing that information.[94] As a result, Carleton realized more than $1 million in profits from the "flip" transaction. It then used these profits to acquire, at least in part, limited partnership interests in the Phase I Partnership—all without Frisco Summit's knowledge.[95]

Moreover, while the LPA granted Frisco Multifamily GP and, by extension, Carleton an exception or limitation of their formal fiduciary obligations arising out of the partnership,[96] the specific authority granted in §7.01(d) was conditioned. Those conditions included the obligation to

---

[93] 2RR94:3-98:8; 3RR 164:3-166:15

[94] The facts demonstrate that Carleton and the Individual Appellees' conduct constituted more than a mere failure to disclose, but was an active fraudulent concealment. 2RR95:18-98:8; 3RR 158:5-166:15

[95] CR.2022 (202:2-203:14); CR.3052-3053

[96] Notably, the FMLP LPA does not provide a specific provision abrogating or limiting the GP's formal fiduciary obligations. *See, e.g.,* Tex. Bus. Orgs. Code §152.002(e).

provide Frisco Summit with a carried partnership interest in the Phase I Partnership—which it never received—and contemplated that the contract entered for Phase I would thereafter be assigned to the Phase I Partnership. The flip transaction orchestrated by the Carleton Group failed to satisfy those conditions. Accordingly, by failing to comply with the requirements of the specific authority set forth in the LPA, Appellees' formal fiduciary duties (among them, not to engage in related party transactions and seeking consent without full disclosure) controlled.

The Fifth Court of Appeals has held such evidence is sufficient to prove a breach of fiduciary duty on numerous occasions. For example, in *O'Donnell v. Roo Investment Fund II, LLC,* No. 05-23-00238-CV, 2024 WL 469558, at *8–9 (Tex. App.—Dallas Feb. 7, 2024, no pet.), the court held that an individual who owned and controlled the general partner in a limited partnership breached his fiduciary duties to a limited partner by engaging in an interested transaction without prior disclosure of material facts. The Fifth Court of Appeals reached similar conclusions in *Anderton v. Cawley,* 378 S.W.3d 38, 52–53 (Tex. App.—Dallas 2012, no pet.), *Miller v. Miller,* 700 S.W.2d 941, 946–47 (Tex. App.—Dallas 1985,

40

writ ref'd n.r.e.), and *Gaynier v. Ginsberg,* 715 S.W.2d 749, 754 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

Moreover, the summary-judgment evidence demonstrates that Carleton, Gary, Hildebrandt, and Fulenchek breached their duties of loyalty and care in failing to timely develop Phases II and III of the Property and failing to disclose the status of their development efforts; their inability to obtain the investment and financing necessary to develop Phases II and III, and their determination to forego the payment of permitting fees to allow for the timely development of the Property, to Frisco Summit.

### ii. Frisco Multifamily GP

The summary-judgment evidence also shows that Gary, Hildebrandt, and Fulenchek owned and controlled Frisco Multifamily GP. All the conduct that they and Carleton, an affiliate of Frisco Multifamily GP, engaged in (and Gary's conduct in particular), is attributable to Frisco Multifamily GP. *See Latch v. Gratty, Inc.,* 107 S.W.3d 543, 545 (Tex. 2003) ("The acts of a corporate agent on behalf of his or her principal are ordinarily deemed to be the corporation's acts."). For same reasons discussed above, the summary-judgment evidence

41

raised genuine issue of fact on whether Frisco Multifamily GP breached the fiduciary duties it owed to Frisco Summit, precluding summary judgment.

### 3. Frisco Summit produced sufficient evidence that the Carleton Group's breaches caused damages.

Moreover, the summary-judgment evidence shows that the Carleton Group's breaches of their fiduciary duties resulted in benefits to them and injuries to Frisco Summit. Carleton, profited from the flip transaction and the Phase I Partnership's formation and operation by obtaining more than $1 million from its flip transaction and the additional proceeds it received from the limited-partnership interest it acquired utilizing those funds.[97] Those profits ultimately inured to the benefit of Carleton's limited partners—Gary, Hildebrandt, and Fulenchek.[98] In addition, Frisco Summitt incurred interest expenses to carry Phases II and III, which was the result of the failure to develop both phases on a timely basis and the representations and non-disclosures related thereto.[99] Therefore, Frisco Summit offered sufficient

---

[97] CR.2022 (202:2-203:14)
[98] CR.1700; CR.2725; CR.3053.
[99] CR.1700-1702.

evidence of damages, and the trial court erred to the extent it granted the Carleton Group's summary-judgment motion on no-evidence grounds.

## B.   Traditional grounds

The Appellees' traditional ground for summary judgment fares no better. The only ground the Appellees asserted was that the economic-loss rule barred Frisco Summit's breach-of-fiduciary-duty claims.[100] Specifically, they argued the damages Frisco Summit sought for its breach-of-fiduciary-duty claim "mirrored" those sought for breach of the LPA.[101] That argument, however, is unavailing for two reasons.

### 1.   The economic-loss rule does not apply to breach-of-fiduciary-duty claims.

First, and most fundamentally, the economic-loss rule does not apply to breach-of-fiduciary-duty claims. That rule "generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam).

---

[100] *See* Section E of the Defendants' Traditional and No-Evidence Motion for Summary Judgment (CR.1261 at 1272-1274 para. 25-27).
[101] CR.1261 at para. 25.

To determine whether a claim sounds in tort, contract, or simultaneously in both, Texas courts consider the source of the duty alleged breached and the nature of the injury. *Sw. Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). "[I]f the defendant's conduct . . . would give rise to liability *only* because it breaches the party's agreement, the plaintiff's claim ordinarily sounds only in contract." *DeLanney*, 809 S.W.2d at 495 (emphasis added). And the plaintiff will ordinarily be limited to a contract claim when its only injury is "the economic loss to the subject of the contract itself." *Id.* at 495 (quoting *Reed*, 711 S.W.2d at 618). In other words, "[w]hen the plaintiff's only harm is economic loss caused by the defendant's failure to perform a contract, the defendant has breached a contractual duty, not a tortious one." *Belanger v. BAC Home Loans Servicing, L.P.*, 839 F. Supp. 2d 873, 877 (W.D. Tex. 2011).

While the economic-loss rule plays an important role in policing the boundary between contract and tort law, the Texas Supreme Court cautioned against oversimplifying the rule and applying it too broadly in *Sharyland Water Supply Corp v. City of Alton*, 354 S.W.3d 407, 419 (Tex.

44

2011). The economic-loss rule originated, and has been applied, in products-liability and negligence claims. *See id.* at 415–17; *see also* William J. Powers, Jr. & Margaret Nivers, *Negligence, Breach of Contract, and the "Economic Loss" Rule*, 23 Tex. Tech L. Rev. 477, 492 (1992) (stating that the 'economic loss' rule has never been a general rule of *tort* law; it is a rule in *negligence* and *strict product liability*" (footnote omitted)). The supreme court refused to apply the rule to fraudulent-inducement claims because "Texas law has long imposed a duty to refrain from fraudulently inducing a party to enter a contract . . . ." *Sharyland Water Supply Corp.*, 354 S.W.3d at 417 (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998)). And, in *Sharyland*, the court noted that purely economic damages were recoverable for other types of tort claims, including "breach of fiduciary duty." *Id.* at 419 (footnote omitted); *see also ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867, 873-74 (Tex. 2010) (confirming that fee forfeiture and actual damages are recoverable for breach of fiduciary duty).

The economic-loss rule does not apply to breach-of-fiduciary-duty claims due to the source of the duties and the nature of the parties'

45

relationship. A fiduciary's duties do not arise "solely from the contract." *See Sw. Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991). Texas common and statutory law impose those duties—"apart from and independent of the promises made and therefore apart from the manifested intent of the parties—to avoid injury to [the beneficiary]." *See id.* at 494 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 92 (5th ed. 1984)); *see also* Jim Wren, *Applying the Economic Loss Rule in Texas*, 64 Baylor L. Rev. 204, (2012) (identifying a fiduciary duty as an "example[] of an independent duty to protect the public generally without regard to a contractual relationship"). Additionally, the supreme court has recognized that "some contracts involve special relationships that may give rise to duties enforceable as torts . . . ." *DeLanney*, 809 S.W.2d at 494 n.1. A formal fiduciary relationship is the paradigmatic example of a special relationship. Wren, *supra*, at 269–70; *Turnbow v. Life Partners, Inc.*, Civil Action No. 3:11-CV-1030-M, 2012 WL 4473080, at *5 (N.D. Tex. Sept. 28, 2012).

Following *Sharyland*, Fifth Court of Appeals and others have held that breach-of-fiduciary-duty claims are exceptions to the economic-loss rule. *Haynes v. Hawkes*, No. 05-17-00304-CV, 2018 WL 3134884, at *4

(Tex. App.—Dallas June 27, 2018, no pet.); *J, Michael Ferguson, P.C. v. Ghrist Law Firm, PLLC*, No, 02-18-00332-CV, 2021 WL 2006321, at *6 (Tex. App.—Fort Worth May 20, 2021, pet. denied); *Meza v. Honorcare Home Health, Inc.*, No. 04-17-00741-CV, 2018 WL 6793839, at *1 (Tex. App.—San Antonio Dec. 27, 2018, no pet.); *James L. Flanagan Shipping Corp. v. Del Monte Fresh Produce, Inc.*, 403 S.W.3d 360, 366 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

Nevertheless, the Fifth Court of Appeals has held that the economic-loss rule bars breach-of-fiduciary-duty claims when the contract created the duty allegedly breached. For example, in *Victory Park Mobile Home Park v. Booher*, No. 05-12-01507-CV, 2014 WL 1017512 (Tex. App.—Dallas Feb. 26, 2014, no pet.), a partner sued the partnership "to recover amounts she alleged were due under an oral partnership agreement." *Id.* at *1. The partnership asserted a breach-of-contact counterclaim, alleging the partner failed to remit rent she collected as required by their agreement. *Id.* At trial, the court directed a verdict for the partner on the counterclaim. *Id.* at *2.

The Fifth Court of Appeals affirmed, holding that the economic-loss rule barred the breach-of-fiduciary-duty counterclaim. *Id.* at *4. It

47

reasoned the duty to remit rent was not independent of the partnership agreement.[102] *Id.* There was, however, "no allegation or evidence regarding any conduct of [the partner] constituting a breach of fiduciary duty other than her alleged failure to remit payment of rent collected for the additional lots." *Id.*

In this case, Frisco Summit has alleged and produced evidence showing breaches of the Appellees' formal fiduciary obligations of loyalty, care, and disclosure. Carleton, Gary, Hildebrandt, and Fulenchek vis-à-vis their obligations as general partners under the JVA on the one hand, and the Frisco Multifamily GP on the other, had, as part of their duty of loyalty, the duty not to defraud Frisco Sumitt or engage in conduct which would constitute the knowing participation in or aiding and abetting the breaches of fiduciary duty each separately owed to Frisco Summit. None of those obligations are imposed by the JVA or the LPA; they arise, if at

---

[102] In support, it cited the Third Court of Appeals' decision in *Fish v. Texas Legislative Service*, No. 03-10-00358-CV, 2012 WL 254613 (Tex. App.—Austin Jan. 27, 2012, no pet.). In *Fish,* as in *Victory,* the summary-judgment record revealed that the breach-of-fiduciary-duty claim was based entirely on specific enumerated provisions of a partnership agreement and the duties set forth in those provisions. *Id.* at *14-15.

all, under the common law fiduciary duties that were owed by the formal fiduciaries in this case.

Unlike the duty to remit rents in *Victory Park*, the duties the Appellees owed and breached are separate and apart from the contractual obligations created by the JVA and LPA. Thus, the economic-loss rule does not apply.

### 2. Alternatively, the Appellees did not establish that Frisco Summit's only damage was the economic loss of a contractual benefit.

Even if the economic-loss rule did apply, the Appellees were not entitled to a traditional summary judgment, because they did not establish that Frisco Summit only sought to recover "the economic loss of a contractual expectancy." *See Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam). In their motion, the Appellees asserted that Frisco Summit's "claimed damages are entirely premised upon purported violation of the . . . LPA."[103]

The Appellees, however, misread Frisco Summit's pleadings. "In the absence of special exceptions or other motion challenging the sufficiency of the pleadings, [the court] must construe a petition liberally

---

[103] (CR.1261 at 1273-74 para. 27)

in favor of the pleader." *Brumley v. McDuff*, 616 S.W.3d 826, 831 (Tex. 2021) (citing *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982)). Frisco Summit's petition stated that its damages "include" those enumerated.[104] That word "introduces examples, not an exhaustive list." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012). Such an allegation in no way limits Frisco Summary's recovery of all damages proven at trial after discovery. Nor did it prohibit Frisco Summit from offering evidence of damages in categories other than those referenced in the pleadings, as it did in response to the Appellees' no-evidence grounds. *See AKIB Constr. Inc. v. Shipwash*, 582 S.W.3d 791, 809 (Tex. App.—Houston [1st Dist.] 2019, no pet.)(general or direct damages need not be specifically pleaded).

Additionally, it is clear from the pleadings that Frisco Summmit's fiduciary duty claims were not limited to economic loss of the LPA's benefit. Indeed, the allegations found in the pleadings include claims for conduct of Carleton, Gary, Hildebrandt, and Fulenchek, even though they are not even parties to the LPA.[105]

---

[104] CR.47 para.57.
[105] See, in particular, CR.42-44, para. 38-42; CR.45-46, para.47-55 of the Original Petition. CR.33.

Moreover, as set forth above, the damages that Frisco Summit sought to recover from Carleton, Gary, Hildebrandt, and Fulenchek for breaches of their fiduciary duties are not in the nature of contract-expectancy damages. Those damages are based upon the profits or benefits improperly obtained as fiduciaries, namely, the profits from the flip transaction and the value of the limited-partnership interests in the Phase I Partnership that Carleton acquired using those profits.[106] The damages also include Frisco Summit's out-of-pocket costs incurred in carrying the mortgage well past any reasonable time for development of Phases II and III.[107]  None of the duties, nor these claims for damages, are specifically enumerated in either the JVA or the LPA.

Therefore, the Appellees did satisfy their burden of establishing their traditional grounds, and the trial court erred by rendering summary judgment on Frisco Summit's breach-of-fiduciary-duty claim.

---

[106] CR.47; CR.2022 (202:2-203:14); CR.1700; CR.2725; CR.3053.
[107] CR.47.

51

### C. Because Frisco Summit's breach-of-fiduciary-duty claims survive summary judgment, so do its conspiracy and aiding-and-abetting claims.

The trial court also erred by rendering summary judgment on Frisco Summit's conspiracy and aiding-and-abetting claims. Those are both derivative claims; they require Frisco Summit to prove a breach of fiduciary duty or, in the case of conspiracy, another underlying tort. *See Agar Corp. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (explaining conspiracy "is connected to the underlying tort and survives and falls alongside it"); *Darocy v. Albidtrup*, 345 S.W.3d 129, 137–38 (Tex. App.—Dallas 2011, no pet.) (explaining aiding-and-abetting liability is available when the defendant "knew of the fiduciary relationship and was aware of his participation in the third party's breach of its duty").

In their motion, the Appellees argued it was entitled to summary judgment on those claims because Frisco Summit had "no evidence of any breaches of fiduciary duties or underlying torts, yet alone a conspiracy or deliberate plot."[108] As explained above, the premise of that argument is incorrect. Frisco Summit offered sufficient evidence Carleton, Gary,

---

[108] CR.1275.

Hildebrandt, Fulenchek, and Frisco Multifamily GP breached their fiduciary duties. Consequently, summary judgment on Frisco Summit's conspiracy and aiding-and-abetting claims was also improper.

## II. The trial court's rulings on the time for performance under the JVA and LPA are legally and factually erroneous.

In addition to its summary-judgment rulings, the trial court erred by rendering a take-nothing judgment on Frisco Summit's claims that the Appellees breached the JVA and LPA by failing to timely develop the Property.

### A. The record evidence and the trial court's findings of fact and conclusions of law regarding the Appellees' obligations to develop the Property

One of Frisco Summit's key complaints about the Appellees' conduct was, after the passage of a decade, their complete failure to develop Phases II and III of the Property. During the trial, Frisco Summit offered evidence the JVA contemplated a three-phase development spaced two years apart commencing after appropriate zoning was obtained.[109] That evidence included a detailed outline of a schedule of critical paths for the construction of Phase I and an outline of the

---

[109] CR.1692; CR.2787-2790; CR.2108 (111:19-113:19)

material terms the joint venture, both of which were prepared and transmitted by the Appellees in July 2013.[110] Frisco Summit confirmed those material terms in an email from its counsel transmitting an initial draft of the partnership agreement dated September 17, 2013.[111] Thereafter, in October 2013, the Appellees transmitted detailed projections of the proposed monetary waterfall for the development of each phase.[112] The Appellees admitted [during the trial] that the financial projection timeline reflected in P-43 was "consistent with the decision of doing a joint venture as contemplated by the joint venture outlined in the Appellees' September 2013 bullet point outlines.[113]

Two years later, in connection with the solicitation of Frisco Summit's consent to the sale of the Phase I Property, the Appellees emailed an updated version of the financial projection timeline sent in October of 2013.[114] As set forth above, this email not only misrepresented the existence of the "flip" transaction, but also reiterated the remaining

---

[110] *See* P-32; P-37; P-40; 2RR.47:11-51:2; 3RR 143:24-145:22
[111] P-42
[112] PX-43.
[113] 2RR 67:21-25
[114] *See* Ex. P86.

phases would be developed in two-year increments.[115]   Indeed, Gary conceded that, as part of the joint venture, Carleton not only had the obligation to develop all three phases, but to do so timely "as the market allows."[116]

The evidence admitted at also trial also showed that the failure to develop Phases II and III was not only untimely because it wholly failed as the market allowed[117] it also established the Appellees' failure to perform was not the result of market factors, but instead resulted from their determination to delay the start of Phase II and not incur costs and expenses of obtaining the necessary permits that were available.[118] Thereafter, the failure to perform was due to the Appellees' inability to

---

[115]  2RR 98:20-99:7

[116] CR.2007 (142:6-25); 3RR 149:2-17; 3RR 150:10-14.

[117] Indeed, the reports generated by professionals retained by the Carleton Group in connection with their development of the Property demonstrated three key points: (1) the development (consistent with Graff's foresight in originally identifying the Property) found itself located in what is known as Frisco's "Platinum Corridor." 2RR 80:14-19; PX-77. *See, for example,* the description of the Frisco market as found in p.4 of PX77; (2) every other property located within the relevant market area that was zoned for multi-family development was developed within the timeframe or windows as originally contemplated in 2013. As reflected on PX-153; 2RR 147:1-150:2, by 2021 high-end multi-family developments had been commenced or completed.

[118] The only excuse or explanation offered by the Carleton Group for the delay—the alleged poor initial lease-up and performance of Phase I (3RR 195:8-25)—was directly contradicted by the management reports generated by the third-party management company, Lincoln Properties, that initially operated the Property and the reports of Carleton's captive management company that replaced Lincoln Properties after only one year.  (3RR 260:4-274:3; P-311, 312, 313).

obtain investors or financing[119] for Phase II because of their earlier

delays.

Nevertheless, the trial court found as follows:

> 4. There is no development timeline provided in the LPA. There are no specific time limits on development in the LPA. Frisco Summit is a sophisticated party and was represented by counsel during the negotiations of the LPA. If there was a development timeline intended by or agreed to by the parties, it would have been included in the LPA. There was no development timeline agreed to by the parties.[120]

And the trial court reached the following conclusions of law:

> 14. Section 7.1(d)(i) of the LPA is not premised upon any development timeline.
>
> . . . .
>
> 16. [The Appellees] did not fail to timely develop Phases 2 and 3.[121]

## B. The Trial Court erred in failing to imply a reasonable time for performance of the LPA.

The trial court's legal conclusion that the LPA did not obligate

Frisco Multifamily GP to develop the Property timely is erroneous. While

LPA §7.1(d) does not impose any deadlines, the Texas Supreme Court has

---

[119] CR.1653-1654; CR.2130-2132; CR.2133-2134; CR.2135-2137.
[120] Findings of Fact and Conclusions of Law (CR.5964 at 5965).
[121] Findings of Fact and Conclusions of Law (CR.5964 at 5966).

56

long held that, when the contract does not specifically state the time for performance, the law will imply a reasonable time. *See Moore v. Dillworth,* 179 S.W.2d 940, 942 (Tex. 1944) (citing *Hart v. Bullion,* 48 Tex. 278, 289 (1877)); *Hall v. Hall*, 308 S.W.2d 12, 16 (Tex. 1957); *Ganguly Holdings, LLC v. Ker-Seva Ltd.*, 2022 Tex. App. LEXIS 5342 (Tex. App.—Dallas 2022) What constitutes a "reasonable time" is usually a question of fact and "must be determined by the circumstances in evidence surrounding the situation of the parties and the subject-matter under which the contract was executed." *Hall*, 308 S.W.3d at 16–17 (quoting *Cheek v. Metzer*, 291 S.W. 860, 863 (Tex. 1927)). While reasonable is a relative concept, it "never means an indulgence in unnecessary delay; instead it denotes such promptitude as the circumstances will allow for the action called for by the contract." *Chen v. Parkwood Creek Owner's Ass'n, Inc.*, No. 05-10-01511-CV, 2012 WL 3759032, at * (Tex. App.—Dallas Aug. 30, 2012, no pet.) (quoting *Heritage Res., Inc. v. Anschutz Corp.*, 689 S.W.2d 952, 955 (Tex. App.—El Paso 1985, writ ref'd n.r.e.)).

Here, the trial court's finding "there was no development timeline agreed to by the parties" and conclusion that the LPA "is not premised

57

upon any development timeline" run headlong into that fundamental precept. As a result, it is clear the trial court's Conclusion of Law No. 16 did not recognize or acknowledge that Frisco Multifamily GP had an obligation to timely perform under the LPA. Moreover, the failure to perform is contrary to Conclusion of Law 16. This is confirmed by the trial court's oral pronouncements at the conclusion of the trial.[122] It is also clear that the trial court did not make determinations regarding what in this case, and under the circumstances known to the parties in 2013, constituted a reasonable time for performance, much less whether Frisco Multifamily GP complied that timeframe.

Moreover, since the evidence at trial was undisputed that the Property would be developed "to follow the market,"[123] a "reasonable time" and Frisco Multi Family's failure to satisfy it, *i.e.* its breach of the LPA, was established as a matter of law.

---

[122] 4RR 128:13
[123] 3RR.128-130

**III.    The trial court erred by failing to make the findings of fact and conclusions of law necessary to support its take-nothing judgment on Frisco Summit's claim for breach of the JVA.**

Even though it was incorrect, the trial court's findings of fact and conclusions of law at least contain an explanation for its judgment on Frisco Summit's claim for breach of the LPA. But the trial court refused to explain why it ruled against Frisco Summit on its claim for breach of the JVA and, thus, erred.

When properly requested, a trial court has a mandatory duty to file findings of fact and conclusions of law. *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1999). If the appellant must guess the reasons for the decision, the trial court's failure to make the requested findings and conclusions is presumptively harmful. *Id.* (quoting *Wagner v. Riske*, 178 S.W.2d 117, 120 (Tex. 1944)); *see also AD Villarai, LLC v. Chan II Pak*, 519 S.W.3d 132, 135 (Tex. 2017) (per curiam) (recognizing that "the burden of rebutting every presumed finding can be so burdensome that it effectively 'prevents the appellant from properly presenting its case'" on appeal (quoting *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014)).

59

Here, Frisco Summit sued Carleton, Gary, Hildebrandt, and Fulenchek for breaching the JVA. That claim survived their summary-judgment motion. And, at the bench trial, the trial court confirmed that one of the issues to be tried was whether Carleton, Gary, Hildebrandt, and Fulenchek had breached the JVA by failing to timely develop Phases II and III.[124]

After the trial court announced its rulings and Frisco Summit timely requested findings of fact and conclusions of law,[125] the Appellees submitted proposed findings and law that did not address the claim for breach of the JVA. The trial court then adopted and entered those proposed findings and conclusions, without change.[126] Neither the JVA nor the claims arising out of its breach are mentioned anywhere in the trial court's findings of fact and conclusions of law.

After the trial court entered its findings of fact and conclusions of law, Frisco Summit timely requested additional and amended findings of fact and conclusions of law[127] and, in the recitation of pertinent history

---

[124] 3RR 128-129
[125] (CR.5951).
[126] (CR.5964).
[127] (SuppCR.23)

and relevant background, noted that one of the remaining claims that was tried to the court was for breach of the JVA.[128] Frisco Summit also specifically requested that the trial court make three additional findings of fact[129] and two conclusions of law with respect to claims under the JVA.[130]

But the trial court failed to adopt any of the proposed additional findings of fact and conclusions of law or make any of its own. This constituted error and an abuse of discretion because the proposed additional findings properly and succinctly related to the ultimate findings of fact and conclusions of law required to support the trial court's take-nothing judgment. *See In re Marriage of CAS*, 405 S.W.3d 337, 381-82 (Tex. App.—Dallas 2013, no pet.).

In this regard, proposed additional findings of fact 4, 5, and 6 requested by Frisco Summit (with a reservation of rights, and without waiver thereof), were as follows:

---

[128] (*See* p. 4 of the Plaintiff's Request for Additional and Amended Findings of Fact and Conclusions of Law. (SuppCr.23)).
[129] *See* proposed additional findings of fact 4, 5, and 6 at SuppCr.29-30
[130] *See* requested conclusions of law 4 and 5 at SuppCr.30-31.

4.      Neither Carleton nor the Individual Defendants entered into a Joint Venture Agreement with Frisco Summit regarding the development of the Property.

5.      The terms of any Joint Venture Agreement between Carleton and the Individual Defendants on the one hand, and Frisco Summit on the other, did not include an obligation on the part of Carleton and/or the Individual Defendants to develop the Property in three Phases.

6.      The terms of any Joint Venture Agreement between Carleton and the Individual Defendants on the one hand, and Frisco Summit on the other, did not include an obligation on the part of Carleton or the Individual Defendants to timely develop the Property in three phases.[131]

Each of these fact findings (although wrong) would be consistent with the Court's judgment because, without the formation of a JVA (No. 4 above) that included the terms set forth in either numbers 5 or 6, there could be no breaches of the JVA as alleged by Frisco Summit. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (holding that a plaintiff asserting a breach-of-contract claim must prove the existence of a valid contract).

Texas Rule of Civil Procedure 299 plainly states that findings of fact "shall form the basis of the judgment." Tex. R. Civ. P. 299*; see also Drew v. Belver*, No. 13-23-00341-CV, 2025 WL 2076881, at *8 (Tex. App.—

---

[131] SuppCr.29-30.

Corpus Christi July 24, 2025, no pet. h.). But the judgment in favor of the Carlton Group on the claims for breach of the JVA is unsupported by any fact findings. And those findings cannot be implied. *See Drew*, 2025 WL 2076881, at \*8 ("If . . . the trial court omits findings as to *all* elements of a cause of action, appellate courts may not imply findings as to that cause of action." (quoting *Clinton v. Gallup*, 621 S.W.3d 848, 850 (Tex. App.—Houston [14th Dist.] 2021, no pet.)).

Moreover, Frisco Summit's proposed additional findings of fact and conclusions of law neither conflict with the findings or conclusions the trial court made, nor were they unnecessary, set forth in the negative, nor obscured. *Cf. Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 253-58 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Asai v. Vanco Insulation Abatement, Inc.,* 932 S.W.2d 118, 122 (Tex. App.—El Paso 1996, no writ); *Jones v. Martin K. Eby Const. Co., Inc.,* 841 S.W.2d 426, 428 (Tex. App.—Dallas 1992, writ denied).

Since the trial court failed to answer a factual question necessary to resolve the case under a correct interpretation, this Court should abate this appeal and remand for the trial court to make the findings and conclusions necessary to support its judgment. *See AD Villarai, LLC v.*

63

*Chan II Pak*, 519 S.W.3d 132, 135 (Tex. 2017) (per curiam) (stating this is the "preferred remedy"); *see also* Tex. R. App. P. 44.4 (requiring appellate courts to direct trial courts to correct any correctable error that prevents "the proper presentation of a case to the court of appeals"). "If the trial court still fails to file findings, [this Court] must reverse the trial court's judgment and remand the case for a new trial." *AD Villarai*, 519 S.W.3d at 135.

### IV. Because the LPA is a partially integrated contract between different parties, it did not extinguish the JVA.

In their motion for summary judgment[132] and throughout the trial,[133] the Appellees argued that LPA §16.3[134] was a merger clause rendering the LPA a "fully" integrated contract.[135] According to the

---

[132] See, e.g., Defendants' Reply in Support of Traditional and No-Evidence Motion for Summary Judgment. CR.1261

[133] See, e.g., 2RR46:17-47:9; 2RR76:13-25.

[134] "Section 16.3 Entire Agreement; Applicable Law; Effect. This Agreement contains the entire agreement by and among the parties with respect to the ownership and operation of the Partnership. The parties have now and expect to have in the future agreements that affect the Partners, such as matters relating to competition, and other business relationships of the Partners. This Agreement shall be construed, enforced and governed in conformity with the laws of the State of Texas and the TLPL, without giving effect to principles of conflicts of law, and shall be binding upon the parties hereto, their successors, heirs, devisees, permitted assigns, legal representatives, executors and administrators, but shall not be deemed for the benefit of creditors or any other Persons." CR.2826-2827

[135] 3RR 125:20-24

Appellees, the JVA, to the extent it existed, was merged into and extinguished by the LPA and parol-evidence rule barred any extrinsic evidence of their promises to timely develop the Property.

The record does not reveal whether the trial court agreed. Instead, the trial court allowed the evidence while reserving a final determination of the issue.[136] It made no explicit rulings in connection with Appellees' summary-judgment motion. The denial of the motion as to at least one of Frisco Summit's claims under the JVA indicates that the trial court rejected the Appellees' arguments.[137] And, at trial, the court "effectively overruled" their objections based on the parol-evidence rule.[138] Nevertheless, the trial court's findings of fact and conclusions of law state "the LPA provides that it contains the entire agreement between the parties relating to the ownership and operation of the partnership. The LPA is a fully integrated contract."[139]

None of the trial court's findings of fact or conclusions of law specifically address the merger doctrine or the parol-evidence rule, and

---

[136] 3RR39:10-13
[137] CR.5199
[138] 2RR46:17-47:9; 2RR76:13-25.
[139] CR.5964

as discussed above, this Court cannot imply that the trial court agreed with the Appellees. *Supra* at III.. But, if the trial court did, it misinterpreted the LPA and misapplied Texas law.

## A.    The LPA is not "fully" integrated.

By its own terms, the LPA is not a fully integrated agreement. A fully integrated agreement is "an agreement adopted by the parties as a complete *and exclusive* statement of the terms of their agreement." Restatement (Second) of Contracts § 210(1) (1981)(emphasis added). When the parties enter into a fully integrated agreement, any prior agreements between them are merged into and extinguished by the new agreement. *Id.* § 213(2); *Smith*, 794 S.W.2d at 827–28. As a corollary, the parol-evidence rule prohibits the court from enforcing any prior agreements that address the same subject matter, regardless of whether their terms are consistent with the new agreement. *Smith*, 794 S.W.2d at 827; *see also* Restatement (Second) of Contracts § 213 cmt. c ("When the parties have adopted a writing as a complete and exclusive statement of the terms of their agreement, even consistent additional terms are superseded.").

In contrast, a "partially integrated agreement is a full and complete expression of the terms contained in that agreement but is not a final and complete expression of all terms agreed upon between the parties." *West v. Quintanilla*, 573 S.W.3d 237, 244 (Tex. 2019) (quoting *ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 719 n.10 (Tex. App.—Eastland 2007, pet. denied)). Prior agreements do not merge into partially integrated agreements. *See* Restatement (Second) of Contracts § 213(1). They remain enforceable to the extent they are consistent with the new agreement's terms. *Id.*; *West*, 573 S.W.3d at 244.

For instance, in *West*, a purchase agreement contained a merger clause that stated it "constitute[d] the entire agreement between the Parties and supersede[d] any prior understandings or agreements by or between the Parties, written or oral, *to the extent they relate in any way to the subject matter* [thereof]." *West*, 573 S.W.3d at 240 (emphasis added). The Texas Supreme Court held that the purchase agreement was "integrated only as to the parties' agreements relating to the 'subject matter' it addresse[d], not as to all prior or contemporaneous agreements between the parties. Although it [was] complete and final as to its subject matter, it [did] not purport to address or supersede agreements related

67

to other matters. It [was] in that sense only a partially integrated contract." *Id.* at 244 (citations omitted).

Likewise, the LPA is partially integrated. Its merger clause, §16.3, states the LPA is the "entire agreement by and among the parties with respect to the ownership and operation of [Frisco Multifamily]."[140] Like the purchase agreement in *West*, the LPA is integrated only as to Frisco Summit's and Frisco Multifamily GP's agreements related to Frisco Multifamily's "ownership and operation." It is not integrated as to all prior and contemporaneous agreements between Frisco Summit and non-parties to the LPA, namely, Carleton, Gary, Hildebrandt, and Fulenchek.

The remainder of §16.3 drives that point home. Unlike most merger clause, which state the document contains the "sole" or "entire" agreement, §16.3 specifically recognizes that the parties "have now" (i.e., contemporaneous with the LPA), and "will in the future," have other agreements.[141] In this sense, the provisions of 16.3 constitute an anti-merger/anti-integration provision.

---

[140] CR.2826; PX-54
[141] CR.2826

Notably, the LPA refers to obligations that Carleton must undertake as a condition precedent to the specific authority granted to the Frisco Multifamily GP in §7.1(d)(i), yet §16.3 makes no reference to the development of the Property. And while the LPA refers to Carleton developer, states that the Project Partnerships will purchase portions of the Property in phases, and provides that zoning is a condition precedent to outright sale as an alternative to development, none of those terms or provisions are inconsistent with any of the material terms of the JVA either. Thus, much like *West,* §16.3 does not support the application of the parol-evidence rule to extrinsic evidence regarding the JVA, obligations under the JVA, or the agreement to timely develop the Property. Any determination otherwise was an error of law.

### B. The merger doctrine does not foreclose Frisco Summit's claims regarding timely development of the Property under the JVA

Additionally, the LPA did not extinguish the JVA under the merger doctrine. In *Smith v. Smith,* , the Fifth Court of Appeals explained how merger operates:

> Merger, with respect to the law of contracts, refers to the extinguishment of one contract by its absorption into another contract and is largely a matter of the intention of the parties. Before one contract is merged into another, *the last contract*

69

*must be between the same parties as the first*, must embrace the same subject matter, and must have been so intended by the parties. A written agreement is not superseded or invalidated by a subsequent integration relating to the same subject matter if the agreement is such that might naturally be made as a separate agreement.

794 S.W.2d at 827–28 (citations removed) (emphasis added).

The merger doctrine cannot apply here for the simple reason that the LPA is not "between the same parties" as the JVA. *See id.* at 828. While Frisco Summit is a party to both agreements, Carleton, Gary, Hildebrandt, and Fulenchek are neither parties to nor third-party beneficiaries of the LPA. The LPA is between Frisco Summit, as the sole limited partner, and the newly created general partner, Frisco Multifamily GP. Additionally, the subject matter referenced in §16.3 of the LPA[142] clearly demonstrates that development of the Property was not included. Instead, the "integration clause" relied on by the Appellees, limits the subject matter solely to Frisco Multifamily's "ownership and operation."[143]

---

[142] Assuming, without admitting §16.3 is an integration clause at all.
[143] CR.2826-2827; PX-54

### C. The JVA is both collateral to and consistent with the LPA.

It is well settled in Texas that the parol evidence rule does not preclude enforcement of an agreement that is "collateral" to and not inconsistent with a contract. *See West,* at 245; *ERI Consulting Eng'rs, Inc.,* 318 S.W.3d at 875; *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 451 (Tex. 2008) (per curiam); *Hubacek v. Ennis State Bank,* 317 S.W.2d 30, 32 (Tex. 1958).

As the Supreme Court has recently reiterated in *West,* "a collateral agreement is one that is supported by separate consideration and that the parties 'might naturally' make separately under the circumstances." *West,* 573 S.W.3d at 245; *see also Boy Scouts of Am. v. Responsive Terminal Sys.,* 790 S.W.2d 738, 745 (Tex. App.—Dallas 1990, writ denied) ("To be collateral, the oral agreement must be such as the parties might naturally make separately and would not ordinarily be expected to embody in the writing; further, the allegedly collateral agreement must not be so clearly connected with the principal transaction as to be part and parcel thereof.").

It is likewise true, however, that to avoid application of the parol evidence rule, a collateral agreement must also not be inconsistent with

71

terms of the written agreement. In this case, and for the reasons discussed above, the JVA is both collateral to, and not inconsistent with, the JVA

As discussed above, the LPA does not, as its subject matter, cover and include the development of the Property. Instead, LPA §16.3 is limited to and governs the "ownership and operation" of Frisco Multifamily. Moreover, as set forth above, the LPA clearly contemplates the development of the Property in phases, that the developer will be Carleton, and that Carleton will form separate Project Partnerships, and provide interests in those partnerships to Frisco Summit. The JVA does not conflict with any of those provisions. Additionally, it is also undisputed that Carleton, Gary, Hildebrandt, and Fulenchek are not parties to the LPA or have any obligations to Frisco Multifamily or Frisco Summit thereunder.[144] It is likewise true that another key component of the JVA is that, after transferring of the Property, Frisco Summit, as a limited partner, would continue to fund the "carrying costs, mortgage,

---

[144] PX-54

and taxes" on the Property pending development is not reflected in the Partnership Agreement.[145]

Accordingly, this case is similar to *ERI Consulting* and *West,* and to the extent the trial court determined the parol-evidence rule barred evidence of the JVA and performance thereunder, it committed reversible error.

As the Appellees would have it, the "inconsistency" lies in the fact that both for purposes of the summary judgment and at trial, they conceded that Carleton not only had the obligation to develop, but to do so timely to "meet the market." They asserted, and the trial court found as fact, that the LPA did not provide a timeframe for development. As set forth above, the trial court erroneously ignored that in the absence of a specific time for performance, a reasonable time must be implied. Moreover, stripped down, Appellees' position seems to be the JVA has a time for performance, but the LPA is silent on that issue. However, silence regarding an issue does not create a conflict. *See e.g. Walz v. Hayes*, No. 01-16-00277-CV, 2017 Tex. App. LEXIS 1557, at *7 (Tex. App.—Houston [1st Dist.] Feb. 23, 2017, pet. denied).

---

[145] 4RR 43:15-21

**V.** **The trial court's finding that Frisco Multifamily GP did not breach §7.01(d)(ii) of the LPA is clearly erroneous.**

As set forth above, Frisco Summit contends that LPA §7.01(d)(ii) sets forth conditions precedent to Frisco Multifamily GP's exercise of the authority granted in §7.01(d)(i)—which according to the Appellees and apparently adopted by the trial court, was a right but not an obligation of Frisco Multifamily. To the extent it is determined that the provisions of §7.01(d)(ii) are Frisco Multifamily GP's obligations, the evidence at trial undisputably showed that Frisco Summit did not receive a carried limited partnership interest in the Phase I Partnership.[146] Accordingly, the trial court's Finding of Fact No. 9, on an ultimate fact issue (breach of the LPA) is both legally incorrect and factually clearly erroneous and warrants reversal.[147] *See Scott Equip., LLC v. Raza,* No. 01-23-00862-CV, 2025 WL 2413074, at *20 (Tex. App.—Houston [1st Dist.] Aug. 21, 2025, no pet. h.)("An ultimate fact issue is 'one that is essential to the cause of action and has a direct effect on the judgment.' An erroneous finding of

---

[146] CR.3052-3053
[147] Notably, according to Appellees in the trial court, the LPA is a "fully integrated agreement" and notwithstanding certain provisions of §7.01(d)(ii), Carleton is not a party to and does not have any obligations under the FMLP LPA. 2794-2830; PX-54.

fact on an ultimate issue is harmful . . . ." (quoting *Wood v. Wiggins*, 650 S.W.3d 533, 562 (Tex. App.—Houston [1st Dist.] 2021, pet. denied))).

## VI.  Newly discovered evidence provided good cause for leave to amend and the trial court abused its discretion in denying it.

The DCO in this case provided "No additional theories or allegations shall be pleaded after [February 23, 2024] without prior leave of court based upon a showing of good cause…." Therefore, that order controls the subsequent course of action.  *James v. Witherite,* 2018 Tex. App. LEXIS 9214, at *18.  Because Appellees showed good cause for leave to amend to file their First Amend Petition, the trial court abused its discretion in denying them leave.

In connection with their motion,[148] Frisco Summit offered undisputed evidence of their diligence in discovery and Appellees' failure to make discovery including but not limited to the Appellees' failure in their January 2024 initial production, despite specific request, to produce any documents necessary to determine issues regarding the development, or lack thereof, of Phases II or III.[149]

---

[148] *See* CR.1500-1585
[149] *See id.  See also* CR.345-643; CR.1029-1202; CR.1203-1209.

Frisco Summit further established that depositions and Appellees' document production shortly before midnight on the last day of discovery revealed new information providing good cause for granting Appellees leave to amend. That newly discovered evidence, previously undisclosed by the Appellees, formed the factual basis of the proposed First Amended Petition,[150] and included matters that were not timely disclosed to Frisco Summit, but instead were learned (only after discovery and an order to compel) on the eve of the close of discovery.[151]

Moreover, the Appellees produced documents showing that when they met with Graff in late 2018, they had in fact solicited bids from subcontractors which reflected anticipated starting construction dates of Phase II in April 2018 and that had project manuals and constructions plans.[152]

While "good cause" in the context of pleading amendments has not been explicitly defined, it most certainly includes newly discovered evidence (that the Appellees had a fiduciary duty to disclose) that had been concealed by the Appellees during discovery, if the proponent of the

[150] *See* CR.1520-1528 at ¶¶ 32, 33, 35, 36, 37, 40, 49, 50-53).
[151] CR.1039-1049
[152] CR.2148-2177; CR.2180-2199; CR.2200-2202

76

amendment offers sufficient evidence to establish good cause. *In re Bird*, No. 12-13-00031-CV, 2013 Tex. App. LEXIS 6716, at *1 (Tex. App.—Tyler May 31, 2013, no pet.), while not a pleading amendment case, is instructive.

In *Bird,* the Plaintiff disclosed the amount and nature of damages it claimed (over $4 million in certain business-related damages ) after defendant's expert designation deadline had passed. *Id.* at *4. The Court of Appeals found "the trial court reasonably could have found that *good cause* existed for resetting All American's deadline for designating expert witnesses or that the interest of justice required it. (citations omitted). *Id.* at *6. Specifically, the trial court reasonably could have found that Bird's delay in disclosing the nature and amount of his damages gave him an unfair advantage because the deadline for All American's designation of expert witnesses had passed. Thus, absent an amendment of the scheduling order, All American would be unable to obtain an expert witness to assist in its defense against these damage allegations." *Id.*

Here, as in *Byrd*, Frisco Summit showed "good cause" and Frisco Summit provided evidence in support. The good cause to grant leave to amend was the delay in learning of the new claims (all of which were

discovered from or as a result of documents produced by Appellees after the Motion to Compel) caused by Appellees' delay, concealment and obfuscation of their discovery obligations, and in particular their failure to make timely production of responsive discoverable documents, despite Frisco Summit's outstanding requests due well before the amendment deadline as evidenced by the facts set forth in, and attached to the Motion for Leave and the other evidence incorporated therein by reference. Moreover, the evidence offered was consistent with other evidence incorporated therein—which is also consistent with the fact that in doing so, Appellees concealed the new claims, which were discovered shortly before the filing of the Motion for Leave itself. Under these circumstances, there is no doubt that Frisco Summit established good cause for leave to file their First Amended Petition. The trial court, in this case, abused its discretion in denying the Motion for Leave to file that amendment.

## VII.   This Court should reverse and remand Appellees' Attorney's Fees Award.

The trial court awarded attorneys' fees to the Appellees pursuant to Findings of Fact 10 and 11 premised on the determination that they prevailed on all claims. Accordingly, if this Court reverses the trial court's

judgment, in whole or in part, this Court should likewise reverse the award of attorney's remand for reconsideration consistent with the rulings of the Fifth Court of Appeals. *See Smith v. Smith*, 757 S.W.2d 422, (Tex. App.—Dallas 1988, writ denied) (reversing and remanding an award of attorney's fees "in view of the fact that appellant was partially successful in this appeal").

## PRAYER

For the foregoing reasons, this Court should abate this appeal and remand the case to the trial court to make the findings of fact and conclusions of law necessary to support its take-nothing judgment on Frisco Summit's claim for breach of the JVA. Alternatively, this Court should reverse the trial court's judgment and remand for further proceedings.

Respectfully submitted,

By*:  /s/ Mitchell Madden*
Mitchell Madden
State Bar No. 12789350
Email:mmadden@hjmmlegal.com;
skinney@hjmmlegal.com
tflores@hjmmlegal.com
Holmgren Johnson:
Mitchell Madden, LLP
12801 North Central Expressway
Suite 140
Dallas, Texas  75243
Telephone:  972-484-7780
Facsimile:  972-484-7743

**Gray Reed & McGraw LLP**

*/s/ William N. Drabble*
James A. Moseley
State Bar. No. 14569100
William N. Drabble
State Bar No. 24074154
1601 Elm Street, Suite 4600
Dallas Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1335
jmoseley@grayreed.com
wdrabble@grayreed.com

ATTORNEYS FOR APPELLANTS

80

**CERTIFICATE OF COMPLIANCE**

Relying on the word count function in the word processing software used to produce this document, I certify that the number of words in this brief (excluding any caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix) is 14,555 words and that the text of the document is in 14-pt. font. The text of all footnotes, if any, is 12-pt. font.

*/s/ Mitchell Madden*
Mitchell Madden

**CERTIFICATE SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on counsel of record according to the Texas Rules of Civil Procedure on October 7, 2025.

*/s/ Mitchell Madden*
Mitchell Madden

## APPENDIX

1. Final Judgment CR.5946-5948
2. Order regarding Summary Judgment CR.5198-5200
3. Findings of Fact and Conclusions of Law CR.5964-5967
4. Request for Additional Findings of Fact and Conclusions of Law SuppCR.23-25
5. Limited Partnership Agreement of Frisco Multifamily Land Partners, LP 5RR.PX-54
6. Declaration of Mitchell Madden in support of Motion to Modify Scheduling Order CR.1039-1049

CAUSE NO. 493-01132-2023

| | | |
|---|---|---|
| Frisco Summit, LP and Frisco Summit, LP derivatively on behalf of Frisco Multifamily Land Partners, LP, | § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § § | 493rd JUDICIAL DISTRICT |
| Frisco Multifamily Land GP, LLC; Carleton Development, Ltd.; GH Southwest II, Inc.; Frisco Summit I, LP; Frisco Summit I GP, LLC; Salt River Capital, Inc.; Frisco Summit II, LP; Frisco Summit II GP, LLC; Printice L. Gary; Jeffrey D. Fulenchek; and Neal R. Hildebrandt, | § § § § § § § § § § § | |
| Defendants. | § | COLLIN COUNTY, TEXAS |

Filed: 1/28/2025 3:42 PM
Michael Gould
District Clerk
Collin County, Texas
By Sarah Beasley Deputy
Envelope ID: 96703321

## FINAL JUDGMENT

On August 27, 2024, this cause came on for final trial before the Court. Plaintiffs Frisco Summit, LP and Frisco Summit, LP derivatively on behalf of Frisco Multifamily Land Partners, LP ("Plaintiffs") appeared in person through their counsel and announced ready for trial. Defendants Frisco Multifamily Land GP, LLC; Carleton Development, Ltd.; GH Southwest II, Inc.; Frisco Summit I, LP; Frisco Summit I GP, LLC; Salt River Capital, Inc.; Frisco Summit II, LP; Frisco Summit II GP, LLC; Printice L. Gary; Jeffrey D. Fulenchek; and Neal R. Hildebrandt (incorrectly named as Neal R. Hildebrand) (collectively referred to as "Defendants") appeared in person through their counsel and announced ready for trial. As no jury was demanded, all questions of fact were submitted to the Court. The bench trial concluded on August 29, 2024. At the conclusion of trial, on August 29, 2024, the Court issued an oral ruling that Plaintiffs take nothing on their claims, and consistent with the pre-trial agreement of the parties, the Court further directed the parties to submit briefing on the issue of attorney's fees and expenses.

On December 23, 2024, the Court informed the parties of its ruling on attorney's fees and expenses, granting in part and denying in part Defendants' request. More specifically,

The Court, after hearing the evidence, reviewing all relevant pleadings, and considering the arguments of counsel, is of the opinion that Plaintiffs should take nothing on its claims.

It is **THEREFORE ORDERED, ADJUDGED,** and **DECREED** that Plaintiffs take nothing against Defendants by this suit and that each of Plaintiffs' claims and causes of action are hereby dismissed with prejudice.

It is further **ORDERED, ADJUDGED,** and **DECREED** that Defendants have and recover from Plaintiffs, jointly and severally, under the Texas Declaratory Judgment Act ("TDJA") reasonable and necessary attorney's fees incurred by Defendants in the trial court in the amount of $242,099.50, and $11,506.75 in costs.

It is further **ORDERED, ADJUDGED,** and **DECREED** that in the event of an appeal to the court of appeals, Defendants will further be entitled to recover reasonable and necessary attorney's fees under the TDJA in the sum of $10,000.00, should Defendants be successful after an appeal; and in the event of an appeal to the Supreme Court of Texas, Defendants shall be entitled to an additional $10,000.00 if full briefing is requested and should Defendants be successful after an appeal.

It is further **ORDERED, ADJUDGED,** and **DECREED** that all sums awarded herein to Defendants shall bear post-judgment interest at the rate of 7.75%, which shall accrue in accordance with Tex. Fin. Code §304.005, and shall be compounded annually.

All relief not expressly granted is denied. This judgment is a final judgment as to all claims and all parties, completely disposes of the entire action, and is appealable.

Signed _____1/24/25_____.

_____
JUDGE PRESIDING

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 96703321
Filing Code Description: Court Action-Signed Order
Filing Description: FINAL JUDGMENT
Status as of 1/28/2025 3:49 PM CST

Associated Case Party: Frisco Summit, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Shawnte Kinney | | skinney@hjmmlegal.com | 1/28/2025 3:42:52 PM | SENT |
| Melissa Johnson | 19142900 | melissa@hjmmlegal.com | 1/28/2025 3:42:52 PM | SENT |
| Mitchell Madden | | mmadden@hjmmlegal.com | 1/28/2025 3:42:52 PM | SENT |
| Dennis Holmgren | | dennis@hjmmlegal.com | 1/28/2025 3:42:52 PM | SENT |

Associated Case Party: Frisco Multifamily Land GP, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ryan D.Marrone | | rmarrone@fbfk.law | 1/28/2025 3:42:52 PM | SENT |
| John Fraser | | jfraser@fbfk.law | 1/28/2025 3:42:52 PM | SENT |
| Luc Whyte | | lwhyte@fbfk.law | 1/28/2025 3:42:52 PM | SENT |
| Kashonna Ross | | kross@fbfk.law | 1/28/2025 3:42:52 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Thomas Murto | 14740500 | tflores@hjmmlegal.com | 1/28/2025 3:42:52 PM | SENT |
| Dennis Holmgren | 24036799 | dennis@hjmmlegal.com | 1/28/2025 3:42:52 PM | SENT |
| Patty Kelly | | pkelly@fbfk.law | 1/28/2025 3:42:52 PM | SENT |
| Kashonna Ross | | kross@fbfk.law | 1/28/2025 3:42:52 PM | SENT |

Appendix

2

CAUSE NO. 493-01132-2023

| | | |
|---|---|---|
| Frisco Summit, LP and Frisco Summit, LP derivatively on behalf of Frisco Multifamily Land Partners, LP, | § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § § | 493rd JUDICIAL DISTRICT |
| Frisco Multifamily Land GP, LLC; Carleton Development, Ltd.; GH Southwest II, Inc.; Frisco Summit I, LP; Frisco Summit I GP, LLC; Salt River Capital, Inc.; Frisco Summit II, LP; Frisco Summit II GP, LLC; Printice L. Gary; Jeffrey D. Fulenchek; and Neal R. Hildebrandt, | § § § § § § § § § § § | |
| Defendants. | § | COLLIN COUNTY, TEXAS |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

Upon review and consideration of all applicable pleadings/filings, and counsel's arguments at the summary judgment hearing, the Court **HEREBY GRANTS IN PART, AND DENIES IN PART,** Defendants' Traditional and No-Evidence Motion for Summary Judgment (the "Motion") and rules as follows:

**IT IS ORDERED, ADJUDGED, AND DECREED** as to

**Count 1 - Request for Declaratory Relief** (which can be found at page 11 ⁋ 40 of Plaintiffs' Original Petition):

| | |
|---|---|
| ⁋ 40(a) whether the price per square foot provisions as set forth in §§7.1(d)(i)(A), (B), and (C) of the FMLP LPA provided minimum amounts or set forth the specific actual purchase price for each phase; | **MOTION GRANTED** |

1

**5198**

| | |
|---|---|
| ℙ 40(b) whether the provisions of §§7.1(d)(i)(A), (B), and (C) of the FMLP LPA constitute an exception to Frisco Multifamily Land GP's fiduciary obligation to sell FMLP's property for its fair market value; and | **MOTION GRANTED** |
| ℙ 40(c) whether the price per square foot provision of §§7.1(d)(i)(A), (B), and (C) of the FMLP LPA were premised upon development of the Frisco Summit Property within a reasonable time. | **MOTION DENIED** |

**Count 2 – Breach of Contract** (which can be found at page 12 ℙ 45 and pages 9 and 10 ℙ 35 of Plaintiff's Original Petition):

| | |
|---|---|
| ℙ 35(a) the failure to provide or account for Plaintiffs' interest in the Phase I Project Partnership (Frisco Summit I, LLP) and the promote fee earned by Carleton from the development of that Phase of the project; | **MOTION DENIED** |
| ℙ 35(b) the failure to timely develop Phase II and Phase III of the JVA; | **MOTION DENIED** |
| ℙ 35(c): as to failing to sell property for its fair market value at the time of the transaction with an affiliate; | **MOTION GRANTED** |
| ℙ 35(c): as to engaging in the Salt River capital refinance as referenced hereinabove; | **MOTION GRANTED** |

2

| | |
|---|---|
| ¶ 35(c) : as to entering into agreements with entities owned or controlled by the Individual Defendants regarding the Frisco Summit Property; | **MOTION DENIED** |
| ¶35(d) failing to provide timely information regarding the project partnership or partnerships formed or to be formed by the Individual Defendants in connection with the development contemplated by the JVA; | **MOTION GRANTED** |
| ¶ 35(e) Failing to provide documentation regarding the interests referenced in paragraph ¶ 35(a); | **MOTION DENIED** |
| ¶ 35(f) as to failing to provide timely access to information regarding the conduct of the business operations of FMLP, including agreements entered into by FMLP with respect to the Phase II and Phase III developments contemplated by the JVA. | **MOTION GRANTED** |

**Count 3 – Breach of Fiduciary Duty** (which can be found at page 13 of Plaintiff's Original Petition) – **MOTION GRANTED**;

**Count 4 -- Conspiracy** (which can be found at page 14 of Plaintiff's Original Petition) – **MOTION GRANTED**;

**Count 5 – Aiding and Abetting** (which can be found at page 14 of Plaintiff's Original Petition) – **MOTION GRANTED**.

Signed_____8/2/2024_____.

CHRISTINE A. NOWAK
JUDGE PRESIDING

3

**5200**

Appendix

3

CAUSE NO. 493-01132-2023

| | | |
|---|---|---|
| Frisco Summit, LP and Frisco Summit, LP derivatively on behalf of Frisco Multifamily Land Partners, LP, | § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | 493rd JUDICIAL DISTRICT |
| Frisco Multifamily Land GP, LLC; Carleton Development, Ltd.; GH Southwest II, Inc.; Frisco Summit I, LP; Frisco Summit I GP, LLC; Salt River Capital, Inc.; Frisco Summit II, LP; Frisco Summit II GP, LLC; Printice L. Gary; Jeffrey D. Fulenchek; and Neal R. Hildebrandt, | § § § § § § § § § § | |
| Defendants. | § § | COLLIN COUNTY, TEXAS |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Findings of Fact**

1. Frisco Summit, LP ("Frisco Summit") and Frisco Multifamily Land GP, LLC (the "GP") entered into a Limited Partnership Agreement, dated December 27, 2013 (the "LPA"), in which Frisco Multifamily Land Partners, LP was formed. The partnership was formed to refinance the debt that encumbered a certain piece of real property in Frisco, Texas, an approximately 21.166 acre tract, and then to develop that property into residential apartment communities in multiple separate phases.

2. The LPA provides that it contains the entire agreement between the parties relating to the ownership and operation of the partnership. The LPA is a fully integrated contract.

3. The LPA Section 7.1(d)(i)(A), (B), and (C) states a minimum purchase price for the property in each phase. More specifically, under the LPA Section 7.1(d)(i), the GP is authorized to sell land to Carleton Development, Ltd. ("Carleton") at $7.00 per square foot for Phase 1, $8.00

per square foot for Phase 2, and $9.00 per square foot for Phase 3. There is no obligation in the LPA to sell land for the current fair market value. Frisco Summit is a sophisticated party and was represented by counsel during the negotiations of the LPA. If there was an agreement to sell land for the current fair market value, it would have been included in the LPA.

4. There is no development timeline provided in the LPA. There are no specific time limits on development in the LPA. Frisco Summit is a sophisticated party and was represented by counsel during the negotiations of the LPA. If there was a development timeline intended by or agreed to by the parties, it would have been included in the LPA. There was no development timeline agreed to by the parties.

5. The LPA provides that the partnership will continue until December 31, 2040, if it is not otherwise previously dissolved, at which point its assets would be liquidated and distributed.

6. Section 7.1(d)(i) of the LPA is not premised upon any development timeline.

7. Frisco Summit received $2,871,718.47 for the Promote Fee for Phase 1. Defendants provided Frisco Summit and Frisco Summit's accountant with a detailed accounting of its interest in Phase 1, and with a detailed accounting of the Promote Fee for Phase 1.

8. Defendants did not engage in unauthorized related party transactions in violation of Section 8.2 of the LPA.

9. The GP and Carleton did not breach the LPA.

10. Defendants prevailed on all claims brought in this action. Taking into consideration the Court's file and all evidence that was presented, it is equitable and just to award Defendants their costs and reasonable and necessary attorney's fees.

11. It is equitable and just to award Defendants their reasonable and necessary attorney's fees incurred in the trial court in the amount of $242,099.50. Defendants incurred

5965

attorney's fees in excess of this amount. In the event of an appeal to the Fifth Court of Appeals at Dallas, it is equitable and just to award Defendants reasonable and necessary attorney's fees in the amount of $10,000.00. Defendants would incur at least this amount in the event of an appeal. In the event of a petition for review to the Texas Supreme Court involving full briefing, it is equitable and just to award Defendants reasonable and necessary attorney's fees in the amount of $10,000.00. Defendants would incur at least this amount in the event of full briefing before the Texas Supreme Court.

12. It is equitable and just to award Defendants reasonable and necessary costs incurred in the trial court in the amount of $11,506.75. Defendants incurred costs of at least this amount.

**Conclusions of Law**

13. The LPA is a fully integrated contract.

14. Section 7.1(d)(i) of the LPA is not premised upon any development timeline.

15. Defendants did not fail to provide Frisco Summit with an accounting of its interest in Phase 1, nor did they fail to provide Defendants with an accounting of the Promote Fee for Phase 1, nor did they fail to provide documentation regarding Frisco Summit's interests.

16. Defendants did not fail to timely develop Phases 2 and 3.

17. Defendants did not enter into agreements with entities owned or controlled by the Individual Defendants in contravention of the LPA.

18. The GP and Carleton did not breach the LPA.

19. Plaintiff should take nothing on its claims.

20. It is equitable and just to award Defendants their reasonable and necessary attorney's fees incurred in the trial court in the amount of $242,099.50. In the event of an appeal to the Fifth Court of Appeals at Dallas, it is equitable and just to award Defendants reasonable and

necessary attorney's fees in the amount of $10,000.00. In the event of a petition for review to the Texas Supreme Court involving full briefing, it is equitable and just to award Defendants reasonable and necessary attorney's fees in the amount of $10,000.00.

21.     It is equitable and just to award Defendants reasonable and necessary costs incurred in the trial court in the amount of $11,506.75.

22.     All sums awarded to Defendants shall bear interest from the date of judgment at the rate of 7.75% per annum, compounded annually.

The headings contained herein are provided for convenience only. Any finding of fact which is more properly construed as a conclusion of law shall be considered a conclusion of law, and vice versa.

Signed_____3/12/25_____.

_____
JUDGE PRESIDING

Filed: 3/28/2025 1:43 PM
Michael Gould
District Clerk
Collin County, Texas
By Darcey Bonnet Deputy
Envelope ID: 99022714

Cause No. 493-01132-2023

**Appendix**

**4**

| | | |
|---|---|---|
| FRISCO SUMMIT, LP, and FRISCO SUMMIT, LP DERIVATIVELY ON BEHALF OF FRISCO MULTIFAMILY LAND PARTNERS, LP, | § § § § § § | IN THE DISTRICT CO~~URT~~ |
| Plaintiffs | § § | 493RD JUDICIAL DISTRICT |
| v. | § § | |
| FRISCO MULTIFAMILY LAND GP, LLC, et al., | § § § § | |
| Defendants | § | COLLIN COUNTY, TEXAS |

_____

## PLAINTIFFS' REQUEST FOR ADDITIONAL AND AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW
_____

Frisco Summit LP, and Frisco Summit, LP derivatively on behalf of Frisco Multifamily Land Partners, LP (collectively "Plaintiffs") in connection with the Judgment rendered on January 24, 2025, and the entry of original findings of fact and conclusions of law signed on March 12, 2025,[1] respectfully request that the Court make and send to the parties further, additional, and amended findings of fact and conclusions of law pursuant to Tex. R. Civ. P. 298 and, in support, respectfully show the Court as follows:

---

[1] Sent to Plaintiffs pursuant to the provisions of Tex. R. Civ. P. 21(b)(10) on March 20, 2025.

**23**

# I. PLAINTIFFS' RESERVATION OF RIGHTS AND NON-WAIVER

Plaintiffs disagree with the take-nothing Judgment entered by the Court on their claims, not only not only on their tort claims, but also on their claims for breach of the LPA; breach of the Joint Venture Agreement that the Plaintiffs have alleged existed between them and the Defendants Carleton Development, Ltd.,[2] Printice L. Gary,[3] Jeffrey D. Fulenchek,[4] and Neal R. Hildebrandt;[5] and, related Requests for Declaratory Judgment. In connection therewith, the Plaintiffs contend that the Court made erroneous determinations of law and, to the extent necessary or applicable for the issues left to be tried to the Court after Summary Judgment, made erroneous factual determinations. Accordingly, the following requests for amendments to the Court's original Findings of Fact and Conclusions of Law (as set forth in Section III below) and the following requests for additional findings of fact and conclusions of law (as set forth in Section IV. below) are for the purpose of preserving issues for appellate review, and by so doing the Plaintiffs do not admit that the matters as set forth therein are true and correct, nor do Plaintiffs waive their right to appeal such Findings of Fact and Conclusions of Law should they be adopted by the Court.

---

[2] "Carleton", Jeffrey D. Fulenchek ("Fulenchek"), and Neal R. Hildebrandt
[3] "Gary"
[4] "Fulenchek"
[5] "Hildebrandt" (Gary, Fulenchek, and Hildebrandt being referred to collectively as the "Individual "Defendants")

## II.    PERTINENT HISTORY AND RELEVANT AUTHORITIES

### A.    Summary Judgment and the Claims Tried

The Court will recall that prior to the commencement of the bench trial, the Court solicited the parties' confirmation of its entry of a detailed Order granting in part and denying in part the Defendants' Traditional and No Evidence Motions for Summary Judgment. For ease of reference, a true and correct copy of the Order that was signed on August 2, 2024 by the Court after that deliberative process is attached hereto as **Exhibit A** and incorporated by reference as though set forth herein at length.

In that regard, the Court, granted summary judgment in favor of the Defendants on Count 3 - Breach of Fiduciary Duty, Count 4 - Conspiracy, and Count 5 - Aiding and Abetting Breach, in their entirety. The Court also granted summary judgment, in part, on the Plaintiffs' Count 1 - Request for Declaratory Relief, and on the Plaintiffs' Breach of Contract claims Count 2.

Accordingly, the sole matters left to be tried to the Court were as follows:

1. Count 1 – Request for Declaratory Relief:  Paragraph 40(c) whether the price per square foot provision of §§7.1(d)(i)(A), (B), and (C) of the FMLP LPA were premised upon development of the Frisco Summit Property within a reasonable time;

2. Count 2 – Breach of Contract:  Paragraph 35(a) the failure to provide or account for Plaintiffs' interest in the Phase I Project Partnership (Frisco Summit I, LLP) and the promote fee earned by Carleton from the development of that Phase of the Project;

**25**

3. Count 2 – Breach of Contract: Paragraph 35(b) the failure to timely develop Phase II and Phase III of the JVA;

4. Count 2 – Breach of Contract: Paragraph 35(c) as to entering into agreements with entities owned or controlled by the Individual Defendants regarding the Frisco Summit Property;

5. Count 2 – Breach of Contract: Paragraph 35(e) Failing to provide documentation regarding the interests referenced in paragraph 35(a); and

6. Count 2 – Breach of Contract: Paragraph 35(f) as to failing to provide timely access to information regarding the conduct of the business operations of FMLP, including agreements entered into by FMLP with respect to the Phase II and Phase III developments contemplated by the JVA.

**B.      Findings of Fact and Conclusions of Law on Matters of Summary Judgment are Improper.**

Findings of fact are not appropriate for the purposes of summary judgments. *See IKB Indus. v. Pro-Line Corp.,* 938 S.W.2d 440, 442 (Tex. 1997), and *Hous. Auth. Of El Paso v. Beltran Elec. Contrs., Inc.,* 550 S.W.3d 707, 711 (Tex. App.-El Paso 2018).

Accordingly, the Findings of Fact entered by the Court which relate solely to matters or issues which were the subject of the Trial Court's summary judgment are inappropriate and those Court's Findings and Conclusions should be amended accordingly.

**C.** **Construction of Contract is a Question of Law for the Court**.

It is well-settled in Texas that construction of a written contract is a question of law for the court's determination. *See Sundown Energy Ltd. P'ship v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021).

**D.** **Contract Ambiguity is a Question of Law for the Court.**

It is well settled in Texas that a question of whether or not a term or provision in a contact is ambiguous is a question of law for the court. *See Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 690 (Tex. 2022). Accordingly, such matters of contract interpretation are to be set forth in the conclusions of law and not findings of fact, and the Court's Findings and Conclusions should be amended accordingly.

## III. PLAINTIFFS' REQUEST FOR AMENDMENTS TO FINDINGS OF <u>FACT AND CONCLUSIONS OF LAW</u>

To Section I above, Plaintiffs request the following amendments to the Court's Findings of Fact and Conclusions of Law:

**Findings of Fact:**

Paragraph 1 – no change;

Paragraph 2 - deleted in its entirety (see paragraph I.A. and B. above);

Paragraph 3 – deleted in its entirety. (As stated, this is a Conclusion of Law. At the conclusion of the evidence, the Court announced that under the terms of the LPA, the General Partner had no obligations to develop the Property referencing Section 7.1(iii));

**27**

Paragraph 4 – deleted in its entirety (As stated, this is a Conclusion of Law)(see paragraph I.C. and D. above);

Paragraph 5 - deleted in its entirety. (see proposed additional Findings of Fact III.A., 1 and 2 below);

Paragraph 6 – deleted in its entirety. (As stated, this is a Conclusion of Law. Moreover, the only Defendant which is a party to the LPA is the GP);

Paragraph 12 - deleted in its entirety. (As stated, this is a Conclusion of Law. Moreover, the only Defendant which is a party to the LPA is the GP);

Paragraph 13 – deleted in its entirety. (As stated, this is a Conclusion of Law);

Paragraph 15 – deleted in its entirety. (As stated, this is a Conclusion of Law);

**Conclusions of Law:**

Paragraph 16 – No change;

Paragraph 17 – deleted in its entirety (see proposed additional Conclusion of Law No. III.B.1.);

Paragraph 18 – deleted in its entirety (see proposed additional Conclusion of Law No. III.B.2.);

Paragraph 19 – deleted in its entirety (see proposed additional Conclusion of Law No. III.B.1.);

Paragraph 20 – deleted in its entirety (see proposed additional Conclusion of Law No. III.B.3.);

Paragraph 21 – amended to delete the reference to Carleton as Carleton was not a party to the LPA;

Paragraph 22 – no change;

Paragraph 23 – amended to replace the term "Defendants" with "the GP";

Paragraph 24 – amended to replace the term "Defendants" with "the GP";

Paragraph 25 – amended to replace the term "Defendants" with "the GP";

IV. **PLAINTIFFS' REQUEST FOR ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

To Section I above, Plaintiffs request the following additional Findings of Fact and Conclusions of Law.

A. **Findings of Fact.**

1. The GP provided Frisco Summit with its interest in the Promote Fee as required pursuant to section 7.1(d)(ii)(ii) regarding, "provides for the Limited Partner to receive a 50% of any Promote Fee."

2. The GP provided Frisco Summit with its interests as set forth in Section 7.1(d)(ii)(i) regarding, "provides for the limited partner to be admitted as a Special Limited Partner in such Project Partnership without any obligations or liabilities of any kind.

3. Carleton assigned its rights under the Phase 1 Purchase Contract with respect to Project Partnership.

4. Neither Carleton nor the Individual Defendants entered into a Joint Venture Agreement with Frisco Summit regarding the development of the Property.

**29**

5. The terms of any Joint Venture Agreement between Carleton and the Individual Defendants on the one hand, and Frisco Summit on the other, did not include an obligation on the part of Carleton and/or the Individual Defendants to develop the Property in three Phases.

6. The terms of any Joint Venture Agreement between Carleton and the Individual Defendants on the one hand, and Frisco Summit on the other, did not include an obligation on the part of Carleton or the Individual Defendants to timely develop the Property in three phases.

**B. Conclusions of Law**

1. Under the LPA, the GP did not have the obligation to develop the Property.

2. The GP did not violate the requirements of Section 7.1(d)(ii)(ii) or Section 7.1(i)(a) of the LPA.

3. The provisions of Section 7.1(d)(i)(c) and the definitions of Purchase Contract and Project Partnership as set forth in the LPA did not prevent Carleton from entering into a separate Purchase Agreement with the Project Partnership.

4. There was no valid or enforceable Joint Venture Agreement between Carleton and the Individual Defendants on the one hand, and Frisco Summit on the other.

5.    Neither Carleton nor the Individual Defendants violated any of their

obligations under any Joint Venture Agreement with Frisco Summit.

Respectfully submitted,

*/s/ Mitchell Madden*
Mitchell Madden (Attorney-in-Charge)
State Bar No. 12789350
mmadden@hjmmlegal.com
skinney@hjmmlegal.com
Melissa Johnson
State Bar No. 19142900
Melissa@hjmmlegal.com
**HOLMGREN JOHNSON:**
**MITCHELL MADDEN, LLP**
12810 N. Central Expressway, Suite 140
Dallas, TX 75243
Tele: 972/484-7780
Fax:  972/484-7743

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on March 28, 2025.

*/s/ Mitchell Madden*
Mitchell Madden

**Exhibit**

**A**

exhibitsticker.com

CAUSE NO. 493-01132-2023

| | | |
|---|---|---|
| Frisco Summit, LP and Frisco Summit, LP derivatively on behalf of Frisco Multifamily Land Partners, LP, | § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § | 493rd JUDICIAL DISTRICT |
| Frisco Multifamily Land GP, LLC; Carleton Development, Ltd.; GH Southwest II, Inc.; Frisco Summit I, LP; Frisco Summit I GP, LLC; Salt River Capital, Inc.; Frisco Summit II, LP; Frisco Summit II GP, LLC; Printice L. Gary; Jeffrey D. Fulenchek; and Neal R. Hildebrandt, | § § § § § § § § § § | |
| Defendants. | § | COLLIN COUNTY, TEXAS |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

Upon review and consideration of all applicable pleadings/filings, and counsel's arguments at the summary judgment hearing, the Court **HEREBY GRANTS IN PART, AND DENIES IN PART,** Defendants' Traditional and No-Evidence Motion for Summary Judgment (the "Motion") and rules as follows:

**IT IS ORDERED, ADJUDGED, AND DECREED** as to

**Count 1 - Request for Declaratory Relief** (which can be found at page 11 ¶ 40 of Plaintiffs' Original Petition):

| | |
|---|---|
| ¶ 40(a) whether the price per square foot provisions as set forth in §§7.1(d)(i)(A), (B), and (C) of the FMLP LPA provided minimum amounts or set forth the specific actual purchase price for each phase; | **MOTION** **GRANTED** |

1

**32**

| ¶ 40(b) whether the provisions of §§7.1(d)(i)(A), (B), and (C) of the FMLP LPA constitute an exception to Frisco Multifamily Land GP's fiduciary obligation to sell FMLP's property for its fair market value; and | **MOTION GRANTED** |
|---|---|
| ¶ 40(c) whether the price per square foot provision of §§7.1(d)(i)(A), (B), and (C) of the FMLP LPA were premised upon development of the Frisco Summit Property within a reasonable time. | **MOTION DENIED** |

**Count 2 – Breach of Contract** (which can be found at page 12 ¶ 45 and pages 9 and 10 ¶ 35 of Plaintiff's Original Petition):

| ¶ 35(a) the failure to provide or account for Plaintiffs' interest in the Phase I Project Partnership (Frisco Summit I, LLP) and the promote fee earned by Carleton from the development of that Phase of the project; | **MOTION DENIED** |
|---|---|
| ¶ 35(b) the failure to timely develop Phase II and Phase III of the JVA; | **MOTION DENIED** |
| ¶ 35(c): as to failing to sell property for its fair market value at the time of the transaction with an affiliate; | **MOTION GRANTED** |
| ¶ 35(c): as to engaging in the Salt River capital refinance as referenced hereinabove; | **MOTION GRANTED** |

2

| | |
|---|---|
| ¶ 35(c) : as to entering into agreements with entities owned or controlled by the Individual Defendants regarding the Frisco Summit Property; | **MOTION DENIED** |
| ¶35(d) failing to provide timely information regarding the project partnership or partnerships formed or to be formed by the Individual Defendants in connection with the development contemplated by the JVA; | **MOTION GRANTED** |
| ¶ 35(e) Failing to provide documentation regarding the interests referenced in paragraph ¶ 35(a); | **MOTION DENIED** |
| ¶ 35(f) as to failing to provide timely access to information regarding the conduct of the business operations of FMLP, including agreements entered into by FMLP with respect to the Phase II and Phase III developments contemplated by the JVA. | **MOTION GRANTED** |

**Count 3 – Breach of Fiduciary Duty** (which can be found at page 13 of Plaintiff's Original Petition) – **MOTION GRANTED**;

**Count 4 -- Conspiracy** (which can be found at page 14 of Plaintiff's Original Petition) – **MOTION GRANTED**;

**Count 5 – Aiding and Abetting** (which can be found at page 14 of Plaintiff's Original Petition) – **MOTION GRANTED.**

Signed_____ 8/2/2024 .

CHRISTINE A. NOWAK
JUDGE PRESIDING

3

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Tania Flores on behalf of Mitchell Madden
Bar No. 12789350
tflores@hjmmlegal.com
Envelope ID: 99022714
Filing Code Description: Request for Findings of Fact and Conclusions of Law
Filing Description: Plaintiffs' Request for Additional and Amended Findings of Fact and Conclusions of Law
Status as of 3/31/2025 11:02 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Shawnte Kinney | | skinney@hjmmlegal.com | 3/28/2025 1:43:26 PM | SENT |
| Thomas Murto | 14740500 | tflores@hjmmlegal.com | 3/28/2025 1:43:26 PM | SENT |
| Melissa Johnson | 19142900 | melissa@hjmmlegal.com | 3/28/2025 1:43:26 PM | SENT |
| Dennis Holmgren | 24036799 | dennis@hjmmlegal.com | 3/28/2025 1:43:26 PM | SENT |
| Ryan D.Marrone | | rmarrone@fbfk.law | 3/28/2025 1:43:26 PM | SENT |
| Patty Kelly | | pkelly@fbfk.law | 3/28/2025 1:43:26 PM | SENT |
| John Fraser | | jfraser@fbfk.law | 3/28/2025 1:43:26 PM | SENT |
| Kashonna Ross | | kross@fbfk.law | 3/28/2025 1:43:26 PM | SENT |
| Mitchell Madden | | mmadden@hjmmlegal.com | 3/28/2025 1:43:26 PM | SENT |
| Luc Whyte | | lwhyte@fbfk.law | 3/28/2025 1:43:26 PM | SENT |
| Kashonna Ross | | kross@fbfk.law | 3/28/2025 1:43:26 PM | SENT |
| Dennis Holmgren | | dennis@hjmmlegal.com | 3/28/2025 1:43:26 PM | SENT |

**Appendix**

**5**

**Exhibit**

**P-54**

## LIMITED PARTNERSHIP AGREEMENT

### OF

### FRISCO MULTIFAMILY LAND PARTNERS, LP

#### A TEXAS LIMITED PARTNERSHIP

This Limited Partnership Agreement (the "Agreement") is made and entered into as of the date set forth below, by and among FRISCO MULTIFAMILY LAND GP, LLC, a Texas limited liability company, as the "General Partner", and FRISCO SUMMIT, L.P., a Texas limited partnership, as the "Limited Partner" (with the General Partner and the Limited Partner hereinafter collectively sometimes referred to as "Partners").

### RECITALS:

WHEREAS, the Partners desire to form a limited partnership to hold the Property (defined herein) for investment and evidence their agreements relative to the Property.

NOW, THEREFORE, in consideration of the premises set forth herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Partners hereby agree as follows:

### ARTICLE I

### ADDITIONAL DEFINITIONS

Section 1.1 Definitions. The defined terms used in this Agreement shall, unless the context otherwise requires, have the respective meanings specified in this Section 1.1.

"Accountants" means any independent certified public accountant, or firm thereof, as may be engaged by the General Partner.

"Acquisition Lender" means Happy State Bank, or any other lender acceptable to the General Partner, in an amount and on terms acceptable to the General Partner, which Acquisition Loan shall be secured by liens against the Property

"Acquisition Loan" means that certain loan secured by a first lien against the Property, as described in Section 5.7, and all subsequent renewals, modifications, or refinancings of such loan.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant fiscal period, after giving effect to the following adjustments:

**EXHIBIT**

P19

02150.121

PLTF003366

(i) Credit to such Capital Account any amounts which such Partner is deemed to be obligated to restore for purposes of Treasury Regulations Section 1.704-l(b)(2)(ii)(c), including such Partner's Minimum Gain Share and such Partner's share of Partner Minimum Gain; and

(ii) Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-l(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-l(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" means, when used with reference to a specified Person, (i) any Person that, directly or indirectly, is the beneficial owner of 50% or more of each class of voting securities of the specified Person or of which the specified Person is directly or indirectly the beneficial owner of 50% or more of each class of voting securities, (ii) any member of the immediate family of the specified Person or any legal representative or trustee for the benefit of such member or any grantor trust or testamentary trust created by such Person and (iii) any Person that is an Affiliate of a Person described in clause (ii) above by reason of clause (i) above.

"Agreement" means this Limited Partnership Agreement, as originally executed and as hereafter amended or modified from time to time.

"Approved Budget" means the pro forma line item budget of all costs and expenses anticipated to be required to maintain the Property for the period of time covered by the budget, and that has been prepared in accordance with Section 7.2(d).

"Bankruptcy" shall be deemed to have occurred as to any Person when (a) such Person makes a general assignment for the benefit of creditors; (b) such Person files a voluntary bankruptcy petition; (c) such Person becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding; (d) such Person files a petition or answer seeking its reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (e) such Person files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in a proceeding of the types described in clauses (a) through (d) above; (f) such Person seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties; (g) 60 days expire after the date of the commencement against such Person of a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law if the proceeding has not been previously dismissed; or (h) 60 days expire after the date of the appointment, without such Person's consent or acquiescence, of a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties if the appointment has not previously been vacated or stayed, or 60 days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

"Book Value" means, with respect to any asset, the asset's adjusted basis for federal

PLTF003367

income tax purposes, except (a) the initial Book Value of any asset contributed by a Partner to the Partnership shall be the fair market value of such asset; (b) the Book Value of all Partnership assets shall be adjusted in the event of a revaluation as provided in Section 5.5(d); (c) the Book Value of any Partnership asset distributed to any Partner shall be the fair market value of such asset on the date of distribution as determined by the General Partner; and (d) such Book Value shall be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Capital Account" means, with respect to any Partner, the account maintained for such Partner in a manner which the General Partner determined is in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv) and Section 5.5 hereof.

"Capital Contribution" or "Capital Contributions" means, with respect to any Partner, the amount of money and fair market value of property (as determined pursuant to the definition of Book Value above) contributed to the Partnership by such Partner, including but not limited to any contributions made by the Partner pursuant to Article V hereof.

"Cash Proceeds" means the net proceeds derived by the Partnership from any sale or refinancing of the Property, after payment of all expenses of such transaction.

"Certificate" means the Certificate of Formation for the Partnership filed with the Secretary of State of the State of Texas, as such Certificate shall be amended and filed from time to time.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provision or provisions of succeeding law).

"Cumulative Net Loss" means the amount, if any, by which the aggregate amount of Losses and other items of loss or deduction allocated to a Partner (or predecessor in interest) in the current and all prior Fiscal Years exceeds the aggregate amount of Profits and other items of income or gain allocated to such Partner (or predecessor in interest) in such period.

"Cumulative Net Profits" means the amount, if any, by which the aggregate amount of Profits and other items of income or gain allocated to a Partner (or predecessor in interest) in the current and all prior Fiscal Years exceeds the aggregate amount of Losses and other items of loss or deduction allocated to such Partner (or predecessor in interest) in such period.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period (as a result of property contributions or adjustments to such values pursuant to Section 5.5(d) hereof), Depreciation shall be adjusted as necessary so as to be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost

PLTF003368

recovery deduction for such year or other period is zero, Depreciation for such year or other period shall be determined with reference to such beginning Book Value using any reasonable method selected by the General Partner.

"Developer" means Carleton Development, Ltd., a Texas limited partnership, and an Affiliate of the General Partner.

"Disposition" means any transfer, pledge, mortgage, granting of a security interest or other encumbrance or any other disposition of all or any portion of an Interest whatsoever, whether voluntary or involuntary.

"Event of Withdrawal" means (a) the assignment by a General Partner of all of its rights as a General Partner (b) the death of a General Partner that is a natural person, (c) the dissolution or termination of a General Partner that is not a natural person, (d) resignation or withdrawal of a General Partner, (e) the entry by a court of competent jurisdiction adjudicating a General Partner who is a natural person incompetent to manage the General Partner's person or property, or (f) the Bankruptcy of a General Partner.

"Fiscal Year" means the fiscal year of the Partnership as established in Section 14.1 hereof.

"General Partner" means Frisco Multifamily Land GP, LLC, a Texas limited liability company, in its capacity as the general partner of the Partnership, and its permitted successors and assigns.

"Interest" means the entire percentage ownership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement, but excluding any rights as a creditor of the Partnership.

"IRS" means the Internal Revenue Service.

"Limited Partner" means the Limited Partner, as listed on Schedule 1 attached hereto, in their capacity as limited partners of the Partnership, and their respective permitted successors and assigns.

"Major Decision" means a decision of the Limited Partner on any of the items set forth in Section 7.3 hereof.

"Minimum Gain" means, with respect to all nonrecourse liabilities of the Partnership, the minimum amount of gain that would be realized by the Partnership if the Partnership disposed of the Partnership property subject to such liability in full satisfaction thereof computed strictly in accordance with Treasury Regulation Sections 1.704-2(b) and 1.704-2(c).

"Minimum Gain Share" means, for each Partner, such Partner's share of Minimum Gain

PLTF003369

for the Fiscal Year (after taking into account any decrease in Minimum Gain for such year), as determined under Treasury Regulations Section 1.704-2(b)(2).

"New Allocation" shall mean the term as defined in Section 9.1(e).

"Nonrecourse Deductions" means, for each Fiscal Year or other period, an amount of Partnership deductions that are characterized as "nonrecourse deductions" under Treasury Regulations Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a Partnership fiscal year equals the net increase, if any, in the amount of Minimum Gain during that Fiscal Year, determined according to the provisions of Section 1.704-2(b)(2) of the Treasury Regulations.

"Partner Minimum Gain" means an amount determined by computing, with respect to each Partner Nonrecourse Debt, the Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Treasury Regulations Section 1.704-2(b).

"Partner Nonrecourse Debt" means nonrecourse Partnership debt for which one or more Partners bears an economic risk of loss, as defined in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Deductions" means, for each Fiscal Year, the Partnership deductions which are attributable to Partner Nonrecourse Debt and are characterized as "partner nonrecourse deductions" under Treasury Regulations Section 1.704-2(b).

"Partners" means the General Partner and the Limited Partner.

"Partnership" means this limited partnership, as the same may from time to time be constituted and, if necessary, reconstituted, in accordance with the TLPL and any other applicable laws and regulations.

"Person" means an individual, firm, corporation, partnership, trust or other legal entity.

"Profits" and "Losses" mean, for each Fiscal Year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b) Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or

PLTF003370

Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(c) Gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from such Book Value;

(d) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with the definition of "Depreciation" herein; and

(e) Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 9.1(b)(ii), (iii), (iv), (v) and (vi) hereof shall not be taken into account in computing Profits or Losses.

"Project Partnerships" means, collectively, the entities that will ultimately acquire portions of the Property pursuant to the Purchase Contracts, that is the entities to whom Carleton Development will assign the Purchase Contracts. Any Partner, and any Affiliate of any Partner, may be a partner in the Project Partnership. "Project Partnership" means any one of the Project Partnerships.

"Project Partnership Agreement" means the written agreement governing the rights, interests, duties and obligations of the Persons owning an interest in a Project Partnership.

"Promote Fee" means the fee Carleton Development anticipates receiving from each Project Partnership after the limited partners in the Project Partnership have received the required (i.e., the negotiated) internal rate of return.

"Property" or "Project" means that certain approximately 21.166 acre tract of real property as more particularly outlined and crosshatched on Exhibit "A" hereto, and all rights appurtenant thereto. The Property has been contributed to the Partnership by the Limited Partner.

"Purchase Contracts" means, collectively, Purchase Contract Phase 1, Purchase Contract Phase 2 and Purchase Contract Phase 3, as such terms are defined in Section 7.1(d). "Purchase Contract" means any one of the Purchase Contracts.

"Substitute Limited Partner" means any Person admitted to the Partnership as the Limited Partner pursuant to the provisions of Section 10.2 hereof.

"Treasury Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"TLPL" means the Texas Limited Partnership Law as adopted and from time to time as

PLTF003371

amended by the State of Texas.

## ARTICLE II

### FORMATION OF PARTNERSHIP, NAME AND OFFICE, PURPOSE

Section 2.1 <u>Formation of Partnership</u>. The Partners hereby form the Partnership. From and after the effective date of this Agreement, the Interests of all of the Partners shall be as set forth on Schedule 1 attached hereto and made a part hereof for all purposes, as same may be amended and modified from time to time, as set forth herein. The Partners hereby acknowledge and agree that the Partnership is formed and shall be governed in accordance with and pursuant to the TLPL for the purposes and upon the terms and conditions herein set forth.

Section 2.2 <u>Name</u>. The business of the Partnership shall be "Frisco Multifamily Land Partners, LP," or such other name as the General Partner shall hereafter designate by notice to the Limited Partner and by amendment to the Certificate.

Section 2.3 <u>Registered Agent and Office</u>. The address of the registered office of the Partnership is 5485 Belt Line Road, Suite 300, Dallas, Texas 75254, and the name of the registered agent for service of process required to be maintained by the TLPL is David Cohenour. The General Partner is hereby authorized and instructed to file the necessary amendment to the Certificate to change the registered office of the Partnership. The General Partner may designate a new registered agent for the Partnership and/or a new office of the Partnership by giving notice to the Limited Partner and filing a proper amendment to the Certificate with the Secretary of State of Texas.

Section 2.4 <u>Office for Records</u>. The location of the principal office of the Partnership in the United States where records are to be kept or made available under the TLPL is 5485 Belt Line Road, Suite 300, Dallas, Texas 75254, or such other address as the General Partner may determine by giving notice to the Limited Partner and filing a proper amendment to the Certificate with the Secretary of State of Texas. The General Partner is hereby authorized and instructed to file the necessary amendment to the Certificate to change the principal office of the Partnership to the address provided herein.

Section 2.5 <u>Purpose</u>. The purpose of the Partnership is strictly limited to the acquisition, ownership, and operation of the Property for investment purposes. This Partnership shall have all requisite power and authority to take all actions necessary or convenient to own, operate, manage and sell the Property and to conduct any lawful business relating thereto as determined by the Partners in accordance with this Agreement.

Section 2.6 <u>Authority of the Partnership</u>. To carry out its purpose and not in limitation thereof, the Partnership is empowered and authorized to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of its purpose, and for the protection and benefit of the Partnership, in accordance with and subject to the limitations in this Agreement and in accordance with the TLPL.

PLTF003372

## ARTICLE III

## TERM

Section 3.1 Dissolution. The term of the Partnership commenced upon the filing of the Certificate and shall continue until December 31, 2040, on which date the Partnership shall dissolve, or upon the occurrence of any of the following events of dissolution:

(a) Event of Withdrawal. An Event of Withdrawal of a General Partner unless the Partnership is continued pursuant to Section 11.2 hereof;

(b) Election. The election in writing by the General Partner and all of the Limited Partner to dissolve the Partnership;

(c) Court Decree. A decree of court;

(d) Sale. The sale or other disposition of all or substantially all of the assets of the Partnership, after the Partnership has collected all money and received all other consideration therefor; or

(e) Accordance with TLPL. In accordance with the provisions of the TLPL not inconsistent with this Agreement.

## ARTICLE IV

## GENERAL PARTNER AND LIMITED PARTNER

Section 4.1 General Partner. The General Partner is and shall continue to be Frisco Multifamily Land GP, LLC, whose business address is 5485 Belt Line Road, Suite 300, Dallas, Texas 75254. The Interest of the General Partner shall be one percent (1%).

Section 4.2 Limited Partner. The Limited Partner is and shall be that Person listed on Schedule 1. The Interests of the Limited Partner shall be ninety-nine percent (99%).

## ARTICLE V

## CAPITAL CONTRIBUTIONS, DEFAULTS

Section 5.1 Initial Capital Contributions of Partners.

(a) Required Contributions to Capital. The Partners shall make or have made the initial Capital Contributions (the "Initial Capital Contribution(s)") to the Partnership as set forth on Schedule 1 attached hereto and incorporated herein.

(b) Required Methods of Initial Capital Contributions. The General Partner has

PLTF003373

made or shall make its required Initial Capital Contributions in the form of cash or other evidence of good funds. The Limited Partner shall make its required Initial Capital Contribution as follows:

(i) Concurrently with the execution and delivery of this Agreement, the Limited Partner shall make its required contribution of $450,000 in cash or other evidence of good funds. The Limited Partner acknowledges and agrees that its cash contribution shall be made to Carleton Development on behalf of the Partnership, pending the establishment of the Partnership's bank accounts.

(ii) Concurrently with the execution and delivery of this Agreement, the Limited Partner shall transfer and convey the Property to the Partnership by Special Warranty Deed. As additional consideration for the covenants contained in this Agreement, the Limited Partner has made the representations and warranties which appear on Schedule 2 attached hereto and incorporated herein. The Limited Partner has made the representations on Schedule 2 with the understanding that the General Partner has relied and, is relying, on the truth and accuracy of such statements in connection with its involvement with the Property and the Partnership.

Section 5.2 Additional Capital Contributions. In the event the Partnership requires funds in addition to the Capital Contributions made by the Partners pursuant to Section 5.1(a) hereof, and the proceeds of the Acquisition Loan, all such additional contributions shall be made only by the Limited Partner, and the General Partner shall have no duty or obligation to make any such contributions, provided, however, the Limited Partner will not be obligated to advance such funds to the Partnership unless such additional Capital Contributions, and the timing of such contributions, are approved by the Limited Partner in accordance with Section 7.3 hereof.

Section 5.3 Partner Loans.

(a) Authorization. The Partnership shall be authorized to borrow money, if necessary, from any Partner or any related Person for authorized Partnership purposes to the extent deemed required by the General Partner and approved in writing by the Limited Partner in accordance with Section 7.3 hereof. The amount of any loan made to the Partnership by a Partner shall not be considered an increase in such Partner's Capital Account or otherwise a contribution to the Partnership, nor shall the making of such loan affect the Interests. No Partner shall be obligated to make any loans to the Partnership.

(b) Terms. In the event a Partner makes a loan to the Partnership as permitted by Section 5.3(a), it shall be entitled to receive interest for such loan at a rate equal to the same rate being charged by Acquisition Lender on the Acquisition Loan, subject to applicable usury laws. A Partner may not receive any security from the Partnership for such loan unless otherwise approved by the Partners. All loans from a Partner, together with interest thereon, shall be repaid prior to making any distributions to Partners. Upon a dissolution of the Partnership after which the Partnership is not reconstituted, any unpaid loans from Partners shall be then immediately due and payable.

PLTF003374

Section 5.4 <u>Return or Withdrawal of Capital Contributions; Distributions</u>. Except as otherwise expressly provided in this Agreement, none of the Partners shall be entitled to demand a refund or return of any Capital Contributions or to withdraw any part of its Capital Account nor to receive any distribution from the Partnership. The General Partner shall not be personally liable for the return of the Capital Contributions of the Limited Partner, or any portion thereof, it being expressly understood that any such return shall be made solely from Partnership assets. The General Partner shall not be required to pay to the Partnership or any Partner any deficit in any Partner's Capital Account upon dissolution or otherwise. No Partner shall have the right to demand or receive property other than cash for its Interest.

Section 5.5 <u>Capital Accounts</u>.

(a) <u>Establishment of Capital Accounts</u>. A Capital Account shall be established and maintained for each Partner.

(b) <u>Credits to Capital Accounts</u>. A Partner's Capital Account shall be credited with (i) the amount of cash and the initial Book Value of any property contributed to the Partnership, (ii) such Partner's allocable share of Profits, and (iii) the amount of any Partnership liabilities that are expressly assumed by such Partner or that are secured by any Partnership property distributed to such Partner.

(c) <u>Debits to Capital Accounts</u>. A Partner's Capital Account shall be debited with (i) the amount of cash and the fair market value of any Partnership property distributed to such Partner pursuant to any provision of this Agreement, (ii) such Partner's allocable share of Losses, and (iii) the amount of any liabilities of such Partner that are expressly assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership.

(d) <u>Adjustments to Capital Accounts</u>. Upon the occurrence of certain events as described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), the General Partner may increase or decrease the Capital Accounts of the Partners to reflect a revaluation of Partnership property on the Partnership's books, provided such adjustment of the Capital Accounts is made in accordance with the rules in Treasury Regulations Section 1.704-1(b)(2)(iv)(f).

(e) <u>Transferred Interest in the Partnership</u>. In the event any Interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Interest (or portion thereof) transferred.

(f) <u>Modifications to Capital Accounts</u>. From time to time as it deems appropriate, the General Partner may make such modifications to the manner in which the Capital Accounts are computed to comply with Treasury Regulations Section 1.704-1(b) provided that such modification is (in the reasonable judgment of the General Partner) not likely to have a material effect on the amounts distributable to any Partner pursuant to this

PLTF003375

Agreement.

(g) Compliance with Treasury Regulations. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-l(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(h) Negative Capital Accounts. Upon any dissolution and liquidation of the Partnership, no Partner shall be liable to repay to the Partnership the negative balance of such Partner's Capital Account.

Section 5.6 Interest on Capital Contributions. No interest shall be paid to any Partner on his Capital Contributions or Capital Preferences.

Section 5.7 Acquisition Loan. The Partnership shall obtain an acquisition loan (the "Acquisition Loan") for use in the purchase of the Property from Acquisition Lender. The Partners hereby specifically authorize the General Partner to execute any and all documents and instruments that may be determined to be reasonably desirable or required by the holder of the Acquisition Loan to evidence the Acquisition Loan. The Limited Partner further specifically authorizes the General Partner to refinance, recast, modify or extend (but not increase) the Acquisition Loan as may be deemed reasonably necessary by the General Partner.

ARTICLE VI

LIMITED PARTNERS

Section 6.1 Powers. The Limited Partner, as such, shall not participate in the management or control of the Partnership's business, nor shall the Limited Partner transact any business for the Partnership, nor shall the Limited Partner have the power to sign for or bind the Partnership, said powers being vested solely and exclusively in the General Partner. The Limited Partner and all Persons affiliated with the Limited Partner shall be entitled at all times to devote itself and themselves to any other business or investment, whether or not similar or competitive in nature to the business of the Partnership, without offering any interest or participation therein to any other Partner or the Partnership. Except as expressly provided herein, or as required by law, the Limited Partner shall have no right to call meetings of the Partners, nor shall he have the right as the Limited Partner to participate in any decision affecting the Partnership or to approve any actions of the General Partner or the Partnership.

Section 6.2 Limitation of Liability. Notwithstanding anything elsewhere provided in this Agreement to the contrary:

(a) No Liability for Partnership Debts. The Limited Partner shall not be liable for any debts, liabilities, contracts, or any other obligations of the Partnership, except as required by law or in accordance with any separate guarantee that may be executed by the Limited Partner.

PLTF003376

(b) No Liability in Excess of Amounts Contributed. The Limited Partner shall not be liable to the Partnership or its creditors for an amount in excess of the amount of contributions the Limited Partner is obligated to make to the Partnership pursuant to Section 5.1 hereof, and the Limited Partner shall not be required to lend any funds to the Partnership.

Section 6.3 Meetings of the Partners.

(a) Call of Meetings. Meetings of the Partners may be called by the General Partner and may also be called on a frequency no more than once per calendar month upon the written request of the Limited Partner. The call shall state the nature of the business to be transacted. Notice of any meeting shall be given to all Partners not less than five days nor more than 15 days prior to the date of such meeting. The Limited Partner may vote in person or by proxy at such meeting. Whenever the vote or consent of the Limited Partner is permitted or required under this Agreement, such vote or consent may be given at a meeting of the Partners or may be given in accordance with the procedures prescribed in Section 6.3(e) below.

(b) Intentionally Deleted.

(c) Proxy. The Limited Partner may authorize any person or persons to act for him by proxy on all matters on which the Limited Partner is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy shall be signed by the Limited Partner or his attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. A proxy may be revoked by the Limited Partner upon written notice of such revocation to the General Partner.

(d) Conduct of Meeting. Each meeting of the Partners shall be conducted by the General Partner or such other person as the General Partner may appoint pursuant to such rules for the conduct of the meeting as the General Partner or such other person deems appropriate.

(e) Action Without a Meeting. Any action that may be taken at a meeting of the Partners may be taken without a meeting if a consent in writing setting forth the action to be taken is signed by the Limited Partner. The General Partner may, if applicable, specify that any written ballot submitted to the Limited Partner for the purpose of taking action without a meeting shall be returned to the Partnership within the time, not less than that specified by the General Partner. The failure of the Limited Partner to approve or disapprove any requested action within 10 days after receipt of the notice from the General Partner requesting approval shall be deemed the approval by the Limited Partner of the action so requested by the General Partner.

(f) Telephone and Similar Meetings. The Limited Partner may participate in and hold a meeting by means of a conference telephone or similar communications equipment by means of which persons participating in the meeting can hear each other.

PLTF003377

Participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called or convened.

## ARTICLE VII

## GENERAL PARTNER

Section 7.1 Powers, Actions.

(a) Responsibilities. The General Partner shall have responsibility for the day-to-day management, operation and control of the business and affairs of the Partnership, subject to the terms of this Agreement. Except as otherwise provided herein, the General Partner may, without the joinder or consent of the Limited Partner, take any action on behalf of the Partnership deemed necessary or convenient by the General Partner to carry out the purposes of the Partnership in accordance with the terms of this Agreement.

(b) Enumerated Powers. Without limiting the generality of subsection (a) above, but subject in all instances to the terms of Section 7.3 hereof, the General Partner shall have full power, without requiring the consent of the Limited Partner, except as provided herein:

(i) To close the acquisition of the Property and to obtain the Acquisition Loan, including the execution and delivery of all documents and instruments necessary or advisable to consummate such transaction;

(ii) To collect all income accruing in or to the Partnership;

(iii) To pay all costs and expenses of ownership, operation and sale of the Property in accordance with the Approved Budget;

(iv) To render for and pay all of the taxes, levies and assessments against the Property or the Partnership;

(v) To prepare (or have prepared) and file all tax returns for and on behalf of the Partnership (but not the tax returns or other reporting of the individual Partners [other than Schedule K-1's to the Partnership tax returns, which will be supplied to the Limited Partner at least two (2) weeks prior to filing with the IRS] or of their respective heirs, representative, executors or assigns, in their individual capacities);

(vi) To maintain and operate the Property or any part or parts thereof;

(vii) To employ, terminate the employment, supervise and compensate such persons, firms or corporations for and in connection with the business of the

PLTF003378

Partnership or the acquisition, operation, maintenance, management, financing, refinancing, sale, exchange or other disposition of the Property or any interest therein, as may be necessary or desirable, it being understood that any Partner may be so employed to perform any of such services by the General Partner;

(viii) To administer all matters pertaining to insurance with respect to the Property, including to obtain and pay for a policy or policies of insurance insuring the Partnership against any liability to the public, or any person or risk to its properties, incident to the operation of the Property in such amounts and upon such terms as the General Partner shall reasonably deem necessary or appropriate under the circumstances, and such policies of insurance shall name the Partnership as a party insured;

(ix) To keep all books or account and other records of the Partnership;

(x) To the extent that funds of the Partnership are available therefor, to pay all debts and other obligations of the Partnership, including amounts due under any loans to the Partnership and costs of operation, maintenance and sale of the Property;

(xi) To coordinate the management, operation and sale of the Property, or any portions thereof;

(xii) To pay all taxes, assessments, and other impositions applicable to the Property, using its best efforts to pay same before delinquency and prior to the addition thereto of interest or penalties and undertake when appropriate any action or proceeding seeking to reduce such taxes, assessments, rents or other impositions; and

(xiii) To deposit all monies received by the General Partner for or on behalf of the Partnership in such national or state banking institutions as may be designated by the General Partner and to disburse and pay all funds on deposit on behalf of and in the name of the Partnership in such amounts and at such times as the same are required in connection with the ownership, development, maintenance, operation and sale of the Property.

All of the foregoing powers may be exercised at such prices, rental or amount, for cash, securities or other property, and upon such terms as the General Partner shall reasonably deem appropriate and in the best interest of the Partnership, subject to the provisions of this Agreement requiring approval of such actions by the Limited Partner.

(c) Certification. Any Person dealing with the Partnership or the General Partner may rely upon a certificate signed by the General Partner as to:

(i) the identities of the General Partner or the Limited Partner;

PLTF003379

(ii) the existence or non-existence of any fact or facts which constitute a condition precedent to the acts by the General Partner or are in any other manner germane to the affairs of the Partnership;

(iii) the Persons who are authorized to execute and deliver any instrument or document of the Partnership;

(iv) any act or failure to act by the Partnership or any other matter whatsoever involving the Partnership or any Partner; and

(v) the authority of the Partnership to take and of the General Partner to cause the Partnership to take action in accordance with the terms and conditions of this Agreement.

(d) Specific Authority. Without limiting the generality of subsections (a) and (b) above, the General Partner shall full power without requiring the consent of the Limited Partner to perform the following:

(i) The General Partner shall have full power to enter into Purchase Contracts with Carleton Development provided the Purchase Contracts reflect the terms and conditions set forth below.

(A) Purchase Contract Phase 1 (herein so called) shall (1) provide for the sale of approximately 7 acres of the Property; (2) reflect a purchase price equal to or greater than $7.00 per square foot; and (3) provide for the buyer under the Purchase Contract (i.e., the purchasing Project Partnership) to pay the rollback taxes applicable to such portion of the Property.

(B) Purchase Contract Phase 2 (herein so called) shall (1) provide for the sale of approximately 7 acres of the Property; (2) reflect a purchase price equal to or greater than $8.00 per square foot, plus the accrued interest under the Acquisition Loan; and (3) provide for the buyer under the Purchase Contract (i.e., the purchasing Project Partnership) to pay the rollback taxes applicable to such portion of the Property.

(C) Purchase Contract Phase 3 (herein so called) shall (1) provide for the sale of the remaining Property; (2) reflect a purchase price equal to or greater than $9.00 per square foot, plus the accrued interest under the Acquisition Loan; and (3) provide for the buyer under the Purchase Contract (i.e., the purchasing Project Partnership) to pay the rollback taxes applicable to such portion of the Property.

The Purchase Contracts shall reflect such other terms and conditions as the General Partner shall deem necessary so long as such other terms and conditions do not conflict with the above.

PLTF003380

(ii) Notwithstanding the authority given to the General Partner to enter into the Purchase Contracts with Carleton Development, the General Partner shall not have the power or authority to consummate the sales contemplated by the Purchase Contracts (i.e., the General Partner may not execute any warranty deed conveying any portion of the Property to a Project Partnership) unless the Project Partnership Agreement for the Project Partnership then acquiring a portion of the Property (i) provides for the Limited Partner to be admitted as a special limited partner in such Project Partnership without any obligations or liabilities of any kind, and (ii) provides for the Limited Partner to receive 50% of any Promote Fee. The General Partner and Carleton Development acknowledge and agree that the Limited Partner's receipt of 50% of the Promote Fee is a material inducement to the Limited Partner entering into this Agreement.

(iii) The Partners acknowledge and agree that the rezoning of the Property in a manner that facilitates the development of the Property into residential apartment communities is a critical component of the General Partner's involvement in the Partnership, as well as the involvement of Carleton Development, and that the rezoning must occur prior to the contemplated sales to the Project Partnerships. Accordingly, in the event the Property cannot be rezoned in a manner acceptable to the General Partner in its sole discretion, the General Partner shall full power without requiring the consent of the Limited Partner to list the Property for sale for a price sufficient to pay off the Acquisition Loan and all other liabilities of the Partnership.

Section 7.2 General Duties and Obligations of the General Partner.

(a) Time. During the term of the Partnership, the General Partner shall diligently and faithfully devote such time to the management of the business of the Partnership as may be reasonably necessary to serve the interests of the Partnership.

(b) Reserves. During the term of the Acquisition Loan, or any refinancing thereof, the General Partner shall establish all reserves or escrow funds as may be required in accordance with the terms and conditions of the Acquisition Loan, or any successor loan.

(c) Filings. If required by law, the General Partner shall file or cause to be filed of record in the office of the appropriate authorities of the State of Texas, such certificates (including limited partnership and fictitious name certificates) and other documents which are required by the applicable statutes, rules or regulations of Texas or as are necessary to reflect the identity of the Partners and the amounts of their respective Capital Contributions, or for any other purpose.

(d) Budget. By November 1st of each year, the General Partner shall prepare and present a proposed detailed annual budget and annual pro forma income and expense statement for the following calendar year for review, comment and approval of the Limited Partner. The Limited Partner will submit comments, if any, and/or approve or

PLTF003381

disapprove such proposed budget and pro forma statement no later than December 1st of such year. The Limited Partner's approval of such proposed budget shall not be unreasonably withheld. A failure to respond by December 1st shall constitute approval of that proposed budget and pro forma statement by the Limited Partner. If the proposed budget and pro forma statement is approved by the Limited Partner, then that proposed budget and pro forma statement shall be deemed thereafter to constitute the Approved Budget for the calendar year in question for all purposes hereof. The Partners shall use their best efforts to resolve any issues and to agree upon the Approved Budget for the calendar year in question.

Section 7.3 <u>Restrictions on General Partner</u>. Notwithstanding the provisions of <u>Section 7.1</u> above, the General Partner agrees that it shall not and will not have authority to do any of the following matters on behalf of the Partnership unless approved in writing by the Limited Partner:

(a) to borrow money, whether on a secured or unsecured basis, on behalf of the Partnership, excluding, however, the Acquisition Loan, which is approved as an authorized borrowing of the Partnership;

(b) to sell, exchange or otherwise dispose of all or any portion of the Property, except as permitted by <u>Section 7.1(d)</u>:

(c) to acquire any additional land or interest therein;

(d) to determine whether the Limited Partner shall be required to make additional Capital Contributions to the Partnership, and, if required, the amount of such additional Capital Contributions that may be required;

(e) to determine whether distributions should be made to the Partners, other than as provided in <u>Section 9.2</u>, <u>Section 9.3</u> or <u>Section 13.2</u> hereof; or

(f) to make any expenditure or incur any obligation by or on behalf of the Partnership involving a sum in excess of $20,000.00, for any transaction or group of similar transactions except as herein expressly permitted, or as permitted in an Approved Budget.

Section 7.4 **Liability; Indemnification. The General Partner shall have no liability to the Partnership or any Partner for any loss suffered by the Partnership which arises out of any action or inaction by the General Partner if the General Partner, in good faith, determined that such course of conduct was in the best interests of the Partnership, and if such course of conduct was not the result of the General Partner's negligence or willful misconduct. Further, to the full extent permitted by the TLPL, the Partnership shall and hereby does indemnify and hold harmless the General Partner from any claim, cause of action, cost, loss, damage, or liability, including, but not limited to, reasonable attorneys' fees and expenses incurred by it by reason of any act performed by the General Partner on behalf of the Partnership or in furtherance of the Partnership's interest or by reason of being a General Partner except if due to the fraud, bad faith, willful malfeasance or**

PLTF003382

**negligence of such General Partner or a material breach by the General Partner of its material obligations under this Agreement; provided, however, if (a) the General Partner is found liable to the Partnership or (b) the General Partner is found liable on the basis that the General Partner improperly received a benefit, the Partnership shall not indemnify and hold harmless the General Partner.**

## ARTICLE VIII

## REPRESENTATIONS; WARRANTIES; COVENANTS

Section 8.1 <u>Representations and Warranties of the Limited Partner</u>. The Limited Partner represents and warrants that he:

(a) <u>No Registration</u>. Is aware that the Partnership has not been registered under the Federal Securities Act of 1933 (the "<u>Act</u>") or the securities laws of any State, and that the sale to it of its Interest is predicated upon such sale being exempt from registration as an exempt transaction under Section 4(2) of the Act, Section 5.1(a) of the Texas Securities Act and comparable provisions of other state securities laws, and such Limited Partner understands that no state or federal governmental authorities have made any finding or determination relating to the fairness for investment in its Interest and that no state or federal governmental authority has or will recommend or endorse these interests, and that no portion of its Interest may be resold unless it is registered under the Act (and applicable blue sky regulations) or unless an exemption from registration is available;

(b) <u>High Degree of Risk</u>. Is aware that this investment involves a high degree of risk and is a speculative venture, and such Limited Partner has been advised by independent counsel, and is not relying upon any representations by the General Partner or its counsel as to the tax consequences from this investment;

(c) <u>An Accredited Investor</u>. Is an Accredited Investor (as defined in Rule 501 of Regulation D adopted under the Act), and alone or with a purchaser representative (as defined in Rule 501 of such Regulation D) such Limited Partner has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investing in the Partnership;

(d) <u>Solely for Own Use</u>. Is acquiring its Interest solely for such Limited Partner's own account for investment and without any present view of making a distribution or sale of such Interest and such Limited Partner has the financial ability to hold the Interest for an indeterminate period of time and has no reason to anticipate any change in its financial condition or circumstances which would cause a need to sell or otherwise dispose of the Interest;

(e) <u>No Public Market</u>. Recognizes that there has been no public market for Interests in the Partnership and no public market for Interests is anticipated or likely, and such Limited Partner understands that the transferability of its Interest is highly restricted;

PLTF003383

(f) Information Regarding Partnership. Has received information concerning the Partnership, understands the nature of the risks involved in the proposed investment, and has asked any questions of the General Partner which it desires to ask and has received the answers or other information from the General Partner with respect to all such questions; and

(g) Negotiations. Has a prior business or personal relationship with officers of the General Partner and is investing in the Partnership as a result of negotiations with the General Partner and its representatives.

**The Limited Partner agree to indemnify and hold harmless the Partnership and any other Partners, their respective agents and representatives, from and against any and all loss, claims, damage or liability directly related to any breach of the foregoing representations and warranties (including any misrepresentations or omissions related thereto, whether existing on the date hereof or subsequent hereto) by such Limited Partner, including, but without limitation, costs and attorneys' fees in respect of any matter related hereto.**

Section 8.2 Contracts with Related Parties. Except as expressly provided in this Agreement, the General Partner shall not enter into any contract, agreement, lease or other arrangement for the furnishing to or by the Partnership of goods, services or space with any party or entity related to or affiliated with the General Partner or with respect to which any Affiliate of the General Partner has any direct or indirect ownership or control unless such contract, agreement, lease or other arrangement has been approved by the General Partner and the Limited Partner. Such prohibition on related party contracts shall specifically include, without limitation, contracts, agreements or fees relative to real estate commissions or similar payments arising on the sale of any portion of the Property. All contracts, agreements, leases or other arrangements for the furnishing to or by the Partnership of goods, services or space shall be bona fide, at competitive prices, in Dallas County, Texas, and for goods, services, materials or space as reasonably needed for the business of the Partnership. Nothing contained herein shall prohibit the General Partner from entering into the Purchase Contracts with the Developer, or from entering into any other agreements or understandings with Carleton Development as deemed reasonably necessary by the General Partner to accomplish the sale of the Property to the Project Partnerships.

Section 8.3 Other Business Ventures. Nothing contained in this Agreement shall prohibit any Partner or any Affiliate of any Partner from owning, operating or investing in a real estate development not owned or operated by the Partnership, wherever located, even if competitive with the Property. Each Partner agrees that the other Partners or Affiliate of such Partner may engage in or possess an interest in other business ventures, of any kind, independently or with others, including but not limited to the ownership, financing, sale, leasing, operation, management, syndication, brokerage and development of real property, and neither the Partnership nor the Partners shall have any rights by virtue of this Agreement in and to such other venturers or to the income or profits derived therefrom.

### ARTICLE IX

PLTF003384

## ALLOCATIONS OF PROFITS; LOSSES; DISTRIBUTIONS

Section 9.1 Allocations of Profits and Losses.

(a) Annually. Except to the extent otherwise provided in Section 9.5 hereof, Profits and Losses of the Partnership for each Fiscal Year shall be allocated as follows:

(i) Profits shall be allocated as follows:

(A) First, pro-rata to any Partners with a Cumulative Net Loss, in accordance with and to the extent of such Cumulative Net Losses, until no Partner has a Cumulative Net Loss;

(B) Then, pro-rata to the Partners in accordance with their distributions set forth in Section 9.2 and Section 9.3.

(ii) Losses shall be allocated as follows:

(A) Except as provided below, Losses shall be allocated to the Partners in percentage amounts based on comparison of the Capital Account balances of the Partners at the end of each Fiscal Year of the Partnership in order that Losses allocated to the Partners will proportionately reduce their respective Capital Account balances until each Partner's Capital Account balance is equal to zero; and then, the balance of Losses shall be allocated to the Partners, pro rata, based on their respective Interests.

(B) No Losses shall be allocated to the Limited Partner under Subsection (A) to the extent that such allocation would cause such Limited Partner to have an Adjusted Capital Account Deficit at the end of such Fiscal Year (or increase the amount of such Adjusted Capital Account Deficit). All Losses in excess of the limitation set forth in this Subsection (B) shall be allocated to the General Partner, in accordance with Treasury Regulations Section 1.704-1(b)(3). Notwithstanding Subsection 9.1(a)(i) above, the first Profits after any allocation of Losses to the General Partner in accordance with the preceding sentence shall be allocated to the General Partner until the General Partner has been allocated Profits in an amount equal to the Losses so allocated.

(C) All Nonrecourse Deductions for each Fiscal Year shall be allocated to the Partners in accordance with their relative Capital Accounts.

(D) All Partner Nonrecourse Deductions for each Fiscal Year shall be allocated to the Partner or Partners who bear the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable, in accordance with the ratio in which the Partners bear such economic risk of loss and Treasury Regulations Section 1.704-2(i)(1).

(b) General. Notwithstanding anything to the contrary in Section 9.1(a), the

PLTF003385

following provisions shall apply to all allocations:

(i) All allocations of Profits and Losses for a Fiscal Year, shall be applied (A) after giving effect to distributions, if any, during such Fiscal Year under Section 9.2, Section 9.3 and Section 13.2(b); and (B) as if all distributions and allocations were made at the end of such Fiscal Year.

(ii) In the event there is any recapture of Depreciation the allocation of gain or income attributable to such recapture shall be shared by the Partners in the same proportion as the deduction for such Depreciation was shared.

(iii) Any interest income realized in connection with any promissory note received by the Partnership in connection with the sale of its assets, net of any interest expense accrued by the Partnership on any underlying obligations related to such asset shall be allocated to the Partners pro rata in accordance with the remaining amount to be distributed to them upon receipt of the principal payments made on such promissory note.

(iv) Prior to any allocations for a Fiscal Year under Section 9.1(a), but after the application of Sections 9.1(b)(v) and (vi) below, in the event any Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) and such adjustment, allocation, or distribution, results in any Partner having an Adjusted Capital Account Deficit, then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the excess deficit of such Partner as quickly as possible. This Section 9.1(b)(iv) is intended to comply with the "qualified income offset" requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3), and shall be interpreted consistently therewith.

(v) Prior to the application for a Fiscal Year of any other provision of this Section 9.1, if there is a net decrease in Minimum Gain during a Fiscal Year, then before any other allocation is made for such year, the Partners shall be allocated items of gross income and gain for such year (and, if necessary, subsequent years) in the amount and in the proportions necessary to satisfy the requirements of a "minimum gain chargeback" under Treasury Regulation Section 1.704-2(b)(2).

(vi) After the application of Section 9.1(b)(v) above, but prior to the application for such Fiscal Year of any other provision of this Section 9.1, if there is a net decrease in Partner Minimum Gain attributable to a Partner Nonrecourse Debt during a Fiscal Year, then any Partner with a share of the Partner Minimum Gain attributable to such debt at the beginning of such year shall be allocated items of income and gain for such year (and, if necessary, subsequent years) in the amount and proportions necessary to satisfy the provisions of Treasury Regulation Section 1.704-2(j).

PLTF003386

(c) Contributed Property. In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Book Value. In the event the Book Value of any Partnership property is adjusted pursuant to Section 5.5(d) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and such Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Subsection (c) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

(d) Distributions In-Kind. Upon a distribution in-kind of Partnership assets, at the time of liquidation pursuant to Section 13.2, or otherwise, for purposes of determining the balance in each Partner's Capital Account, each such asset shall be deemed sold by the Partnership for the amount of such asset's fair market value (as determined in accordance with the method for determining Book Value, or by the Special Liquidator, as the case may be), and any gain or loss deemed realized on such deemed sale shall be properly charged to the Capital Accounts of the Partners according to Section 9.1 as if such assets were sold.

(e) Authority of General Partner to Amend Allocations. The Partners intend that all allocations of Partnership taxable income and loss (or any separate item thereof) shall be determined and allocated in accordance with this Section 9.1 to the fullest extent permitted by Code Section 704(b). However, the General Partner is authorized to allocate any or all items of Partnership taxable income or loss in a manner differently from that set forth in this Section 9.1 during any Partnership fiscal year if the General Partner believes that as a result of the IRS issuing regulations or other official statements under or in connection with Code Section 704(b) or, as a result of other developments in the law, the IRS is likely to successfully challenge the allocations of any or all items of Partnership taxable income or loss, or recategorize Partnership distributions, or is likely to successfully assert any position that would substantially reduce or eliminate the Partners' distributive shares of Partnership tax losses. Any amendment to the allocations made pursuant to this Section 9.1(e) shall be deemed to be a complete substitute for any allocation otherwise provided for in this Section 9.1, and no amendment of this Agreement shall be required.

(f) Advice of Accountants and/or Counsel. In making any New Allocation under Section 9.1(e), the General Partner is authorized to act only after having been advised by its accountants and/or legal counsel that the New Allocation is necessary to comply with any issued regulations or other official IRS statement under or in connection with Code

PLTF003387

Section 704(b) or other developments in the law, and the New Allocation, in the best judgment of the General Partner's accountant and/or legal counsel, is the minimum modification of the allocations otherwise provided for in this Section 9.1 necessary to satisfy the applicable criteria that, either in the then current or in any preceding Partnership fiscal year, each Partner's distributive share of Partnership taxable income or loss is determined and allocated in accordance with this Section 9.1 to the fullest extent permitted by Code Section 704(b).

(g) Subsequent Allocations. If the General Partner exercises its authority under Section 9.1(e) to make any New Allocation in a manner less favorable to any Partner than is otherwise provided for in this Section 9.1, then the General Partner is authorized and directed to allocate Partnership taxable income or loss arising in later Partnership fiscal years in such manner so as to bring the allocations of Partnership taxable income or loss to the Partners as near as possible to the tax allocations originally set forth in this Section 9.1, insofar as it is advised by its accountants and/or legal counsel that such tax allocations comply with Code Section 704(b).

(h) Reliance by General Partner. New Allocations made by the General Partner under Section 9.1 in reliance upon the advice of its accountants and/or legal counsel shall be deemed to be made pursuant to the fiduciary obligation of the General Partner to the Partnership, and no such allocation shall give rise to any claim or cause of action by any Limited Partner.

Section 9.2 Distributions of Cash Proceeds from Sales. Cash Proceeds from any sale of the Property shall be distributed at such time as may be determined by the General Partner. Cash Proceeds from such transaction shall be applied and distributed in the following order of priority:

(a) First, to repay then existing loans of the Partnership, including the Acquisition Loan, but excluding debts and liabilities of the Partnership to Partners or any Affiliates;

(b) Second, to the payment of any debts and liabilities (including unpaid fees) owed to the Partners or any Affiliates by the Partnership for Partnership obligations;

(c) Third, to the Limited Partner, in an amount equal to any Capital Contributions previously contributed by the Limited Partner to the Partnership and not previously reimbursed by the Partnership; and

(c) After repayments of the Limited Partner Capital Contributions all remaining Cash Proceeds from the sale of the Property will be distributed on a ratable basis to each of the Partners, based on the Interest of each Partner in effect at the time of such distribution.

Section 9.3 Distributions of Cash Proceeds from Refinancings. Cash Proceeds from any refinancing of the Acquisition Loan or any other loan obtained by the Partnership which is secured by the Property, or any portion thereof, shall be distributed at such time as may be determined by the General Partner. Cash Proceeds from such transaction shall be applied and

PLTF003388

distributed in the following order of priority:

(a) First, if the Cash Proceeds from such refinancing exceed the cost or outstanding debt secured by the Property, then the Cash Proceeds shall be distributed to the Limited Partner until the Limited Partner has received an amount equal to its Capital Contribution made to the Partnership and not previously reimbursed to such Partner; and

(b) Then, all remaining Cash Proceeds from the refinancing of the Property will be distributed to all Partners on a ratable basis based on the Interest of each Partner in effect at the time of such distribution.

Section 9.4 Division and Treatment of Allocations and Distributions. Except as otherwise expressly provided in this Agreement:

(a) Record Party. Except as otherwise expressly provided elsewhere in this Agreement, distributions of cash or other property shall be made only to such Persons who appear as Partners on the books of the Partnership on the date of distribution.

(b) Amounts Withheld. All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment or distribution to the Partnership or a Partner shall be treated as amounts distributed to the Partners pursuant to Section 9.2 or Section 9.3, as applicable, for all purposes under this Agreement.

Section 9.5 Profit or Loss from the Liquidation of the Partnership.

(a) Profit. After adjusting the Capital Accounts for distributions made under Section 9.2 and Section 9.3 and allocations under Section 9.1(a) through (h) for the applicable Fiscal Year of the Partnership, the Profit resulting from a sale of the Partnership's assets upon the dissolution and termination of the Partnership shall be allocated to the Partners in the following order and priority:

(i) First, if the Capital Account of any Partner has a negative balance, to such Partner to the extent of such negative balance. If the Capital Accounts of more than one Partner have a negative balance, Profit, to the extent of the aggregate negative balances in the Capital Accounts of the Partners, shall be allocated to such Partners in proportion to their respective negative balances;

(ii) Second, after the Capital Accounts of the Partners are adjusted for the allocations of Profits under Section 9.4(a)(i) and (ii), thereafter, the balance of Profits shall be allocated to the Partners in accordance with their respective Interest in effect at the time applicable distributions are made hereunder.

PLTF003389

(b)     Loss.  After adjusting the Capital Accounts for distributions made under Section 9.2 and Section 9.3 and allocations under Section 9.1(a) through (h) for the applicable Fiscal Year of the Partnership, Losses resulting from a sale of the Partnership's assets upon the dissolution and termination of the Partnership shall be allocated to the Partners in the following order and priority:

(i)     First, to those Partners in the least amount necessary and to the extent possible so that the Partners' Level One Balances (as hereinafter defined) are as closely as possible in the ratio of their relative Interests and then to all the Partners in proportion to their Level One Balances until the Level One Balances are reduced to zero.  A Partner's "Level One Balance" is defined as the amount, if any, by which the positive balance in its Capital Account exceeds the aggregate amount of its unpaid Capital Contributions.

(ii)     Second, to the Partners with positive Capital Account balances in proportion to such positive balances until such balances are reduced to zero.

(iii)     Third, to the Partners in accordance with their Partnership percentages as determined under Treasury Regulation Section 1.704-1(b)(3).

## ARTICLE X

## DISPOSITION OF A LIMITED PARTNER'S INTEREST AND WITHDRAWAL

Section 10.1 Restrictions on Transfer.  Except for transfers of their respective Interests to Affiliates, which transfers may be made by the Limited Partner without requiring any consent or approval from the General Partner and which transferees shall be admitted as Substitute Limited Partner without the consent or vote of any Partners, and except for withdrawals or transfers expressly authorized or permitted hereunder, the Limited Partner shall not have the right to withdraw as such, nor may it make any other Disposition of all or any part of its Interest in the Partnership without the prior written consent of the General Partner, the giving or withholding of which is exclusively within the discretion of the General Partner.

Section 10.2 Substitute Limited Partner; Other Transferees; Transferor.

(a) Substitution.  Other than Affiliates of the Limited Partner, no other Person may become a Substitute Limited Partner, nor may such right of substitution be granted by the Limited Partner to any assignee by operation of law or otherwise, without the prior written consent of the General Partner, the granting of which shall be in its sole and uncontrolled discretion, and otherwise complying with the applicable terms and conditions of this Article X and Article XII, and such Person shall become a Substitute Limited Partner only when the General Partner has accepted such Person as the Limited Partner of the Partnership, without further consent or approval by or of any Limited Partner.

PLTF003390

(b) Death, Incompetency or Bankruptcy of the Limited Partner. If the Limited Partner dies, the executor, administrator or trustee, or, if such Limited Partner is adjudicated incompetent or insane, its guardian or conservator, or, if a Bankruptcy occurs as to the Limited Partner, the trustee or receiver of the estate, shall have all the rights of such Limited Partner for the purpose of settling or managing the estate's or incompetent's affairs, and the power to assign all or any part of the Interest to the extent permitted by Section 10.1 above, and to join with the assignee thereof in satisfying conditions precedent to such assignee becoming a Substitute Limited Partner. The death, adjudication of incompetence or Bankruptcy of the Limited Partner in and of itself shall not dissolve the Partnership.

(c) Limits for Assignee. An assignee of the Limited Partner who does not become a Substitute Limited Partner shall have no right to vote or otherwise act as the Limited Partner under any of the provisions of this Agreement, including, but not limited to, the right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. Except as required by operation of law, any such assignee who does not become a Substitute Limited Partner (including, but not limited to, an intestate successor, a receiver, trustee, legal representative, guardian or other successor in interest), and who desires to make a further transfer of all or any part of his, her or its Interest in the Partnership shall be subject to all of the provisions of this Article X and Article XII to the same extent and in the same manner as any Limited Partner desiring to make an assignment of all or part of its Interest in the Partnership.

(d) Assignor Limited Partner. If the Limited Partner transfers all of his Interest in the Partnership, he shall cease to be the Limited Partner of the Partnership, and shall no longer have any rights or privileges of the Limited Partner except that, unless and until the assignee of such Limited Partner is admitted as a Substitute Limited Partner in accordance with this Section 10.2, said transferring Limited Partner shall retain the statutory rights and obligations of an assignor Limited Partner under the TLPL.

ARTICLE XI

DISPOSITION OF A GENERAL PARTNER'S INTEREST AND WITHDRAWAL

Section 11.1 Limitations on Transfer.

(a) Transfer Prohibited. Except as provided in this Article XI, the General Partner shall not withdraw or attempt to withdraw from the Partnership, nor shall the General Partner make any Disposition of any portion of its Interest in the Partnership, without the consent of the Limited Partner.

(b) Assignment to Affiliates. A General Partner shall be permitted to assign to an Affiliate any portion but not all of its Interest, including its interest in the Profits, Losses, Cash Available for Distribution, Net Profits and other allocations and distributions, provided that such General Partner retains an interest of at least one percent (1%) of Partnership capital, Profits, Losses, Cash Proceeds, Net Profits and other allocations and

PLTF003391

distributions. Notwithstanding the assignment by a General Partner of a portion of its Interest pursuant to the foregoing, upon any such assignment (A) such General Partner shall not cease to be a general partner of the Partnership, and shall continue to be the General Partner of the Partnership, and (B) such General Partner shall continue to have any and all rights, powers and obligations of a General Partner under this Agreement and the TLPL, and the power to exercise any and all rights, powers and obligations of a General Partner under this Agreement and the TLPL, and the assignee shall not acquire any such rights and powers of a General Partner.

Section 11.2 Continuation of Partnership.

(a) If, upon an Event of Withdrawal of a General Partner, there remains at least one General Partner, (A) the withdrawing General Partner shall thereupon be deemed to have retired as and ceased to be a General Partner and (B) the Partnership shall be reconstituted and its business continued without being wound up and the remaining General Partner(s) shall continue the business of the Partnership.

(b) If, upon an Event of Withdrawal of a General Partner, there remains no other General Partner, notice of such Event of Withdrawal shall promptly be sent by such withdrawing General Partner or its representative to the Limited Partner. In such event, the Partnership shall be reconstituted and its business continued without being wound up, if the Limited Partner elect within ninety (90) days of such Event of Withdrawal to continue the business of the Partnership and appoint a substitute General Partner effective as of the Event of Withdrawal of the departing General Partner. Such substitute General Partner shall be required to own at least a one percent (1%) Interest in the Partnership, and must otherwise agree to be bound by the terms of this Agreement.

Section 11.3 Continuing Obligation. If a General Partner shall cease to be a General Partner of the Partnership, it shall be and remain liable for all obligations and liabilities incurred by it as a General Partner prior to or at the time such withdrawal shall have become effective, but it shall be free of any obligation or liability incurred after the time such withdrawal shall have become effective.

## ARTICLE XII

## DISPOSITION OF ANY PARTNER'S INTEREST; PROCEDURES; EFFECT; POWERS

Section 12.1 Procedures.

(a) Transfer on Books. Except as otherwise expressly provided in this Agreement and subject in all respects to the provisions of Articles X and XI hereof, the transfer of any Interest in the Partnership shall be accomplished only by the submission to the General Partner by the transferor or transferee of all documents and instruments requested by the General Partner, including without limitation the instrument making such transfer, and instrument signifying the transferee's representations regarding his, her

PLTF003392

or its investment and agreement to be bound by all of the provisions of this Agreement and all of the transferor's obligations, each duly executed and acknowledged and in such form and substance as shall be satisfactory to the General Partner in its sole discretion.

(b) Costs. All costs and expenses incurred by the Partnership in connection with any transfer of an Interest, or any part thereof, including, but not limited to, any filing, recording and publishing costs and the fees and disbursements of counsel, shall be paid by the Partner disposing of such Interest or such part thereof or, if not so paid, then by the transferee of such Interest.

Section 12.2 Effects of Transfers.

(a) Allocations and Distributions. When an Interest, or any part thereof, of a Partner in the Partnership is effectively transferred during any fiscal period pursuant to Articles X or XI, or this Article XII, Profits, Losses, each item thereof and all other items attributable to such Interest for such period shall be divided and allocated between such Partner (the "Transferor") and the Person to whom the Interest or part thereof is transferred (the "Transferee") by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner. All distributions on or before the date of such transfer shall be made to the Transferor, and all distributions thereafter shall be made to the Transferee; provided, however, that the Partnership and the General Partner shall be exonerated from any and all liability under this Section 12.2(a) with respect to distributions made prior to the date of transfer of any Interest to any Person who at the time of such distribution appears on the books of the Partnership as the Partner entitled thereto.

(b) Void. Except as otherwise expressly required by applicable law or as otherwise consented to by all of the Partners, any act or attempted act by any Partner in violation of Article X, XI or this Article XII shall be null and void ab initio.

Section 12.3 Effectuating Action. The General Partner shall take all action, including, but not limited to, the transfer of any Interests, any amendment of this Agreement and/or the Certificate and/or the effectuation of any new Certificate of Limited Partnership, all as may be required to effectuate any of the provisions of Articles X, XI or this Article XII.

Section 12.4 Third Party Sale or Disposition and Right of First Refusal. Any Partner who receives a bona fide offer from an unaffiliated third party to purchase all or any part of its Interest in the Partnership (and which offer such Partner desires to accept) shall provide to the other Partner(s) written notice of its intention to sell. The selling Partner (herein called "Offeror") shall include in such notice an offer to sell the Interest in the Partnership affected by such offer to the other Partner(s) (herein collectively called the "Offeree"), all according to the following terms and conditions:

(a) Such offer shall be in writing and shall be sent by facsimile or by United States certified or registered mail, postage prepaid, return receipt requested, to the

PLTF003393

Offeree's address, stating the terms of the bona fide offer received by the Offeror and the closing date and giving the Offeree the right to purchase Offeror's Interest on the same terms. In addition, such offer shall fully disclose the identity of such third party making such offer, and, to the extent known or made available to the Offeror, the financial status of the third party making such bona fide offer, and, to the full extent known or otherwise available to the Offeror, the Offeror shall provide such information as the Offeree may reasonably require concerning the true party-in-interest making such bona fide offer to Offeror.

(b) The Offeree shall have ten (10) days after the receipt of such notice within which to indicate in writing whether it will buy the Interest of the Offeror in accordance with such offer. If the Offeree indicates that it will buy in accordance with such notice within such time provided, the Offeror will be bound accordingly to complete the transaction as hereinafter provided. If the Offeree does not indicate within the said ten (10) days, it shall be deemed to have elected not to buy the Offeror's Interest on the terms indicated in the written offer made by Offeror.

(c) If the Offeree accepts such offer, the Offeree shall consummate the purchase of the Interest of the Offeror on the date provided in and in accordance with the terms of said offer. Upon payment or tender of the consideration due for the Interest to be purchased and sold as aforesaid, the Offeror shall forthwith execute and deliver to the Offeree such bills of sale, assignments and conveyances as shall be necessary to transfer all of the Offeror's rights, title and interest in and to the Partnership, and the assets thereof, to the Offeree. Upon the consummation of a sale under the above stated provisions, all subsequently resulting losses, profits, gains, credits or distributions from the development, operation and sale of the Interest so purchased shall be solely attributable to and be borne by the Offeree.

(d) In the event the Offeree does not exercise its right to purchase the Offeror's Interest herein, then the Offeror may sell its Interest to the third party purchaser on the same terms and conditions of the offer submitted to the Offeree herein; provided, however, that in the event the Interest in the Partnership is offered to such third party at a price lower than the price at which it was offered to the Offeree, or on more favorable terms, or in the event the sale to such third party is not consummated within the time period provided in the offer, the Offeror again must offer to the Offeree the right of first refusal at the lower price or more favorable terms, or in the latter event, upon the same terms, under the same procedure described above. In the event that an Interest in the Partnership is sold to a third party purchaser under this Section, the third party purchaser shall become an assignee of the selling Partner's Interest and shall expressly assume in writing all of the duties, responsibilities and liabilities of the selling Partnership.

(e) In the event the Offeree consists of more than one person or entity, the offer shall be transmitted simultaneously by the Offeror to all parties comprising the Offeree, and each party comprising the Offeree may exercise the right to purchase the Interest covered by such offer in the same proportion that the Interest of each person comprising the Offeree bears to the total of all Interests held by all persons comprising

PLTF003394

the Offeree. In the event that more than one person or entity comprises the Offeree, however, each person comprising the Offeree shall be required to notify the other persons comprising the Offeree within five (5) business days following the receipt of such offer whether they will elect to purchase the Interest covered by such offer. In the event one or more of such persons comprising the Offeree desire to accept such offer, and one or more of such persons comprising the Offeree desire to decline such offer, the parties desiring to accept such offer may elect to purchase the Interest subject to such offer in such proportions as they may determine, and in the absence of agreement, each party desiring to purchase shall be entitled to purchase a part of the Interest covered by such offer in the same proportion that the Interest of each person desiring to purchase bears to the total Interests of all persons desiring to purchase. In the event, however, that the persons desiring to purchase the Interest covered by such offer do not elect to purchase the entire Interest covered by such offer, the Offeree shall be deemed to have elected not to purchase the Interest of the Offeror pursuant to such offer.

Section 12.5 Intentionally Deleted.

Section 12.6 Intentionally Deleted.

## ARTICLE XIII

## DISSOLUTION

Section 13.1 Liquidation of Partnership. In the event of a dissolution of the Partnership pursuant to Section 3.1 of this Agreement after which the Partnership is not reconstituted and its business continued, the General Partner or, in the event of a dissolution in which there is no General Partner, a special liquidator ("Special Liquidator") appointed by the Limited Partner shall immediately commence to wind up Partnership affairs and shall liquidate the assets of the Partnership as promptly as possible in an orderly and business-like manner so as not to involve undue sacrifice, as the General Partner (or Special Liquidator, as the case may be) in its discretion shall determine.

Section 13.2 Procedures on Liquidation.

(a) Examination. Upon dissolution of the Partnership, to the extent Partnership funds are available therefor, the General Partner (or Special Liquidator, as the case may be) may cause the Accountants to perform an examination of the assets and liabilities of the Partnership as of the date of dissolution, and such statement shall be furnished to all Partners as soon thereafter as is practicable.

(b) Distribution. In the event of liquidation, the assets of the Partnership or the Cash Proceeds thereof shall be applied and distributed in the following order of priority:

(i) to the payment of the debts and liabilities of the Partnership (other than Partners who are creditors solely as a result of application of the TLPL), and the expenses of liquidation, including, but not limited to, the reasonable fees of the

PLTF003395

Special Liquidator, if applicable;

(ii) to the setting up of any reserves which the General Partner (or Special Liquidator, as the case may be) may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership, which reserves shall be paid over to a bank, as escrow-holder, to be held by it for the purpose of disbursing (under the direction of the General Partner or Special Liquidator, as the case may be) such reserves in payment of any of the aforementioned liabilities and obligations and, at the expiration of such period as the General Partner (or Special Liquidator, as the case may be) may deem advisable, for distribution in the manner hereinafter provided;

(iii) to the payment of debts and liabilities of the Partnership to Partners to the extent they are creditors solely as a result of application of the TLPL;

(vi) to the extent that the Partners have not previously received distributions in accordance with Section 9.2 or Section 9.3 in an amount equal to the sum of all Capital Contributions previously made by the Partners, to the Partners, on a prorata basis, until they have each received distributions equal to the amount of all Capital Contributions previously made by them to the Partnership; then

(vii) to the extent there remains any additional assets of the Partnership or Cash Proceeds, they shall be distributed to the Partners prorata based on the Interest of each Partner in effect at the time of such distribution.

Section 13.3 No Release. No dissolution of the Partnership shall release or relieve any of the Partners or any of their respective successors, assigns, heirs or legal representatives, from any previous breach or default of, or from any obligations theretofore incurred or accrued under, any of the provisions of this Agreement, except to the extent otherwise expressly provided herein.

ARTICLE XIV

ACCOUNTS AND RECORDS; ACCOUNTANTS

Section 14.1 Accounting Methods; Fiscal Year. The books of account of the Partnership shall be kept on the method selected by the General Partner. The Fiscal Year of the Partnership shall be the calendar year.

Section 14.2 Records and Books of Account.

(a) Maintenance. The General Partner shall maintain, or cause to be maintained, complete and accurate records and books of account of all transactions of the Partnership wherein shall be entered all transactions, matters and things relating to the Partnership's business as are usually entered into books of account kept by persons engaged in a business of a like character, all on the

PLTF003396

method of accounting selected by the General Partner.

(b) Location. All of such records and books of account together with all other documents and files of the Partnership, including, but not limited to, copies of all documents prepared by the General Partner and all correspondence and drafts of documents, shall, at all times, be kept at the office for records of the Partnership established pursuant to Section 2.4, and all such records, books of account, documents and files shall be the exclusive property of the Partnership. Upon an Event of Withdrawal of a General Partner, all such records, books of account, documents and files shall remain in the exclusive possession of the Partnership. At any time and from time to time while the Partnership continues and until its complete liquidation (but only during reasonable business hours), the Limited Partner, and/or any accountant or other professional or representative employed by it may, at such Limited Partner's own expense and upon at least five business days' prior written notice to the General Partner, fully examine, inspect, make copies and audit the Partnership's books, records, accounts and assets.

Section 14.3 Elections and Adjustments. The General Partner, in its sole discretion, shall be permitted in any Fiscal Year to make such tax elections as it may from time to time deem necessary or appropriate. In addition, upon receipt of a notice from any Partner requesting that the Partnership file an election pursuant to Section 754 of the Code, the Partnership shall file such election. In the case of a Section 754 election, any additional fees or expenses resulting from the initial accounting set-up for such election shall be borne by the Persons for whom the permitted adjustments to basis as provided for in Code Section 734 and 743 are made. If a Section 754 election is filed, the General Partner will be required to provide additional accounting or tax information with respect to any adjustment to basis for the Limited Partner, provided such information is reasonably within the General Partner's knowledge. The Partners agree to provide the Partnership with such information as they possess which is required to give effect to any Section 754 election made by the Partnership.

Section 14.4 Tax Returns. As soon as practicable after the end of each Fiscal Year of the Partnership, and no later than March 31 of each Fiscal Year, the General Partner shall deliver to the Limited Partner such information as shall be necessary for the preparation by the Limited Partner of their federal income tax return. The General Partner shall also prepare or cause to be prepared all tax and information returns which the Partnership is required to file and the same shall be filed by the General Partner within the time prescribed by law for the filing of each such return.

Section 14.5 Tax Matters Partner. In accordance with the provisions of Section 6231 of the Code, the General Partner will be treated as the "tax matters partner" of the Partnership pursuant to Section 6231(a)(7) of the Code. The General Partner shall take such action as may be necessary to cause all Partners to become "notice partners" within the applicable provisions of the Code. The General Partner shall keep all other Partners informed of all matters which may come to the attention of the General Partner in its capacity as tax matters partner by giving the other Partners notice thereof within thirty (30) days after the General Partner becomes informed of any such matter. The General Partner may not take any action contemplated by Sections 6222

PLTF003397

through 6232 of the Code without the consent of a Majority Interest of the Limited Partner, but this sentence does not authorize the General Partner to take any action left to the determination of an individual Partner under Sections 6222 through 6232 of the Code.

## ARTICLE XV

## CONSENT OF LIMITED PARTNERS

Whenever the consent of the Limited Partner is required under this Agreement or applicable law or is otherwise requested by the General Partner in connection with any proposed action, the General Partner shall give notice of such proposed action to the Limited Partner. If after ten (10) business days the Limited Partner has not objected to the taking of such action by delivering such proper notice of its objection to the General Partner, the Limited Partner will be deemed to have consented to the taking of the action. The foregoing shall not apply in the case of an Event of Withdrawal of a sole General Partner as described in Section 11.2(b). In that event, such General Partner will be required to give notice of the Event of Withdrawal as provided in Section 11.2(b), but the Limited Partner must affirmatively elect to continue the Partnership business and appoint a substitute General Partner.

## ARTICLE XVI

## MISCELLANEOUS

Section 16.1 Recipient of Distributions and Payments. All distributions and payments of cash or property to be made pursuant to the provisions of this Agreement shall be made directly to the parties who are entitled thereto at their respective addresses indicated in the records of the Partnership or at such other address as shall have been set forth in a notice sent pursuant to the provisions of Section 16.2 hereof.

Section 16.2 Communications. Except as otherwise expressly provided in this Agreement, any election, approval, consent, objection, request, waiver, notice or other document required or permitted to be made or given pursuant to any provisions of this Agreement, shall be deemed duly made or given, as the case may be, if in writing, signed by or on behalf of the Person making or giving the same, and shall be deemed completed when either (a) personally delivered (with receipt acknowledged by the recipient), or (b) sent by electronic facsimile, provided a copy of such document is sent to such party the same day by one of the other methods set forth herein, or (c) deposited for delivery by Federal Express or other similar overnight courier service; addressed to the Person or Persons to whom such election, approval, consent, objection, request, waiver, notice or other document is to be made or given at their respective addresses, as reflected in the records of the Partnership. Any party hereto shall have the right to change its address hereunder by sending notice to all other parties hereto pursuant to this Section.

Section 16.3 Entire Agreement; Applicable Law; Effect. This Agreement contains the entire agreement by and among the parties with respect to the ownership and operation of the Partnership. The parties have now and expect to have in the future agreements that affect the Partners, such as matters relating to competition, and other business relationships of the Partners.

PLTF003398

This Agreement shall be construed, enforced and governed in conformity with the laws of the State of Texas and the TLPL, without giving effect to principles of conflicts of law, and shall be binding upon the parties hereto, their successors, heirs, devisees, permitted assigns, legal representatives, executors and administrators, but shall not be deemed for the benefit of creditors or any other Persons.

Section 16.4 Modification; Waiver or Termination. Except as otherwise expressly provided in this Agreement, no modification, waiver or termination of this Agreement, or any part hereof, shall be effective unless made in writing signed by the party sought to be bound thereby, and no failure to pursue or elect any remedy shall constitute a waiver of any default under or breach of any provision of this Agreement, nor shall any waiver of any default under or breach of any provision of this Agreement be deemed to be a waiver of any other subsequent similar or different default under or breach of such or any other provision or of any election or remedies available in connection therewith. Receipt by any party of any money or other consideration due under this Agreement, with or without knowledge of any breach of default, shall not constitute a waiver of such breach or default of any provision of this Agreement.

Section 16.5 Counterparts. This Agreement may be executed in one or more counterparts and, notwithstanding that all of the parties did not execute the same counterpart, each of such counterparts shall, for all purposes, be deemed to be an original, and all of such counterparts shall constitute one and the same instrument binding on all of the parties hereto.

Section 16.6 Separability. Each provision of this Agreement shall be considered separable and (a) if for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, and (b) if for any reason any provision or provisions of this Agreement would subject the Limited Partner to any personal liability for the obligations of the Partnership under the laws of the State of Texas or any other laws, as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

Section 16.7 Article and Section Headings. Article and section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference, and shall not be construed in any way to define, limit, extend or describe the scope of any of the provisions hereof.

Section 16.8 Word Meanings. The words such as "herein," "hereinafter "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

Section 16.9 Exhibits. All exhibits annexed hereto are expressly made a part of this Agreement, as fully as though completely set forth herein.

Section 16.10 Survival of Covenants. Etc. The covenants and other statements set forth

PLTF003399

in this Agreement shall survive execution and delivery hereof and making of the Capital Contributions provided for herein. All of the same shall be deemed to be independently material and to have been relied upon by the party or parties to whom made.

Section 16.11 <u>Further Actions</u>. Each of the Partners shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the provisions hereof.

## ARTICLE XVII

## PROHIBITION RE PARTITION

Each of the parties hereto does hereby permanently waive and relinquish any and all rights he or it may have to cause any asset of the Partnership to be partitioned, it being the intention of the parties to prohibit any party hereto from bringing a suit for partition against the Partnership or the other parties hereto.

*(Signature Page Follows)*

*(The remainder of this page was intentionally left blank.)*

PLTF003400

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of (though not necessarily on) the 27th day of December, 2013.

GENERAL PARTNER:

FRISCO MULTIFAMILY LAND GP, LLC, a Texas limited liability company

By: _____

Printice L. Gary
Manager

LIMITED PARTNERS:

FRISCO SUMMIT, L.P., a Texas limited partnership

By:    Frisco Summit GP, LLC, a Texas limited liability company, General Partner

By:_____
Stanley V. Graff, Manager

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of (though not necessarily on) the 27th day of December, 2013.

GENERAL PARTNER:

FRISCO MULTIFAMILY LAND GP, LLC, a
Texas limited liability company

By: _____
      Printice L. Gary
      Manager

LIMITED PARTNERS:

FRISCO SUMMIT, L.P., a Texas limited
partnership

By:    Frisco Summit GP, LLC, a Texas limited
      liability company, General Partner

      By:_____
          Stanley V. Graff, Manager

PLTF003402

to
Agreement of Limited Partnership of
Frisco Multifamily Land Partners, LP

| Partner/Address | Interest | Initial Contribution |
|---|---|---|
| **General Partner**<br>Frisco Multifamily Land GP, LLC<br>5485 Beltline Road, Suite 300<br>Dallas, Texas 75254 | 1% | $10.00 in cash |
| **Limited Partner**<br>Frisco Summit, L.P.<br>8901 Governor's Row<br>Dallas, Texas 75247 | 99% | The Property and $450,000 in cash |
| | 100% | |

## SCHEDULE 2

### to
### Agreement of Limited Partnership of
### Frisco Multifamily Land Partners, LP

### Representations and Warranties of the Limited Partner

The following representations and warranties are made as of the date this Agreement is executed after having been carefully read and confirmed by the Limited Partner.

1.  The Limited Partner has not received any notice of any violation of any ordinance, regulation, law or statute from any governmental agency regarding the Property which has not been complied with.

2.  To the best of the Limited Partner's knowledge, the documents and information provided, or made available, to the Partnership regarding the Property are true, correct and complete originals or copies, as the case may be, of what they purport to be.

3.  No party has been granted any license, lease, or other right relating to the use or possession of the Property, or any part thereof, except (a) the tenant under that certain grazing lease which affords the owner of the Property an ad valorem tax exemption (the "Grazing Lease"), and (b) as may be disclosed in that certain Commitment for Title Insurance issued by Fidelity National Title Insurance Company under GF No. FTDAL34-4403400502.

4.  The Limited Partner has not received any notice from any insurance company or board of fire underwriters requesting the performance of any work or alteration with respect to the Property that has not been performed, or requiring an increase in the insurance rates applicable to the Property.

5.  To the best of the Limited Partner's knowledge, there are no pending condemnation actions with respect to the Property. The Limited Partner has not received any written notice of any such condemnation action being contemplated. To the best of the Limited Partner's knowledge, there are no contemplated public improvements which will or would result in any charge being levied or assessed against, or in the creation of any lien upon, the Property.

6.  Other than the Grazing Lease, there are no options, purchase contracts or leases, written or oral, whereunder or whereby any person has or could claim or assert any right, title or interest in, or right to acquire, the Property.

7.  There is no litigation, action or proceeding pending or, to the best of the Limited Partner's knowledge, threatened, against the Limited Partner or the Property before any court or administrative agency relating to the Property.

PLTF003404

8. There are no management, maintenance, operating, service or any other contracts or leases affecting the Property which are not terminable upon the delivery of thirty (30) days prior written notice.

9. The Limited Partner has received no written notice from any governmental authority stating that the Property is in violation of any law relating to the manufacture, disposal or storage of any substance which is designated, defined, classified or regulated as a hazardous substance, hazardous material, hazardous waste, pollutant or contaminant under any local, state or federal law.

10. Neither this Agreement nor anything provided to be done hereunder, including, without limitation, the contribution and transfer of the Property to the Partnership, violates or shall violate any written or oral contract, agreement or instrument to which the Limited Partner is a party or which affects the Property.

11. The execution, delivery and performance of this Agreement by the Limited Partner, and the contribution and transfer of the Property to the Partnership by the Limited Partner, have been duly and validly authorized by all necessary action and proceedings, and no further action or authorization is necessary on the part of the Limited Partner in order to consummate the transactions contemplated herein. This Agreement is the legal, valid and binding obligations of the Limited Partner, enforceable in accordance with its terms.

12. All income and ordinary operating expenses of the Property, including, without limitation, public utility charges, maintenance, management, and other service charges, leasing commissions, and all other normal operating charges with respect to the Property have been paid and extinguished by the Limited Partner as of the date of this Agreement.

13. Except for Roger Gault (the "Broker"), the Limited Partner has not contacted or entered into any agreement with any real estate broker or other broker, agent, finder, or any other party in connection with the Property, and that, except for payments due to the Broker in accordance with a separate agreement a copy of which has been provided to the General Partner, the Limited Partner has not taken any action which would result in any real estate broker's, finder's, or other fees or commissions being due or payable to any party with respect to the Property.

THE LIMITED PARTNER HEREBY INDEMNIFIES AND AGREES TO HOLD THE PARTNERSHIP AND THE GENERAL PARTNER HARMLESS FROM ANY LOSS, LIABILITY, DAMAGE, COST, OR EXPENSE (INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEY'S FEES) RESULTING TO THE PARTNERSHIP BY REASON OF A BREACH OF THE REPRESENTATIONS AND WARRANTIES MADE BY THE LIMITED PARTNER IN THIS SCHEDULE 2.

PLTF003405

# EXHIBIT "A"

## DESCRIPTION OF PROPERTY



02150.121

PLTF003406



| | | |
|---|---|---|
| FRISCO SUMMIT, LP, and FRISCO | § | IN THE DISTRICT COURT |
| SUMMIT, LP DERIVATIVELY ON | § | |
| BEHALF OF FRISCO | § | |
| MULTIFAMILY LAND PARTNERS, | § | |
| LP, | § | |
| | § | 493rd JUDICIAL DISTRICT |
| Plaintiffs | § | |
| v. | § | |
| FRISCO MULTIFAMILY LAND GP, | § | |
| LLC, et al., | § | |
| | § | |
| Defendants | § | COLLIN COUNTY, TEXAS |

### DECLARATION OF MITCHELL MADDEN

I, MITCHELL MADDEN, declare:

1. "My name is Mitchell Madden. I am over the age of twenty-one (21) years and am fully competent to make this declaration. I have never been convicted of a felony or a crime involving moral turpitude. The facts stated herein are true and correct and within my personal knowledge.

2. I am lead counsel for Plaintiffs Frisco Summit, LP and Frisco Summit, LP Derivatively on behalf of Frisco Multifamily Land Partners, LP ("Plaintiffs") in the above-styled case. I have personal knowledge of the matters testified to in this Declaration from my work as counsel in this lawsuit and they are all true and correct.

#### A. Information related to Plaintiffs' expert, Rhys Heinsch

3. Rhys Heinsch is a principal of Catalyst Urban Development ("Catalyst") and his background and expertise as it relates to multi-family development in areas such as Frisco, Texas, is as set forth in the Company's website at www.catalysturban.com. His general resume as reflected on the Catalyst website is excerpted and attached hereto as **Exhibit 1**, and it is true and correct.

4. Information regarding Catalyst's operations in general and the consulting services it offers excerpted from the website. True and correct copies of that information, which accurately describes Catalyst's general operations and services are attached hereto as **Exhibits 2** and **3** respectively.

5. Mr. Heinsch was requested by Plaintiffs in the above-styled case (the "Lawsuit")to address two issues with respect to the claims made the basis of the Lawsuit. First, to evaluate issues regarding the Plaintiffs' economic interest in the Phase I Project Partnership considering the

Partnership Agreement between the parties which provided that the Plaintiffs have the following economic interests in that Partnership:

> (ii) Notwithstanding the authority given to the General Partner to enter into the Purchase Contracts with Carleton Development, the General Partner shall not have the power or authority to consummate the sales contemplated by the Purchase Contracts (i.e., the General Partner may not execute any warranty deed conveying any portion of the Property to a Project Partnership) unless the Project Partnership Agreement of the Property to a Project Partnership) unless the Project Partnership Agreement for the Project Partnership then acquiring a portion of the Property (i) provides for the Limited Partner to be admitted as a special limited partner in such Project Partnership without any obligations or liabilities of any kind, and (ii) provides for the Limited Partner to receive 50% of any Promote Fee. The General Partner and Carleton Development acknowledge and agree that the Limited Partner's receipt of 50% of the Promote Fee is a material inducement to the Limited Partner entering into this Agreement.[1]

1.      Second, Mr. Heinsch was asked to express opinions on whether the project's three phases were developed within a reasonable time, and more importantly, why Phase II and Phase III land of this Project turned out to be the only land available for multi-family development within the relevant sub-market and immediate area that went undeveloped prior to the impacts of, and the macro-economic effects of, the COVID-19 pandemic. As the Catalyst website shows, Mr. Heinsch was directly involved in the development of a luxury apartment complex located in the same submarket as the Project made the basis of this suit. A true and correct copy of which is attached as **Exhibit 6**.

6.      One of the few substantive documents originally produced by Defendants is an email with an attached reference BOV (or "Broker's Opinion of Value") that was prepared by International Property Advisors ("IPA") in connection with the offering for sale of the first Phase of the Project Partnership known as the Echelon at the Summit. IPA, as part of its opinion of value, chronicles recent Dallas Class A executions. See the page labelled Defendant000465 of **Exhibit 7**, a true and correct copy of which is attached hereto. Notably, two of the first three properties identified, the Huntington (which is noted to be less than a mile from the Echelon at the Summits), and the Village of Rowlett, are both properties with which Catalyst and Mr. Heinsch were directly involved.

7.      Based upon his review of information disclosed in this Lawsuit by Defendants, and based upon his background and experience, Mr. Heinsch's preliminary opinion was that this Project did not "meet the market" and the Defendants failed to timely develop Phases II and III. See Plaintiffs' Preliminary Expert Designation. A true and correct of which is attached hereto as **Exhibit 8**.

---

1 Including the profit Defendants in the above-captioned matter ("Defendants") enjoyed from the purchase and sale price of the land for the first Phase in connection with that Phase of the Development. Discovery has disclosed that Defendants acquired the property from the Partnership for a total price of approximately $2.77 million, see a true and correct copy of **Exhibit 4**, attached and on the same day sold the property to the First Phase Limited Partnership for approximately $3.7 million, a true and correct copy of which is attached as **Exhibit 5**.

8.      Indeed, the IPA report correctly discloses (See Exhibit 7 page Defendant472) that all of the available land zoned for multi-family development within the sub-market of this Project had either been developed or was under construction by the Summer of 2021.  See also page ___ as to the status of all construction within the sub-market.  Indeed, the same would have been true for the area in north Plano along Legacy Parkway to the south and the area immediately to the east in west McKinney.  For example, prior to the COVID-19 pandemic, immediately to the east of the location of Echelon at the Summit and the Huntington in southeast Frisco, a 3-phase 1800-unit development had been completed at the project known as Craig's Ranch.  *See* true and correct copy of the article, attached as **Exhibit 9.**  Moreover, by the end of 2019, it was well known that the City of Plano was no longer zoning additional multi-family development in the north Plano/Legacy sub-market.  See the information regarding the City Council's denial of zoning and development to develop a large multi-family development at the JC Penney site true and correct copies of which are attached hereto as **Exhibits 10 and 11**.

9.      Based upon the Defendants' lack of production and to inform Mr. Heinsch's final opinion, Plaintiffs requested underlying documents regarding factors that would explain why Defendants were the only developers that did not develop all available multifamily-zoned land by 2021.  This includes (1) governmental constraints (including zoning, permitting, entitlements, and the like); (2) claimed characteristics of the Property (such as encumbrances or topography); (3) issues that arose in the planning and design of a Project; (4) aspects of construction (including costs, availability of subcontractors and timing); (5) construction and temporary financing; (6) equity investment (including the demands or conditions placed upon such investment by potential investors); and ultimately (7) the successful operation of a multi-family project (through lease-up and stabilization).

10.     As is detailed in the Motion to Compel and evidence filed therewith, both prior to and in the litigation, the Defendants have to date provided little or no detailed documentation regarding Phase I as to the following in their original production: (1) the timing or completion of either engineering or architectural plans or designs; (2) submissions and approval of those plans by governmental officials; (3) efforts to identify subcontractors and establish a timeline and budget for construction; or (4) the timing of solicitations of the institutional lenders identify Bank of America ("BOA").  Moreover, despite requests, Defendants did not produce any underlying documentation regarding the solicitation of equity investors or any demands, conditions, or restraints from them with respect to their investment in Phase I of the Project Partnership or documents regarding the Loan or Loan Application with BOA.  Moreover, despite requests there are no documents reflecting whether or not there were issues regarding the timely construction or completion of Phase I of the Property once the construction was commenced.  Finally, despite requests there had been no production of documents showing any underlying financial operations of the Partnership Property from the time that the first units were completed and lease-up began.  Nor, despite requests, have there been any documentation or information provided regarding the lease-up of the Project or the timing of rent stabilization.

11.     Additionally, Defendants have offered no explanation and produced no documents with respect to the 15-month delay between the zoning approval in August of 2014 and the commencement of construction of the first Phase in 2016.

**1041**

12.    None of this type of information had been produced with respect to the development of either Phase II or Phase III. For example, documents necessary to determine issues regarding timely development of Phases II and III, would have included, among others, the following which were identified in the deposition of the individual Defendants:

a.    Agreements, estimates, and/or bids with respect to subcontractors for Phase II of the Project as referenced in Mr. Hildebrandt's deposition at page 50:15-51:12.

b.    Construction budgets generated by Mr. Hildebrandt in connection with Phases I and II of the Project including, but not limited to, the preliminary construction budgets that Mr. Hildebrandt believes he prepared in connection with information generated by Mr. Fulenchek in September of 2013 and in November of 2015 as referenced in his deposition at pages 17:25-18:6; 19:21-20:7; 23:13-25; 38:3-20; 50:15-51:12, and internal communications about the construction budgets.

c.    Federal income tax returns for Frisco Summit I, LP for calendar years 2016-2022, with any personal information, which includes but is not limited to SSNs and other identifying information, produced as "Confidential" subject to a protective order;

d.    Monthly construction status reports that reflect the construction or contemplated construction of Phase I or Phase II identified by Mr. Hildebrandt in his deposition at pages 45:20-46:4 (redacted with respect to projects other than Phase I or Phase II made the basis of this suit).

e.    Certificate(s) of Occupancy obtained on Phase I construction of the Project.

f.    The initial architectural plans and drawings, and engineer plans and drawings for Phase II.

g.    The final architectural plans and drawings, and engineer drawings as submitted to the City of Frisco for Phase II.

h.    All correspondence and communications between the Defendants or their affiliates and the representatives of the City of Frisco with respect to request for issuance of a Permit(s) for the construction of Phase II, including but not limited to, documents evidencing the "$1 million" that was due for the issuance of the Permit on Phase II as testified by Mr. Fulenchek at page 50:1-14; 52:8-21 and any renewal or reapplication for such Permit(s).

i.    Mr. Hildebrandt's email correspondence and communications attempting to secure or maintain the agriculture exemption on the Property as referenced in his deposition at pages 30:24-32:9.

j.    Correspondence and communication with Bank of America regarding the construction and semi-perm financing for Phase I of the Property, including loan application(s).

**1042**

k.  Loan commitments and preliminary loan commitments from potential construction lenders for Phase II of the Property.

l.  Documents reflecting construction financing solicited by Salt River Capital for the Phase II Development of the Project, including loan application(s).

m.  A summary of contributions and distributions for the Limited Partners of Frisco Summit I, LP, and bank statements from Frisco Summit I, LP, which track the distributions, produced as "Confidential" subject to a protective order.

n.  Documents reflecting the annual budget of FMLP as provided for in the FMLP LPA.

o.  Agreements or correspondence with any Limited Partner Investor in Phase I regarding or relating to the timing of the development of Phases II and III of the Project.

p.  Documents that the Defendants contend show the lease-up of Phase I, including any delays in the lease-up of Phase I.

q.  Documents reflecting agreements with respect to the management of Phase I of the property, including information regarding the termination of Lincoln Properties.

13.  Moreover, due to the relationship with the institutional lender, Bank of America ("BOA"), it would have been important to commence the planning of the second Phase while the first Phase was being completed. However, despite the fact that deposition discovery has disclosed that at some point in 2018 or 2019 the Defendants had designed and planned the second Phase and had received governmental approval for the issuance of a construction permit for that phase, Defendants failed to take down that permit at that time and commence construction. Apparently, this failure was based upon Defendants' belief that there was an over-abundance of market competition and worse than anticipated lease-up. See pages 123:2-124:22 of Printice Gary deposition **Exhibit 12.** However, as discussed below at paragraph C, to date Defendants have failed and refused to produce any documents to support a contention that there were problems with the property manager, Lincoln Property, or that lease-up of Phase I justified the failure to commence the construction of Phase II.

14.  In my opinion, to evaluate whether or not any of the above-referenced elements of the construction process reasonably support a contention that the failure to develop Phase II of the property was reasonable, must involve a review of all such underlying documentation or information. As set forth below, late Friday April 26, 2024, the Defendants supplemented their production to include some, but not necessarily all, of their documents referenced in paragraph 13 above.

15.  With respect to an evaluation of the Plaintiffs' economic interests in the Phase I development, prior to the commencement of the Lawsuit and despite demand, all that was

**1043**

provided to the Plaintiffs with respect to a calculation of the Plaintiffs' interest in the Defendants' "promote fee," was a draft K-1 for the year of 2021[2] and an Excel spreadsheet of amounts with respect to claimed profits from the operation and sale of the Property and amounts claimed to have been contributed by and paid or disbursed to the Limited Partners.[3]

16.     Finally, in order to assess the economics of the Special Limited Partner interest to be provided to the Plaintiffs at no cost or expense, information regarding the Limited Partners' investment and interest in the Partnership, the Defendants' separate Limited Partnership interest in the Limited Partnership, and the detailed results of operations of the Partnership, would likewise be necessary.[4]  And it would likewise be necessary to verify the actual amounts invested by the Limited Partners.  Despite requests, none of this information has been provided by Defendants, either.

17.     Finally, with respect to the development of Phases II and III, it would be important to ascertain whether or not, as a condition of investment, the equity investors in Phase I place limitations, terms, or conditions on the timing of the development of Phases II and III of the Project.  Defendants have refused to provide such information despite request.

## B.  Identified categories of documents not resolved by the Agreed Order

18.     The following documents or category of documents that could not be agreed to in the meet and confer should be produced:

A.     Documents to support their contention that the lease-up or rent stabilization of Phase I was the result of poor performance by the property manager, Lincoln Properties, and resulted in the termination of Lincoln Properties as the property manager and that was the basis for the Defendants failing to move forward with the issuance of the permit for Phase II in 2018 or 2019.

B.     Correspondence and communications with the initial investor/limited partners in the first Phase Partnership, Frisco Summit I, LP, including  but not limited to solicitations and the timing of the development of Phases II and III of the Projects;[5]

C.     Underlying supporting documentation to support the Defendants' allegation of the results of financial information of the Frisco Summit I, LP and its general partner, Frisco Summit GP, LLC and documents supporting the Defendants' contentions regarding the distributions to the partners of the Frisco Summit I, LP pursuant to its "waterfall" provisions.

---

2 The ultimate sale of the Echelon apartments to a third party
3 See Defendant1206 from Exhibit 33 to the deposition of Stanley V. Graff a true and correct copy of which is attached hereto as **Exhibit 13**.
4 Indeed, Plaintiffs held a 50% member interest in the General Partner of the first Phase Limited Partnership.
5 For example, the Defendants were unable to explain the 15-month delay between obtaining zoning and contracting to commence Phase I. In part, recent production may explain that delay. See for example Defendants14048-140050 **Exhibit 17** attached which indicates that it wasn't until November that Defendants had come to an agreement with their "main equity source." Notably, the referenced "equity documents" involving that main equity source have not been produced.

## C. Documents still not produced in supplemental production April 26, 2024

19.     I incorporate by reference my Declaration as set forth in the Motion to Continue hearing filed on Monday morning, April 29 with respect to my and my staff's availability to review the production from late on the 26th.

20.     Since that time we have had only the weekend to commence a review of that production; however, that limited review indicates as follows:   The details regarding the production appear to be

    a.     The 4/26/24 supplemental production bates labeled Defendants 19327-21297 contains 1,310 discrete documents; and

    b.     The documents in the production are stamped "Defendants XXX" and underlying metadata with respect to custodians is "unspecified."  While there are a number of documents that include "file author," that information would not necessarily correspond to the custodian under the Rules.

21.     In particular, there appear to be no documents produced with respect to the following:

    a.     Bank of America application documents for the construction and temp-to-perm loans on Phase I of the Property (See Agreed Order ¶9). See Defendant14104-14105 and 14729-14730 checklist in ¶27below.

    b.     Construction budgets and, in particular, the construction budgets for Phase I that were generated in 2013 and 2015 and specifically identified and referenced by Mr. Hildebrand to support the projections and calculations prepared by Fulenchek and delivered to Plaintiffs.  (See Agreed Order ¶2).

    c.     Correspondence and communications with the City of Frisco, including references and support to the claim that there were $1 million of fees due with the issuance of the Permit. (See Agreed Order ¶7)  In this regard, and as set forth below in detail, the only document that apparently complies with this request is bates labelled Defendant19202-19219. Also, as set forth below the documents that have been produced do not correspond with the testimony and indicate a need for additional deposition testimony.  See ¶E below.

    D.     Monthly construction status reports that reflect the construction or contemplated construction of Phase II. (Agreed Order ¶3).

## D. Defendants' continued failure to segregate and properly provide responses to discovery requests

22.    As is set forth in the supporting documents referenced therein in Plaintiffs' original Motion to Compel, the Defendants failed to properly comply with the Rules with respect to the production. In particular, the Defendants filed an omnibus response and did not identify which party or parties were producing the documents and whether or not one or more of the parties had no such documents. Moreover, despite requests Defendants have failed to identify documents by bates label which documents are responsive to which request. In part, this was addressed by a paragraph in the Agreed Order of April 24, 2024 that for purposes of Rule 193.7 the Defendants stipulated that all documents were, in effect, produced by all Defendants.

23.    Moreover, the supplemental production made by the Defendants on April 26th was not supported by updated responses. By email dated May 1, 2024, a true and correct copy of which is attached hereto as **Exhibit 14** and incorporated by reference as though set forth herein at length, on behalf of the Plaintiffs I requested that the Defendants provide information necessary to comply with the applicable rules.

24.    Furthermore, on the afternoon of May 3, 2024, I had a telephone conference with opposing counsel, Ryan Marrone, and in that regard discussed the request as set forth in the above-referenced email. Mr. Marrone indicated he would not have the time nor the inclination to provide bates label ranges for each of the categories as set forth in the April 24, 2024 Agreed Order to Compel and would not affirmatively agree to indicate whether or not there were documents or categories of documents as referenced above in paragraph C which the Defendants, despite their deposition testimony, now contend do not exist or are not being produced.

### E. Additional deposition testimony is warranted

25.    Additionally, based upon the foregoing and based upon the limited review of the documents available to me and my staff since the production on April 26, 2024, in order to properly prepare for trial and in order to provide sufficient background and information to Plaintiffs' experts regarding the Plaintiffs' claims and, more importantly, the Defendants' contentions regarding those claims, it is important that the Plaintiffs have an opportunity to re-depose the Defendants regarding the information contained in certain key documents which have now been produced, which include but are not limited to the following:[6]

a)  Plan Review- Workflow Routing Slip (Defendant21254-21257);
b)  Frisco Multifamily Land Partners LP- Operating Budgets (Defendant21243-21253);
c)  January 6, 2021 Fulenchek Re: Frisco II with Rent Comps from IPA 12-202 and 10 Year CF-Echelon (Defendants18208-18214);
d)  December 16, 2020 Fulenchek Re: Frisco 2 Model (18190-18200);
e)  December 1, 2015 Email with Bank of America regarding Due Diligence Checklist (Defendants14104-14105);

---

[6] Notably, at the conclusion of each deposition, the Plaintiffs did not release the deponent but adjourned the deposition subject to the ultimate production of documents that were identified during the depositions. Excerpts in this regard are attached hereto as **Exhibits 12, 15, and 16** incorporated by reference as though set forth herein at length.

f) December 8, 2015 Email with Bank of America regarding Due Diligence Checklist (Defendants14729-14730);

g) Job Cost Entry Detail (Defendant21237-21241);

h) 2/21/22 Permit Set Plans Budget (Defendants19202-19219);

i) Frisco Summit Phase I vs Phase II Cost Analysis (Defendant18182);

j) Spreadsheet Summary of Partner Distributions (Defendant21285-21287);

k) November 1, 2022 Gary Holland email re Frisco II Bank Package (Defendant20498-20530); and

l) Multiple excel spreadsheets regarding Phase II construction with detailed documents and information which include: Projection Information Set Up; Permit Set Plans-Budget; Hard Cost Budget; Construction Services Report (Preliminary Budget); Pre Construction Summary and Bid Submission Reports (See Defendant19025)

26.     In addition, the following information or documents that have been produced, in my opinion, demonstrate that additional deposition testimony is warranted:

a) Apparently, by October of 2019, Carleton had moved all of their accounts with their prime banker, David Brock, to Bank of Texas, and were no longer doing business with Bank of America. See Defendants' 17959. While the Defendants have produced the Construction Loan Agreement, Guaranty Agreement, and related documents, and an email regarding the transmittal of the final loan documents dated December 30, 2015 (see 15837), they have apparently produced no correspondence or communications regarding the Application, nor the Original Application for the loan as called for in ¶10 of the Agreed Order. Moreover, the Due Diligence checklist provided demonstrate may additional documents which have not been produced;

b) Note that Defendants have produced a number of documents from 2022 regarding their solicitation of a number of banks regarding construction lending on Phase II. In June of 2022, Valerie Williams, on behalf of Bank of America, indicated that they do not do market rate developments at this time and Hall & Gary wrote Bank of Texas has no interest in Frisco II whatsoever. See Defendants 20107. Frost Bank did give Defendant a term sheet, at least one copy of which is 20239; however, by November of 2022 in exchanges between Defendants and a Kyle Webster (defendants 20542) they were raising concerns about the covenants and the guaranty that could not be met.

c) By October 6, 2022, there is a "revised SOV Budget" as 20491 and see, for example, 20492 to 20497. Note that we do not appear to have any construction budgets for Phase I including, with particularity, the ones generated in connection with the pro formas or projections that they provided Plaintiffs in 2013 prior to entering into

the JV and again in 2015 when they were getting ready to commence the construction of Phase I.

d)  With respect to Lincoln Properties, Defendants have produced the agreement (See 16843) and a termination letter dated March 28, 2018 (See 17274). The term of the Management Agreement was one year from January 2017 so the termination letter was not within 30 days of the expiration of the initial term. Note also that the letter states "as previously discussed, March 31, 2018 would be the final date of the Agreement." It doesn't speak at all to problems with management or lease-up but says "we appreciate the professional and *successful* relationship we have enjoyed throughout the term of this agreement." (Emphasis added)

e)  My and my staff's review have found no documents which reference "lease-up" or rent stabilization for Phase I, other than as contained in the BOV which is exhibit 55.

f)  With respect to the permitting and licensing, or the million-dollar fees, the only document I or my staff located is 19193, which is the project fee summary. It appears to be from 2022, not from 2018 or 2019.

g)  There is a 12-30-20 email from David Coenhour to Jeffrey Fulenchek noting he "won't be on the Frisco Phase II call next week so here are some thoughts." Plaintiffs have no information regarding a meeting.

27.    Finally, as set forth in the Supplement to the Motion to Compel, it is clear that based upon the additional documents produced by the Defendants relating to Phase II, there exist documents relating to Phase I that have not been produced including but not limited to:

* Documents that exist because they were part of the due diligence checklist and either given or received from Bank of America relating to Phase I (See Defendants14104-14105, 14729-14730):

    1.    Detailed Soft Cost Breakdown
    2.    Leasing Schedule
    3.    Lease Cost
    4.    Marketing Plan
    5.    Appraisal
    6.    Financial Statements
    7.    Project Proforma
    8.    Market Information

* Excel spreadsheets regarding Phase I construction with detailed documents and information as produced with regard to Phase II which include: Projection Information Set

**1048**

Up; Permit Set Plans-Budget; Hard Cost Budget; Construction Services Report (Preliminary Budget); Pre Construction Summary and Bid Submission Reports.)

FURTHER DECLARANT SAYETH NAUGHT.

JURAT

My name is Mitchell Madden, my date of birth is May 5, 1959, and my business address is 12801 N. Central Expressway, Suite 140, Dallas, Texas 75243. I declare under penalty of United States perjury that the foregoing is true and correct. Executed in Dallas County, Texas on May 6, 2024.

*/s/ Mitchell Madden*
Mitchell Madden

**1049**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Tania Flores on behalf of Mitchell Madden
Bar No. 12789350
tflores@hjmmlegal.com
Envelope ID: 106571568
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellant
Status as of 10/8/2025 7:04 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William NDrabble | | wdrabble@grayreed.com | 10/7/2025 7:37:59 PM | SENT |
| tania flores | | tflores@hjmmlegal.com | 10/7/2025 7:37:59 PM | SENT |
| Jim Moseley | | jmoseley@grayreed.com | 10/7/2025 7:37:59 PM | SENT |
| Christi Lillie | | clillie@grayreed.com | 10/7/2025 7:37:59 PM | SENT |
| Mitchell Madden | | Mmadden@hjmmlegal.com | 10/7/2025 7:37:59 PM | SENT |
| Shawnte Kinney | | skinney@hjmmlegal.com | 10/7/2025 7:37:59 PM | SENT |
| Melissa Johnson | | Melissa@hjmmlegal.com | 10/7/2025 7:37:59 PM | SENT |
| Ryan D.Marrone | | rmarrone@fbfk.law | 10/7/2025 7:37:59 PM | SENT |
| John D.Fraser | | jfraser@fbfk.law | 10/7/2025 7:37:59 PM | SENT |
| Luc J.Whyte | | lwhyte@fbfk.law | 10/7/2025 7:37:59 PM | SENT |